USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: _01/15/2015_

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------------x

IN RE:

GENERAL MOTORS LLC IGNITION SWITCH LITIGATION

*This Document Relates To All Actions*
------------------------------------------------------------------------------x

14-MD-2543 (JMF)

<u>OPINION AND ORDER</u>

JESSE M. FURMAN, United States District Judge:

     Less than one year ago, General Motors LLC ("New GM") announced the first of what would be become many recalls of its vehicles based on an ignition switch defect. Shortly after the first recall, New GM retained the law firm Jenner & Block LLP ("Jenner") and its chairperson, Anton Valukas, to conduct an internal investigation into the defect and the delays in recalling the affected vehicles. As part of their investigation, Valukas and his colleagues reviewed a vast number of documents and interviewed over 200 New GM employees and former employees, among others. The result was a written report (the "Valukas Report") that New GM submitted to Congress, the Department of Justice ("DOJ"), and the National Highway Traffic Safety Administration ("NHTSA"), among others.

     Plaintiffs in this multi-district litigation proceeding ("MDL") bring claims relating to the subject matter of the Valukas Report, namely the ignition switch defect. As part of discovery, New GM has disclosed the Valukas Report itself, and has agreed to disclose on a rolling basis every New GM document cited in the Report, including otherwise privileged documents (pursuant to a Federal Rule of Evidence 502(d) order). But it refuses to disclose other materials underlying the Valukas investigation, particularly notes and memoranda relating to the witness interviews conducted by the Jenner lawyers. The principal question here is whether those

materials are protected from disclosure by either or both the attorney-client privilege or the attorney work product doctrine.

For the reasons that follow, the Court agrees with New GM that the materials at issue are protected by both the attorney-client privilege and the attorney work product doctrine and that New GM has not waived either form of protection as to the materials at issue.  Accordingly, New GM need not produce them in discovery at this time.

## BACKGROUND

As noted, this MDL relates to defects in certain General Motors vehicles and associated product recalls, general familiarity with which is assumed.  The following facts are taken from the parties' briefs (14-MD-2543 Docket Nos. 437, 438, 465, 466) and are included by way of background to the privilege issues addressed in this Opinion and Order.

In February 2014, New GM announced the first recall of GM-brand vehicles based on an ignition switch defect.  (Def. General Motors LLC's Br. Regarding Privileged Interview Notes & Mem. (Docket No. 437) ("New GM's Opening Br.") 1, 3.  Following the announcement of the "highly publicized" recalls, DOJ launched a criminal investigation into New GM.  (*Id.*).  In light of the DOJ investigation — and the spate of civil litigation anticipated by New GM — the company retained Jenner and its chairperson, Anton Valukas.  (New GM's Opening Br., Ex. 1 (Decl. of Anton Valukas) ("Valukas Decl.") ¶¶ 1, 2).  According to Valukas and Michael P. Millikin, the General Counsel of New GM, Jenner was retained "to represent New GM's interests and to provide legal advice to new GM in a variety of matters relating to the recalls, including the DOJ investigation and other anticipated government investigations and civil litigation."  (*Id.* ¶ 2; *see also* New GM's Opening Br., Ex. 2 (Decl. Michael P. Millikin) ("Millikin Decl.") ¶¶ 4-5).  "As part of [New GM's] request for legal advice regarding the

pending government investigation," New GM directed Valukas to "investigate the circumstances that led up to the recall of the Cobalt and other cars due to the flawed ignition switch" — specifically, "to determine why it took so long to recall the Cobalt and other vehicles."  (Valukas Decl. ¶ 2; *see also* Millikin Decl. ¶ 5; Pls.' Br. Concerning Produc. Material Related Valukas Report (Docket No. 438) ("Pls.' Opening Br.") 5 (internal quotation marks omitted); New GM's Opening Br. 4 (internal quotation marks omitted)).

The investigation that followed was swift but wide-ranging.  In the span of only seventy days, the Jenner lawyers collected over 41 million documents and conducted over 350 interviews with 230 witnesses, including over 200 current and former GM employees, several employees of GM's insurance claims administrator, and several of New GM's outside counsel.  (Pls.' Opening Br., Ex. A (Report to Bd. of Directors of Gen. Motors Co. Regarding Ignition Switch Recalls ("Valukas Report")) 14; Valukas Decl. ¶ 3).  According to Valukas, the interviews were conducted confidentially, with the intention of preserving the attorney-client privilege between New GM and its counsel; all witnesses were informed at the outset of each interview that the purpose of the interview was to assist in the provision of legal advice to New GM and that the interview was privileged and should be kept confidential.  (Valukas Decl. ¶ 4).  No transcript or recording was made of the interviews.  (*Id.* ¶ 5).  Instead, the Jenner lawyers produced three types of writings during and after the interviews: attorney notes taken during the interviews; summaries created after each interview; and formal attorney memoranda created after the interviews (collectively, the "Interview Materials").  (New GM's Opening Br. 5).

On May 29, 2014, Valukas presented the fruits of Jenner's labors — a 315-page document that came to be known as the "Valukas Report" — to the New GM Board of Directors.

3

(Pls.' Opening Br. 5; *see generally* Valukas Report).[1]  The Valukas Report, which includes citations to many (but not all) of the witness interviews conducted by the Jenner lawyers, is prominently marked (on the cover and each page thereafter) "Privileged and Confidential: Protected by Attorney-Client Privilege and As Attorney Work Product."  (Pls.' Opening Br. 5; New GM's Opening Br. 6).  New GM, however, provided a copy of the report to Congress, DOJ, and NHTSA in connection with their ongoing investigations into the defects and related recalls. (New GM's Opening Br. 6).  Thereafter, NHTSA published a copy of the report on its website with personal identifying information redacted.  (*Id.*; *see also* Def. General Motors LLC's Resp. Pls.' Br. Concerning Produc. Material Related Valukas Report (Docket No. 465) ("New GM's Resp. Br.") 4 n.4).  Months later, New GM placed the Report into the MDL Document Depository, making it available to Plaintiffs in the MDL.  (New GM's Opening Br. 6).

On October 15, 2014, Plaintiffs in *Melton v. General Motors, LLC et al.*, No. 14-A-1197-4 (Ga. Cobb Cnty. Ct.) ("*Melton II*"), a related state court action against New GM, filed a motion to compel New GM to produce various documents relating to the Valukas Report.  (New GM's Oct. 24, 2014 Ltr. (14-MD-2543 Docket No. 363), Ex. 2).  Shortly thereafter, New GM filed a letter, arguing, *inter alia*, that this Court — rather than the *Melton II* Court — should decide most of the issues raised by the motion to compel.  (New GM's Oct. 30, 2014 Ltr. (14-MD-2543 Docket No. 369) 3).  After further discussion, this Court and the *Melton II* Court agreed with the parties' proposal to meet and confer in an effort to narrow the issues in dispute, and ordered the parties to submit a joint letter by November 12, 2014, indicating what issues remained to be

---

[1]     Jenner submitted amended versions of the Valukas Report to the New GM Board on June 1, 2014, and June 4, 2014.  (New GM's Opening Br. 6 n.2).  As used in this Opinion and Order, the "Valukas Report" refers to the final version.

decided and "proposing an expedited briefing schedule to address both the substantive merits of any remaining disputes and whether and how the two courts should coordinate rulings on those disputes." (14-MD-2543 Order No. 21 (Docket No. 390) (emphasis omitted)). The parties' meet-and-confer process did narrow the issues in dispute: New GM agreed to produce many documents previously identified as privileged, including some documents previously produced to the federal government (*see* Nov. 12, 2014 Joint Ltr. (Docket No. 397) 1) — an agreement that was memorialized in a Federal Rule of Evidence 502(d) order adopted by the Court on November 14, 2014. (*See* 14-MD-2543 Order No. 23 (Docket No. 404) 3). But New GM refused to produce other documents relating to the Valukas Report demanded by Plaintiffs, including, most notably, the Interview Materials. (Nov. 12, 2014 Joint Ltr. 3).

Per this Court's Order (Docket No. 406), the parties then submitted joint opening and responsive briefs on the question of whether those materials are protected by the attorney-client privilege or the attorney work product doctrine and whether that question should be decided by this Court or the *Melton II* Court. (14-MD-2543 Docket Nos. 437, 438, 465, 466). In their opening brief, Plaintiffs indicate that they are seeking to compel production of three categories of information: (1) "An index evidencing all documents or information provided to Anton Valukas and/or Jenner & Block with respect to investigation into the GM ignition switch recalls"; (2) "Copies of all hard drives of documents that were gathered in connection with the investigation of GM and the preparation of the Valukas Report encompassing the 23 TB of data and 41 million documents referenced in the Valukas Report"; and (3) "A copy of all notes, transcripts, and tapes (audio or video) related to any person interviewed during the course of the Valukas investigation and preparation of the Valukas Report, including any of those not cited in the final Valukas Report." (Pls.' Opening Br. 13). Both sides agree, however, that the question

of whether the relevant materials are subject to disclosure should be decided by this Court rather

than the *Melton II* Court.  (Pls.' Opening Br. 13-14; New GM's Opening Br. 8-9).

## DISCUSSION

As a threshold matter, the Court agrees with the parties that the question of whether the

materials at issue are protected by the attorney-client privilege or the attorney work product

doctrine should be decided in this forum.  First, a decision by this Court is consistent with the

Court's role as "the lead case for discovery . . . in Coordinated Actions," including *Melton II*, a

role that the Court has played in an effort to promote efficiency and ensure consistency in

ignition switch litigation across the country.  (14-MD-2543 Order No. 15 (Docket No. 315)

("Joint Coordination Order") 3).  Given the size and nature of this Court's docket, not to mention

its national jurisdiction, it is in a better position than any other tribunal to decide issues that are

likely to arise in, or apply to, large numbers of other ignition switch cases.  Second, as discussed

below, because New GM initially provided the Valukas Report "to a federal office or agency,"

and subsequently produced the Report in this "federal proceeding," Rule 502 of the Federal

Rules of Evidence governs — and limits — the scope of any waiver of any such privilege.  Fed.

R. Evid. 502(a).  Moreover, Rule 502(d) provides that this Court's ruling on the question of

waiver is binding on other courts throughout the country.  In short, a decision on the questions

presented by this Court in the first instance will help prevent inconsistent rulings in related

actions as Valukas Report-related privilege issues arise (as they are bound to do).[2]

---

[2]   As reflected in the Joint Coordination Order, this Court's proper role does not extend to deciding issues that are specific to any individual related case or cases.  Accordingly, the Court intimates no view on the motion to compel in *Melton II* to the extent it raises issues specific to that case, such as whether New GM or its attorneys committed fraud during discovery in *Melton*

Turning then to the substantive questions, New GM argues that the Interview Materials are protected by both the attorney-client privilege and the attorney work product doctrine. Plaintiffs dispute both claims and contend that, even if the Interview Materials are protected, New GM has waived those protections. The Court will address each issue in turn.

## A.  The Attorney-Client Privilege

New GM contends first that the Interview Materials "reflect confidential communications between New GM's outside counsel and its current or former employees, agents, and counsel," and are thus protected by the attorney-client privilege. (New GM's Opening Br. 9). In the Second Circuit, "[t]he attorney-client privilege protects communications (1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal assistance." *Brennan Ctr. for Justice at N.Y. Univ. Sch. of Law v. DOJ*, 697 F.3d 184, 207 (2d Cir. 2012) (internal quotation marks omitted).[3] It is well established that the privilege applies to communications between corporate counsel and a corporation's employees, made "at the direction of corporate superiors in order to secure legal advice from counsel." *Upjohn Co. v. United States*, 449 U.S. 383, 394 (1981). And although the

---

*I.* To the extent that case-specific issues are raised in *Melton II* or any other related case, the Court leaves it to the court presiding over the case to decide the issue in the first instance.

[3]      Insofar as many of the cases in this MDL are subject to this Court's diversity jurisdiction, it is by no means clear that federal law should govern analysis of the attorney-client privilege. *See, e.g.*, *Dixon v. 80 Pine St. Corp.*, 516 F.2d 1278, 1280 (2d Cir. 1975) ("It is not contested that, in a diversity case, the issue of privilege is to be governed by the substantive law of the forum state . . . ."). In their memoranda, however, the parties rely solely on federal law and fail to address the issue of choice of law. Given that, the Court finds that the parties have implicitly consented to application of federal privilege law and that that implied consent "is sufficient to establish choice of law" on the question. *Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000) (internal quotation marks omitted); *see also Allied Irish Banks v. Bank of Am., N.A.*, 240 F.R.D. 96 (S.D.N.Y. 2007) (finding implied consent to apply New York privilege law where the parties did not address the choice of law and cited New York cases).

Supreme Court and Second Circuit have not addressed the issue, *see id.* at 395 n.3 (declining to address the issue), district courts in this Circuit have consistently held that the privilege also extends to "conversations between corporate counsel and *former* employees of the corporation, so long as the discussion related to the former employee's conduct and knowledge gained during employment." *In re Refco Inc. Sec. Litig.*, Nos. 07-MD-1902 (JSR) et al., 2012 WL 678139, at *2 (S.D.N.Y. Feb. 28, 2012) (emphasis added) (citing cases).

Upjohn is the foundational case on attorney-client privilege in the corporate environment. There, the Supreme Court held that the privilege protected interview notes and memoranda prepared by a corporation's in-house counsel during an internal investigation of illegal payments by employees.  The Court noted that, in this context, "the privilege exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice." *Upjohn*, 449 U.S. at 390.  That is the case, the Court explained, because the "first step in the resolution of any legal problem is ascertaining the factual background and sifting through the facts with an eye to the legally relevant." *Id.* at 390-91.  Furthermore, failing to consistently and predictably protect communications between corporate counsel and lower-level employees would "threaten[] to limit the valuable efforts of corporate counsel to ensure their client's compliance with the law," because "[i]n light of the vast and complicated array of regulatory legislation confronting the modern corporation, corporations . . . constantly go to lawyers to find out how to obey the law." *Id.* at 392 (internal quotation marks omitted).  Applying those principles, the Court concluded that the documents at issue were privileged because they were collected by in-house counsel as part of "a factual investigation to determine the nature and extent of the questionable payments and to be in a position to give legal advice to the company with respect to the payments," and the

interviewed employees were "sufficiently aware" of the legal purpose of the interviews and the confidentiality attached to their communications.  *Id.* at 394-95 (emphasis omitted).

*Upjohn* applies squarely to the materials at issue in this case, at least to the extent that they reflect witnesses' communications rather than the thoughts or impressions of lawyers (a subject that is discussed further below).  Here, as in *Upjohn*, the internal investigation and accompanying interviews were conducted "as part of [the company's] request for legal advice" in light of possible misconduct and accompanying governmental investigations and civil litigation.  (Valukas Decl. ¶ 2).  Here, as in *Upjohn*, the employees interviewed were aware (and, in fact, explicitly told) that the purpose of the interviews was to collect information to assist in providing legal advice to the company, and that the matters discussed were therefore confidential.  (*Id.* ¶ 4).  Here, as in *Upjohn*, the documents reflecting communications between the company's lawyers and its employees during the interview process have not been provided to third parties; instead, they have been shared, if at all, only with King & Spalding (a law firm that has also been representing New GM in connection with the recalls) and with the holder of the privilege, New GM itself.  (*Id.* ¶¶ 3, 6-8).  And although the investigation here was conducted by outside counsel rather than in-house counsel, that difference from *Upjohn* strengthens rather than weakens New GM's claim to the privilege.  *See, e.g.*, *ABB Kent-Taylor, Inc. v. Stallings and Co., Inc.*, 172 F.R.D. 53, 55 (W.D.N.Y. 1996) (noting that "[p]rivilege issues with respect to communications between in-house corporate counsel and the corporate client have proven to generate thorny discovery and disclosure problems" because "[i]n-house counsel often serve their corporate employer in mixed business-legal roles").

In arguing otherwise, Plaintiffs make two principal arguments.  First, citing the testimony of New GM's Chief Executive Officer Mary Barra before Congress, in which she promised to

share the Valukas Report and "everything and anything that is related to safety," Plaintiffs assert

"[t]here was no expectation that the Valukas Report or the investigation would be confidential."

(Pls.' Opening Br. 2, 14-15).[4]  Second, Plaintiffs contend that the privilege does not apply to the

Interview Materials because the communications they reflect were not made for the purpose of

obtaining or providing legal advice.  (Pls.' Opening Br. 15-16).  Noting that "[m]ost of the

Report contains factual findings and then ends with a series of recommendations relating to

business processes controls, communications, policies, and training," Plaintiffs argue that the

Valukas Report "itself did not reflect the provision of legal advice."  (*Id.* at 15-16).  It follows,

they contend, that "drafts of the report and memoranda of the lawyers' interviews with witnesses

were not prepared 'primarily' or 'predominantly' for the purpose of providing legal advice."  (*Id.*

at 15-16).  More specifically, Plaintiffs assert that the investigation was conducted — and the

Valukas Report was prepared — for the purpose of making business recommendations, not legal

recommendations, and thus that communications made during the course of the investigation do

not meet the "primary purpose" test for application of the privilege.  (Pls.' Resp. Br. Concerning

Produc. Material Related Valukas Report (Docket No. 466) ("Pls.' Resp. Br.") 4).

Those arguments are unavailing.  Plaintiffs' first argument — that New GM did not

intend to keep the Interview Materials confidential — is based on a flawed inference: that

because New GM promised to (and did) disclose the *facts* shared in the Valukas Report, it

follows that the company did not intend to keep the *communications* reflected in the Interview

Materials confidential.  It is well established, however, that the attorney-client privilege "protects

---

[4]      Relatedly, Plaintiffs contend that they are entitled to the Interview Materials because the
Valukas Report was, in fact, "not kept confidential."  (Pls.' Opening Br. 2).  That contention is
analyzed further below, in connection with Plaintiffs' broader argument that New GM waived
any attorney-client privilege through its disclosures to Congress, NHTSA, and DOJ.

communications rather than information." *In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d 1032, 1037 (2d Cir. 1984). Thus, "the privilege does not impede disclosure of information except to the extent that that disclosure would reveal confidential communications." *Id.* And "the fact that certain *information* in [otherwise protected] documents might ultimately be disclosed" or "that certain *information* might later be disclosed to others" does not, by itself, "create the factual inference that the *communications* were not intended to be confidential at the time they were made." *Id.* (emphases added). Were it otherwise, "any attorney-client communications relating to the preparation of publicly filed legal documents — such as court pleadings — would be unprotected," which is plainly not the law. *In re Grand Jury Subpoena*, 341 F.3d 331, 336 (4th Cir. 2003); *see also In re Feldberg*, 862 F.2d 622, 629 (7th Cir. 1988) (noting that "[r]are is the case in which attorney-client conversations do not lead to some public disclosure" and that, just because a trial is public or a lawyer writes a brief to be filed with the court, it does not follow that communications "antecedent" to the trial and "drafts of the brief" are unprivileged); *Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d at 1037 (holding that the privilege can apply to "drafts of communications the final version of which might eventually be sent to other persons, and as distributed would not be privileged").

The touchstone of the analysis, therefore, is not whether New GM intended to keep confidential the results of its investigation, but rather whether it intended to keep confidential the communications reflected in the Interview Materials. Applying that standard here, New GM has established a valid claim to the privilege. Barra may have promised transparency in matters relating to safety (*see* Pls.' Opening Br. 14-15), but she did not promise to disclose the communications reflected in the Interview Materials. And the participants in the interviews themselves understood that their communications were intended to be kept confidential. As

Valukas explains in a sworn declaration, consistent with *Upjohn* and its progeny, "at the outset of each interview the interviewing attorney informed the witness that the purpose of the interview was to gather information to assist in providing legal advice to New GM, that the interview was accordingly privileged, that this privilege belonged to New GM, and that the witness should keep confidential the matters discussed in the interview." (Valukas Decl. ¶ 4). And consistent with those warnings and assurances, Jenner and New GM have never shared the Interview Materials with any government agency or third party. (*Id.* ¶¶ 5-8).[5]

Plaintiffs' second argument — that the communications reflected in the Interview Materials were not made for the purpose of obtaining or providing legal assistance — is also unpersuasive. Plaintiffs are certainly correct that the privilege attaches only if "the predominant purpose of the communication is to render or solicit legal advice." *In re County of Erie*, 473 F.3d 413, 420 (2d Cir. 2007). Further, it is plain, as Plaintiffs argue, that New GM's purposes in retaining Jenner and producing the Valukas Report were not exclusively legal — that the company sought to identify and correct the problems that resulted in the delayed recalls and to address a public relations fiasco by reassuring investors and the public that it takes safety seriously. The primary purpose test, however, does not require a showing that obtaining or providing legal advice was the *sole* purpose of an internal investigation or that the communications at issue "would not have been made 'but for' the fact that legal advice was

---

[5] Based on the interviews, and in order to cooperate with the DOJ investigation, Jenner attorneys "made oral hypothetical proffers" of "what certain witnesses might say if the DOJ were to speak with them," a tactic New GM represents is "in accord with typical practice in DOJ investigations conducted in the Southern District of New York." (New GM Opening Br. 6). Plaintiffs make no argument that those oral proffers — which "were not complete or verbatim recitations of what the witnesses said or of the [Interview Materials]" (Valukas Decl. ¶ 9) — or the intention to make those oral proffers, vitiated the attorney-client privilege.

sought." *In re Kellogg Brown & Root, Inc.*, 756 F.3d 754, 759 (D.C. Cir. 2014).  Instead, as the D.C. Circuit has expressly held, "the primary purpose test, sensibly and properly applied, cannot and does not draw a rigid distinction between a legal purpose on the one hand and a business purpose on the other."  *Id.* at 759.  "So long as obtaining or providing legal advice was one of the significant purposes of the internal investigation, the attorney-client privilege applies, even if there were also other purposes for the investigation . . . ."  *Id.* at 758-59.

To be sure, the D.C. Circuit's decision in *Kellogg Brown & Root* is not binding on this Court.  Nevertheless, its analysis of the "primary purpose" test as applied to internal investigations in the corporate setting is consistent with the Second Circuit's analysis in *County of Erie*, where the Court explained (in addressing the privilege as applied to advice by a government lawyer) that "[t]he modern lawyer almost invariably advises his client upon not only what is permissible but also what is desirable . . .  [T]he privilege of nondisclosure is not lost merely because relevant nonlegal considerations are expressly stated in a communication which also includes legal advice."  473 F.3d at 420 (internal quotation marks omitted); *see also id.* at 421 ("The predominant purpose of a particular document — legal advice, or not — may also be informed by the overall needs and objectives that animate the client's request for advice.").  More broadly, the D.C. Circuit's holding is consistent with — if not compelled by — the Supreme Court's logic in *Upjohn*.  Rare is the case that a troubled corporation will initiate an internal investigation solely for legal, rather than business, purposes; indeed, the very prospect of legal action against a company necessarily implicates larger concerns about the company's internal procedures and controls, not to mention its bottom line.  Accordingly, an attorney-client privilege that fails to account for the multiple and often-overlapping purposes of internal

investigations would "threaten[] to limit the valuable efforts of corporate counsel to ensure their client's compliance with the law." *Upjohn*, 449 U.S. at 393.

Applying those standards here, the Court finds that New GM has met its burden of demonstrating that the provision of legal advice was a "primary purpose" of Jenner's investigation and the communications reflected in the Interview Materials.  In the face of an already-launched criminal investigation by the DOJ, and the inevitability of civil litigation, New GM "retained Jenner to represent New GM's interests and to provide legal advice to new GM in a variety of matters relating to the recalls," including the DOJ investigation.  (Valukas Decl. ¶ 2). "[I]n order to facilitate [that] provision of legal advice," Jenner and Valukas conducted the interviews in question.  (*Id.* ¶ 3).  And as New GM's submissions make plain, the interviews have in fact been used in connection with Jenner's representation of New GM with respect to the DOJ investigation.  (*See, e.g.*, *id.* ¶ 9 (noting that Jenner lawyers "orally proffered" to representatives of the U.S. Attorney's Office for the Southern District of New York "their hypothetical understandings, based on the interviews, of what certain witnesses would likely say about the facts relating to the ignition switch recalls")).  Accordingly, regardless of whether New GM had other purposes in retaining Jenner, and regardless of whether the Valukas Report *itself* contained legal as opposed to business advice — a question this Court need not, and does not, reach — the underlying investigation, and the interviews conducted as part of it, had a "primary purpose" of enabling Valukas and Jenner to provide New GM with legal advice.

This Court's decision in *Allied Irish Banks*, upon which Plaintiffs principally rely (Pls.' Opening Br. 15-17; Pls.' Resp. Br. 5), does not call for a different result.  In that case, the Court held (applying New York law) that the attorney-client privilege did not protect materials underlying a report prepared following an internal investigation.  *See* 240 F.R.D. at 103-05.  But

that holding was based on facts unlike those here.  There, the company had hired a non-lawyer — the principal of a consulting firm, touted by the bank as an "eminent person with standing and expertise in the financial services industry" — to produce the report, which the company promptly released publicly.  *Id.* at 100-01.  The terms of the consultant's engagement had been limited to business-related matters and had said nothing about legal advice.  *See id.*  And while the consultant had, in turn, engaged a law firm to "assist" in his investigation, *id.*; *see also id.* at 105, neither the company nor the law firm "provided any evidence regarding the manner in which [the law firm's] purported legal advice was provided to [the company] . . . or on what dates," *id.* at 101.  In fact, "[t]he only document attributable in any form to [the law firm] that was also presented to [the company]" was the final report itself, "which indisputably did not provide legal advice."  *Id.* at 104.  In this case, by contrast, New GM explicitly engaged Jenner, a law firm, to provide legal advice, and — whether or not such advice is reflected in the Valukas Report — there is no dispute that Jenner has in fact provided legal advice to the company as a result of its investigation.  *See also, e.g.*, *Orbit One Commc'ns, Inc. v. Numerex Corp.*, 255 F.R.D. 98, 104 (S.D.N.Y. 2008) (noting that determination of "the precise limits of the attorney-client privilege in the corporate context" requires a "fact-intensive" analysis).

In short, as a threshold matter, New GM has shown that the attorney-client privilege applies to the portions of the Interview Materials reflecting communications between current and former New GM employees and agents and outside counsel.

## B.  The Attorney Work Product Doctrine

As noted, New GM argues that the Interview Materials are also protected by the attorney work product doctrine.  (New GM's Opening Br. 11-12; New GM's Resp. Br. 13-16).  Protection of attorney work product is based on the notion that "it is essential that a lawyer work with a

certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel.
Proper preparation of a client's case demands that he assemble information, sift what he
considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his
strategy without undue and needless interference." *Hickman v. Taylor*, 329 U.S. 495, 510-11
(1947).  As the Supreme Court acknowledged in *Hickman*, "[t]his work is reflected, of course, in
interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs,
and countless other tangible and intangible ways." *Id.* at 511.  *Hickman* has since been codified
in Rule 26(b)(3) of the Federal Rules of Civil Procedure, which provides that "[o]rdinarily, a
party may not discover documents and tangible things that are prepared in anticipation of
litigation or for trial by or for another party or its representative."  Fed. R. Civ. P. 26(b)(3).

As the Second Circuit has noted, "[n]othing" in Rule 26(b)(3) "states or suggests that
documents prepared 'in anticipation of litigation' with the purpose of assisting in the making of a
business decision do not fall within its scope." *United States v. Adlman*, 134 F.3d 1194, 1198-99
(2d Cir. 1998).  Indeed, "a requirement that documents be produced primarily or exclusively to
assist in litigation in order to be protected is at odds with the text and the policies of the Rule.
Nowhere does Rule 26(b)(3) state that a document must have been prepared to *aid* in the conduct
of litigation in order to constitute work product, much less *primarily* or *exclusively* to aid in
litigation.  Preparing a document 'in anticipation of litigation' is sufficient." *Id.* at 1198.
Accordingly, to demonstrate that material is protected by the attorney work product doctrine, a
party need only show that, "in light of the nature of the document and the factual situation in the
particular case, the document can fairly be said to have been prepared or obtained *because of* the
prospect of litigation." *Schaeffler v. United States*, 22 F. Supp. 3d 319, 335 (S.D.N.Y. 2014)
(internal quotation marks omitted).  Work product protection does not apply to "documents that

are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the litigation." *Id.* (internal quotation marks omitted).

Applying those standards here, Rule 26(b)(3) provides an independent basis for New GM to withhold the Interview Materials.  The materials at issue were produced in a situation far from the "ordinary course of business"; the interviews were conducted — and the Interview Materials were prepared — in light of the pending DOJ investigation and the anticipation of civil litigation. (Valukas Decl. ¶¶ 2-3; Millikin Decl. ¶¶ 4-5).  Further, in light of the nature of the documents at issue and the factual situation in this case, it can "fairly be said" that the Interview Materials would not have been created in "essentially similar form" had New GM not been faced with the inevitability of such litigation.  *See, e.g.*, *In re Woolworth Corp. Sec. Class Action Litig.*, No. 94-CV-2217 (RO), 1996 WL 306576, at *3 (S.D.N.Y. June 7, 1996) (noting that when civil and criminal litigation are virtually certain, "[a]pplying a distinction between 'anticipation of litigation' and 'business purposes' is . . . artificial, unrealistic, and the line between is . . . essentially blurred to oblivion").  Indeed, the interviews themselves were shaped by the specter of litigation: All witnesses were informed "that the purpose of the interview[s] was to gather information to assist in providing legal advice to New GM," and the interviews were conducted with an eye towards the goal of "facilitat[ing] [Jenner's] provision of legal advice to New GM." (Valukas Decl. ¶¶ 3-4).  Interview notes and memoranda produced in the course of similar internal investigations have long been considered classic attorney work product.  *See, e.g.*, *William A. Gross Constr., Assoc., Inc. v. Am. Mfrs. Mut. Ins. Co.*, 262 F.R.D. 354, 362 (S.D.N.Y. 2009); *In re Cardinal Health, Inc. Sec. Litig.*, No. C2-04-575 (RPP), 2007 WL 495150, at *5 (S.D.N.Y. Jan. 26, 2007).  There is no basis to reach a different conclusion here.

That does not end the analysis, however, as the protections afforded by the attorney work product doctrine are not absolute.  Instead, a party may obtain "fact" work product if it "shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means."  Fed. R. Civ. P. 26(b)(3)(ii).[6] Plaintiffs here cannot make that showing as to the Interview Materials as a whole, given the vast amount of materials that New GM has produced or will be producing and given the fact that Plaintiffs are free to depose the witnesses whom the Jenner attorneys interviewed as part of the Valukas investigation.  *See Hickman*, 329 U.S. at 513 (noting that "direct interviews with the witnesses themselves all serve to reveal the facts in [the attorney's] possession to the fullest possible extent consistent with public policy"); *see also, e.g.*, *Gucci Am., Inc. v. Guess?, Inc.*, 271 F.R.D. 58, 80 (S.D.N.Y. 2010) ("No substantial need exists where a party can obtain the information it seeks through discovery devices such as interrogatories or deposition testimony.").  Accordingly, Plaintiffs' request for the Interview Materials is denied on the independent ground that it constitutes attorney work product.  That denial, however, is without prejudice to any future application (after conferring with counsel for New GM) for particular materials in the event that a witness who was interviewed by the Valukas team proves to be unavailable for deposition as a result of death, invocation of the Fifth Amendment privilege against self-incrimination, or otherwise.  And to facilitate any such application, New GM is ordered to disclose, within two

---

[6]     By contrast, "opinion" work product is subject to heightened protection; it is not subject to disclosure absent, "at a minimum . . . a highly persuasive showing of need."  *In re Grand Jury Proceedings*, 219 F.3d 175, 192 (2d Cir. 2000) (internal quotation marks omitted).  Although New GM argues that some of the Interview Materials contain opinion work product (New GM's Opening Br. 18-19), the Court need not reach that question at this juncture.

weeks, the names of all witnesses who were interviewed by the Valukas team but not mentioned by name in the Valukas Report itself.  (*See* Dec. 15, 2014 Hr'g Tr. at 8:2-10:21).

## C.  Waiver

Finally, the Court turns to the question of whether New GM waived the protections of either the attorney-client privilege or the attorney work product doctrine — as to which New GM also bears the burden of proof.  *See*, *e.g.*, *United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO*, 119 F.3d 210, 214 (2d Cir. 1997); *Denney v. Jenkens & Gilchrist*, 362 F. Supp. 2d 407, 412 (S.D.N.Y. 2004).  Rule 502 of the Federal Rules of Evidence, titled "Attorney-Client Privilege and Work Product; Limitations on Waiver," provides that "when [a] disclosure is made in a federal proceeding or to a federal office or agency and waives the attorney-client privilege or work-product protection, the waiver extends to an undisclosed communication or information in a federal or state proceeding *only if*: (1) the waiver is intentional; (2) the disclosed and undisclosed communications or information concern the same subject matter; *and* (3) they ought in fairness to be considered together."  Fed. R. Evid. 502(a) (emphases added).  As the Advisory Committee Notes state, the Rule — enacted in 2008 — "provides that a voluntary disclosure in a federal proceeding or to a federal office or agency . . . generally results in a waiver *only* of the communication or information disclosed."  Fed. R. Evid. 502, Committee Notes (emphasis added).  In particular, such disclosure results in a subject matter waiver of undisclosed materials only in those "unusual situations in which fairness requires a further disclosure of related, protected information, in order to prevent a selective and misleading presentation of evidence to the disadvantage of the adversary."  *Id.*

Significantly, although the parties discuss the common law of waiver in their memoranda of law (*see* New GM's Opening Br. 15-16; Pls.' Opening Br. 17-20), both sides agree that the

waiver analysis is controlled by Rule 502.  ((Pls.' Opening Br. 17-20; Pls.' Resp. Br. 7-9; *see*

Dec. 15, 2014 Hr'g Transcript at 14:16-15:12).  After all, New GM provided the Valukas Report

to Congress, DOJ, and NHTSA — "federal office[s] or agenc[ies]" — and has since disclosed

the Report in this MDL — a "federal proceeding."  Applying Rule 502, there is no basis to

conclude that New GM waived either attorney-client privilege or the attorney work product

doctrine with respect to documents that New GM has withheld — namely, the Interview

Materials.  Specifically, as New GM has shown, the company has — as of today's date —

"neither offensively used the Valukas Report in litigation nor made a selective or misleading

presentation that is unfair to adversaries in this litigation, or any other."  (New GM's Resp. Br.

11; *see also* New GM's Opening Br. 7 & n.3).  Additionally, New GM has produced, or soon

will produce, millions of pages of documents, including many that would otherwise be privileged

(pursuant to the Court's Rule 502(d) Order).  (14-MD-2543 Docket No. 404).  Put simply, this

case does not present the unusual and rare circumstances in which fairness requires a judicial

finding of waiver with respect to related, protected information.

## D.  Plaintiffs' Other Requests

Separate and apart from the Interview Materials, Plaintiffs seeks both "[a]n index

evidencing all documents or information provided to Anton Valukas and/or Jenner & Block with

respect to investigation into the GM ignition switch recalls" and "[c]opies of all hard drives of

documents that were gathered in connection with the investigation of GM and the preparation of

the Valukas Report encompassing the 23 TB of data and 41 million documents referenced in the

Valukas Report."  (Pls.' Opening Br. 13).  Substantially for the reasons argued by New GM in its

responsive memorandum of law (New GM's Resp. Br. 16-17), the Court denies those requests.

Plaintiffs have not argued — nor, likely, could they — that the production of those materials is

"reasonably calculated to lead to the discovery of admissible evidence."  Fed. R. Civ. P. 26(b)(1).  Moreover, in light of the extensive — indeed, vast — universe of documents that New GM has disclosed or will be disclosing in the coming months, the discovery sought by Plaintiffs is "unreasonably cumulative or duplicative."  Fed. R. Civ. P. 26(b)(2)(C)(i).  Accordingly, Plaintiffs' requests for those additional materials are DENIED.

## CONCLUSION

For the foregoing reasons, the Court agrees with New GM that the Interview Materials are protected by both the attorney-client privilege and the attorney work product doctrine.  The Court acknowledges that that ruling deprives Plaintiffs of material that might be helpful in the preparation of their cases.  In reality, however, it "puts [Plaintiffs] in no worse position than if the communications had never taken place," *Upjohn*, 449 U.S. at 395, as Plaintiffs themselves are free to question the witnesses who were interviewed by the Valukas team.  Moreover, in the memorable words of Justice Robert Jackson, "[d]iscovery was hardly intended to enable a learned profession to perform its functions . . . on wits borrowed from the adversary."  *Hickman*, 329 U.S. at 516 (Jackson, J., concurring).  And, in the final analysis, the cost of withholding the materials is outweighed by the benefits to society of "encourag[ing] 'full and frank communication between attorneys and their clients and thereby promot[ing] broader public interests in the observance of law and the administration of justice.'"  *Swidler & Berlin v. United States*, 524 U.S. 399, 403 (1998) (quoting *Upjohn*, 449 U.S. at 389).

Accordingly, and for the reasons explained above, Plaintiffs' application to compel disclosure of the Interview Materials and other items is DENIED, except that New GM is ordered to disclose, **within two weeks**, the names of all witnesses who were interviewed by Valukas and his colleagues but not mentioned by name in the Valukas Report itself.

SO ORDERED.

Date:   January 15, 2015
        New York, New York

_____
JESSE M. FURMAN
United States District Judge