USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 08/15/2016

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------x

IN RE:

GENERAL MOTORS LLC IGNITION SWITCH LITIGATION

This Document Relates To:
*Fleck, et al. v. General Motors LLC, 14-CV-8176*
-------------------------------------------------------------------------x

14-MD-2543 (JMF)
14-MC-2543 (JMF)

OPINION AND ORDER

JESSE M. FURMAN, United States District Judge:

The next bellwether trial in this multi-district litigation ("MDL"), familiarity with which is presumed, involves claims brought by Plaintiff Stephanie Cockram against General Motors LLC (also known as "New GM") stemming from a June 28, 2011 car accident. At the time of the accident, Cockram was driving her 2006 Chevrolet Cobalt, which had been manufactured by General Motors Corporation (also known as "Old GM") — which filed for bankruptcy in 2009, a bankruptcy from which New GM emerged. New GM now moves, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for partial summary judgment, contending that Cockram's claims based on New GM's conduct alone (the only claims that could expose New GM to punitive damages in light of earlier rulings by the United States Bankruptcy Court for the Southern District of New York) fail as a matter of law. (Docket No. 2938). For the reasons that follow, New GM's motion is GRANTED in part and DENIED in part.

## FACTUAL BACKGROUND

On December 31, 2005, Cockram, a resident of Virginia, purchased a new 2006 Chevrolet Cobalt. (Def. New GM's Statement Undisputed Material Facts Pursuant to Local Civil Rule 56.1 (Docket No. 2939) ¶ 2). Roughly five-and-a-half years later, in the early evening of June 28, 2011, Cockram crashed her Cobalt into a drainage ditch culvert. (*Id.* ¶¶ 4-6; Pl.'s Local Rule 56.1 Resp. in Opp'n New GM's Statement Undisputed Material Facts & Statement of

Additional Facts (Docket No. 3016) ("Pl.'s SOF") ¶ 44).  Despite the frontal impact, the frontal

airbags did not deploy, and Cockram was severely injured in the crash.  (*Id.* ¶¶ 45, 49).  In this

action, Cockram brings various claims under Virginia law.  (*See* Third Am. Compl. (14-CV-

8176, Docket No. 393) ("TAC") ¶¶ 421-432).  More specifically, she seeks compensatory and

punitive damages for her injuries resulting from the airbag nondeployment, claiming that it was

caused by a defect in the ignition switch that allowed the switch to move from the "run" to the

"accessory" or "off" positions.  (*See* Pl.'s SOF ¶¶ 44-50; TAC ¶¶ 23, 421-432).  Notably, she

does not claim that inadvertent ignition switch rotation caused her car to veer off the road and

crash — only that it caused the airbags to fail, enhancing or exacerbating her injuries.

## BANKRUPTCY RULINGS

Before turning to New GM's arguments for summary judgment, the Court briefly

summarizes certain rulings by the Honorable Robert E. Gerber, former United States Bankruptcy

Judge for the Southern District of New York, that bear heavily on this case.  After New GM's

disclosure of the ignition switch defect in early 2014, many plaintiffs filed claims against New

GM — some alleging economic losses and some, including Cockram, alleging personal injuries

and wrongful deaths.  In April and August 2014, New GM filed motions before the Bankruptcy

Court alleging that many of those claims were barred by the 2009 Sale Order through which New

GM assumed many of Old GM's assets and some of its liabilities.  In April 2015, Judge Gerber

ruled that many of those claims brought against New GM were in fact barred by the 2009 Sale

Order.  *See In re Motors Liquidation Co.*, 529 B.R. 510 (Bankr. S.D.N.Y. 2015).  In particular,

he determined that New GM could be held liable for certain assumed liabilities of Old GM

(namely, products liability claims that were included in the Sale Agreement) and for "claims

based solely on any wrongful conduct on its own part."  *Id.* at 583.  A later Order implementing

that opinion defined claims "based solely on New GM's own, independent, post-Closing acts or conduct" as "Independent Claims." *See In re Motors Liquidation Co.*, 09-50026 (REG), Docket No. 13177 ¶ 4 (Bankr. S.D.N.Y. June 1, 2015).

The definition of "Independent Claims" reemerged as significant in November 2015, when Judge Gerber issued an opinion addressing the issues of punitive damages and "imputation." *See In re Motors Liquidation Co.*, 541 B.R. 104 (Bankr. S.D.N.Y. 2015) ("*November Decision*"). In that opinion, Judge Gerber made two rulings that bear significantly on this bellwether trial. First, he determined that, as a matter of bankruptcy law, knowledge of Old GM personnel or knowledge of information contained in Old GM files could be imputed to New GM only to the extent that it could be shown, as a matter of *non-bankruptcy* law, that New GM actually had that knowledge (for example, through an Old GM employee who later became an employee of New GM). *See id.* at 108. Second, Judge Gerber ruled that claims for punitive damages could only be "based on New GM knowledge and conduct alone" because New GM did not assume liability for punitive damages under the Sale Agreement. *See id.* In light of Judge Gerber's decisions, it is undisputed that there are three types of damages potentially available to Cockram in this action: (1) compensatory damages for products liability claims based on Old GM conduct, liability for which was assumed by New GM; (2) compensatory damages for "Independent Claims" — that is, claims based solely on New GM conduct; and (3) punitive damages for "Independent Claims." Cockram pursues all three. (*See* TAC ¶¶ 421-432).[1]

---

[1]    On July 13, 2016, the Second Circuit issued an opinion resolving various appeals from orders entered by Judge Gerber. *See In re Motors Liquidation Co.*, — F.3d —, 2016 WL 3766237 (2d Cir.). On July 18, 2016, the Court held a telephone conference with counsel to discuss the implications, if any, of that decision for *Cockram* generally and for New GM's motion for summary judgment in particular. The parties were in agreement that the decision had no effect on the motion or the availability of punitive damages in *Cockram*.

## LEGAL STANDARDS

Summary judgment is appropriate where the admissible evidence and pleadings demonstrate "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (per curiam).  A dispute over an issue of material fact qualifies as genuine if the "evidence is such that a reasonable jury could return a judgment for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *accord Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim."  *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (citing *Celotex*, 477 U.S. at 322-23); *accord PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002).

In ruling on a motion for summary judgment, all evidence must be viewed "in the light most favorable to the non-moving party," *Overton v. N.Y. State Div. of Military & Naval Affairs*, 373 F.3d 83, 89 (2d Cir. 2004), and the court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought," *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004).  To defeat a motion for summary judgment, the non-moving party must advance more than a "scintilla of evidence," *Anderson*, 477 U.S. at 252, and demonstrate more than "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The non-moving party "cannot defeat the motion by relying on the

allegations in [its] pleading or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (citation omitted).

## DISCUSSION

New GM moves for summary judgment only as to some of Cockram's claims. Specifically, it does not seek dismissal of her claims based on Old GM's conduct and pursued against New GM on a theory of assumed products liability.[2]  Instead, New GM targets Cockram's Independent Claims — that is, her claims based on New GM's own conduct, the only claims that could expose New GM to punitive damages in light of Judge Gerber's earlier rulings. More specifically, New GM moves for summary judgment with respect to Cockram's claims for negligent failure to warn or to recall (Count I), negligence *per se* (Count III), fraud (Count IV), and violation of the Virginia Consumer Protection Act (the "VCPA") (Count V).  The Court will address each of those claims in turn.

## A.  Negligence

New GM moves first to dismiss Cockram's claims for negligent failure to warn (or to recall) and negligence *per se*.  (Mem. Supp. Gen. Motors LLC's Mot. Partial Summ. J. (Docket No. 2941) ("New GM's Mem.") 7-13; Reply Supp. Gen. Motors LLC's Mot. Partial Summ. J. (Docket No. 3056) ("New GM's Reply") 3-11).  With respect to the first, there is no dispute that Virginia recognizes a failure-to-warn cause of action against a car supplier based on that supplier's knowledge of a latent defect in the car at the point of sale and its failure to warn the purchaser about that defect.  *See Featherall v. Firestone Tire & Rubber Co.*, 219 Va. 949, 962

---

[2]     As New GM notes without any opposition from Cockram (New GM's Mem. 17; New GM's Reply 15), Cockram brings her implied-warranty claim only on an assumed liability theory, not as an Independent Claim.  (*See* TAC ¶¶ 377-385).

(1979) (adopting the Restatement (Second) of Torts § 388 and stating that "[t]he duty to warn stems from the view that the manufacturer should have superior knowledge of his product"); *accord Baker v. Poolservice Co.*, 272 Va. 677, 685 (2006).  Although New GM does not quite concede that, under Virginia law, the duty to warn extends beyond the point of sale (*see* New GM's Mem. 8 & n.12), the weight of authority supports the conclusion that it does.  *See, e.g.*, *A.J. Buck & Son, Inc., for Use & Ben. of Atl. Mut. Ins. Co. v. Crown Equip. Corp.*, 34 F.3d 1066 (Table) (4th Cir. 1994) ("[A] manufacturer can be held liable under a negligence theory for breach of a continuing duty to warn if it learns of a defect after sale and fails to warn purchasers"); *Island Creek Coal Co. v. Lake Shore, Inc.*, 832 F.2d 274, 280 (4th Cir. 1987) ("There seems no question that, if the defendant discovered that the machine it had sold to the plaintiffs was not safe, it had a duty to notify the plaintiffs and a failure to do so would be actionable negligence."); *Bly v. Otis Elevator Co.*, 713 F.2d 1040, 1045-46 (4th Cir. 1983) ("[U]nder a negligence theory the duty to warn is continuous and is not interrupted by manufacture or sale of the product . . . ."); *see also, e.g.*, *Russell v. Wright*, 916 F. Supp. 2d 629, 650 (W.D. Va. 2013); *King v. Flinn & Dreffein Eng'g Co.*, No. 7:09-CV-00410, 2012 WL 4459568, at *5-8 (W.D. Va. May 16, 2012); *Rash v. Stryker Corp.*, 589 F. Supp. 2d 733, 735-36 (W.D. Va. 2008); *cf. McAlpin v. Leeds & Northrup Co.*, 912 F. Supp. 207, 210 (W.D. Va. 1996) ("[T]here is nothing in the case law of Virginia to indicate that a manufacturer should be relieved of liability for failure to warn under a theory of negligence if it learns of a potential danger to a buyer only after the product has left the manufacturer's hands.").  *See generally* Restatement (Third) of Torts: Prods. Liab. § 10 (1998) (recognizing a post-sale duty to warn).[3]

---

[3]      To be sure, there is some contrary authority.  *See, e.g.*, *Ambrose v. Southworth Products Corp.*, 953 F. Supp. 728 (W.D. Va. 1997); *Estate of Kimmel v. Clark Equip. Co.*, 773 F. Supp. 828, 831 (W.D. Va. 1991); *Paschall v. Abex Corp.*, 2011 WL 13073287 (Va. Cir. Ct. July 26,

The parties' real dispute is whether Virginia does — or would — recognize a post-sale duty to warn in the circumstances of this case, involving a *successor* corporation (or, more precisely, an asset purchaser) rather than the original manufacturer or supplier.  That issue, albeit under Oklahoma law, was the subject of litigation in the first bellwether trial as well.  In that case, the Court predicted that, if presented with the issue, Oklahoma's highest court would recognize a post-sale duty to warn on the part of a successor assuming certain conditions were met.  *See In re Gen. Motors LLC Ignition Switch Litig.*, — F. Supp. 3d —, 2015 WL 9582714, at *4-7 (S.D.N.Y. Dec. 30, 2015) (the "*Scheuer Summ. J. Op.*").  The Court cited several reasons for its conclusion.  "First and foremost," it "is the position taken by the influential *Restatement*

---

2011); *Hart v. Savage*, No. L-04-1663, 2006 WL 3021110, at *3 (Va. Cir. Ct. Oct. 19, 2006).  In the Court's view, however, those decisions are unpersuasive.  Among other things, the *Ambrose* and *Kimmel* Courts placed undue weight on the fact that the Virginia Supreme Court had not adopted a post-sale duty to warn, ignoring that a federal court's duty where a state's highest court has not ruled on an issue is to predict how that court would rule on it.  *See Travelers Ins. Co. v. 633 Third Assocs.*, 14 F.3d 114, 119 (2d Cir. 1994).  And the *Hart* and *Paschall* Courts provided little or no reasoning for their holdings.  In the absence of either binding or persuasive authority to the contrary, the Court elects to follow the influential *Restatement (Third) of Torts* and the Fourth Circuit.  *See* Jill Wieber Lens, *Warning: A Post-Sale Duty to Warn Targets Small Manufacturers*, 2014 Utah L. Rev. 1013, 1020 (2014) ("[O]ver half the states have adopted a post-sale duty to warn and more are likely to follow given the *Third Restatement* also includes a post-sale duty to warn."); Kenneth Ross & Professor J. David Prince, *Post-Sale Duties: The Most Expansive Theory in Products Liability*, 74 Brook. L. Rev. 963, 984-985 (2009) (discussing the influence of the *Restatement (Third)* with respect to recognition of a post-sale duty to warn); Tom Stilwell, *Warning: You May Possess Continuing Duties After the Sale of Your Product! (An Evaluation of the Restatement (Third) of Torts: Products Liability's Treatment of Post-Sale Duties)*, 26 Rev. Litig. 1035, 1064-65 (2007) ("In the ten years since the publishing of Third Restatement, post-sale duties climbed from relative obscurity to common assertions in products liability actions.  Similarly, the states and their courts have traversed the path from rejecting the creation of the duties to a growing acceptance and knowledgeable handling of their burdens and benefits."); *Factors Etc., Inc. v. Pro Arts, Inc.*, 652 F.2d 278, 283 (2d Cir. 1981) (holding that where a "court of appeals has essayed its own prediction of the course of state law on a question of first impression within that state, the federal courts of other circuits should defer to that holding, perhaps always, and at least in all situations except the rare instance when it can be said with conviction that the pertinent court of appeals has disregarded clear signals emanating from the state's highest court pointing toward a different rule").

*(Third) of Torts: Products Liability*." *Id.* at *6 (quoting Restatement (Third) of Torts: Products

Liability § 13 (1998)).  Second, "many other states and many federal courts have adopted that

position." *Id.* (citing cases).  Third, an Oklahoma products liability treatise suggested that that

the position was consistent with Oklahoma law and, more generally, the *Restatement* had been

"highly influential in Oklahoma products liability law." *Id.* (citing authorities).  And finally, the

Court concluded that "recognizing a duty to warn on the part of some successor corporations

would be consistent with the theory of products liability endorsed by the Oklahoma Supreme

Court, which places the duty to protect the public from a dangerous defect on the entity that 'is

best situated to protect the public against products that are a menace to safety.'" *Id.* (quoting

*Okla. Gas & Elec. Co. v. McGraw-Edison Co.*, 834 P.2d 980, 984-85 (Okla. 1992)).

       For largely the same reasons, the Court reaches the identical conclusion here.  Like the

Oklahoma Supreme Court, the Virginia Supreme Court has not ruled on whether or when a

successor corporation can have a post-sale duty to warn.  Notably, the Virginia Court was

presented with that precise question in *Harris v. T.I., Inc.*, 243 Va. 63 (1992), but it merely

"assum[ed], without deciding, that in a proper case" it "would recognize a successor

corporation's post-sale duty to warn." *Id.* at 72.  Whether *Harris* should be read as a thumb on

the scales in favor of recognizing a successor's post-sale duty to warn (as Cockram contends

(Pl.'s Mem. Law Opp'n (Docket No. 3015) ("Pl.'s Opp'n") 11)) or not (as New GM asserts

(New GM's Mem. 8)), the clear trend since the Virginia Supreme Court's decision has been

toward recognizing such a duty, with Section 13 of the *Restatement (Third)* in 1998 and

decisions by many other state and federal courts thereafter.  *See, e.g.*, *Herrod v. Metal Powder

Prods.*, 413 F. App'x 7, 13 (10th Cir. 2010) (per curiam) (applying Utah law); *Patton v. TIC

United Corp.*, 77 F.3d 1235, 1240-41 (10th Cir. 1996) (applying Kansas law); *Florom v. Elliott*

*Mfg.*, 867 F.2d 570, 577 (10th Cir. 1989) (applying Colorado law); *Tabor v. Metal Ware Corp.*,
168 P.3d 814, 818 (Utah 2007); *see also* Restatement (Third) of Torts: Products Liability § 13,
Reporters' Note to Comment a (1998) (collecting cases).  Further, as it has in Oklahoma, the
*Restatement* has been highly influential in Virginia products liability law (at least with respect to
negligence claims and, in particular, duty-to-warn claims).  *See, e.g. Funkhouser v. Ford Motor
Co.*, 285 Va. 272, 281 (2013) (applying the Restatement (Second) of Torts' standards for failure
to warn); *Owens-Corning Fiberglas Corp. v. Watson*, 243 Va. 128 (1992), 134-46 (same);
*Featherall*, 219 Va. at 962 (same); *see also Ford Motor Co. v. Boomer*, 285 Va. 141, 154-59
(2013) (adopting Sections 26 and 27 of the Restatement (Third) of Torts: Liability for Physical
and Emotional Harm (2010)); *cf. Alphonse Hotel Corp. v. Tran*, No. 14-3447-CV, 2016 WL
3675321, at *9 (2d Cir. July 11, 2016) (stating that the Court's prediction of Pennsylvania
contract law "is bolstered by the fact that the Pennsylvania Supreme Court generally adopts the
principles of the Restatement of Contracts" and, in particular, "has relied upon the Restatement
in shaping the parameters of" the relevant subject area).  And finally, "recognizing a duty to
warn on the part of some successor corporations would be consistent with the theory of products
liability endorsed by" the Virginia Supreme Court, *Scheuer Summ. J. Op.*, 2015 WL 9582714, at
*6, which "is based upon the principle of law that where one person is placed in such a position
with regard to another that anyone of ordinary sense would know that his failure to use ordinary
care and skill might cause injury to the person or property of the other, a duty arises to use
ordinary care and skill to avoid such danger," *McClanahan v. California Spray-Chem. Corp.*,
194 Va. 842, 852 (1953).

Likewise, with respect to whether New GM had a duty to warn Cockram given the facts
of this case, the Court holds that the Virginia Supreme Court would find such a duty existed here

— again, for largely the same reasons as in *Scheuer*. *See Scheuer Summ. J. Op.*, 2015 WL
9582714, at *7. To be sure, the question is a closer one here in light of *Harris*. That case
involved claims on behalf of a woman who had been killed by a reversing trash truck,
manufactured and sold by Truxmore Industries and owned and operated by David Cooper. She
sued Truxmore, which had acquired substantially all of the assets of Truxmore Industries after
the sale to Cooper, alleging that the truck was defective because it lacked a backup warning
signal. Truxmore had assumed "all liabilities and obligations of [its predecessor] arising . . .
under all . . . contracts, leases, commitments and agreements . . . ." *Id.* at 66. Further, following
the acquisition, Truxmore had "made a continued, active effort to maintain the same customers[,]
and acquired its predecessor's goodwill." *Id.* More specifically, Truxmore had several
interactions with Cooper, the owner and operator of the trash truck: "a representative of
Truxmore visited Cooper, informed him of the purchase, and advised him that Truxmore, in
continuing to operate the business, would be available to satisfy Cooper's needs," *id.* at 67;
Truxmore "was in contact with Cooper prior to the accident, endeavoring to sell him a new
truck," *id.* at 71; Cooper bought replacement parts for the truck from Truxmore (the only source
for such parts), *id.* at 71; and "[a]t all times, Truxmore knew where Cooper resided and where the
truck was located," *id.* at 67.

Despite those connections between Truxmore and Cooper, the Virginia Supreme Court
held that the former did not have "an independent duty to warn [the latter] about the alleged
defects in the truck." *Id.* at 71. In jurisdictions that have recognized a post-sale duty to warn on
the part of a successor corporation, the Court explained, "courts have looked to whether there
was a direct and continuing relationship between the successor and the predecessor's customers.
A mere casual contact is not sufficient. The contact must have been substantial and connected

10

with the predecessor corporation in a meaningful way." *Id.* at 72 (citations omitted).  The Court cited four factors that guided the inquiry — "the successor party's succession to service contracts, coverage of the customer's allegedly defective product by a contract, service of the product by the successor, and the successor's knowledge of the defect and of the customer's location," *id.* at 72 (citing *Polius v. Clark Equip. Co.*, 802 F.2d 75, 84 (3d Cir. 1986) — and noted that courts "have overwhelmingly rejected claims . . . when there is no service obligation or there has been no actual service of the product," *id.* (citing cases).  Applying those standards, the Virginia Supreme Court concluded that the facts alleged by the plaintiff "would establish, at most, a mere casual contact between Truxmore and Cooper" and could not "establish the existence of the requisite special relationship" to create a duty to warn.  *Id.*

New GM argues — admittedly not without force — that if the facts in *Harris* were insufficient to establish a duty to warn, the facts in this case are insufficient as well.  (New GM's Mem. 11).  Nevertheless, the Court disagrees.  Significantly, although the direct interactions between New GM and Cockram were fewer in number than the direct interactions between Truxmore and Cooper, the relationship between the parties here satisfies all but the third factor ("service of the product by the successor") cited by the *Harris* Court.  And on top of that, this case has several critical features that were lacking in *Harris*.  As recounted in *Scheuer*, New GM's relationship with Cockram arose from the obligations New GM undertook in the 2009 Sale Agreement, pursuant to which New GM assumed Old GM's obligations to its customers arising from any express warranties and Old GM's obligations under the Safety Act.  *See Scheuer Summ. J. Op.*, 2015 WL 9582714, at *7.  (*See* Pl.'s Ex. 3, § 2.3(a)(vii)(A); *id.* § 6.15(a)-(b)).[4]

---

[4]       New GM contends that the obligations it undertook in the Sale Order are irrelevant to the question of whether it owed Old GM's customers a duty under Virginia (or, really, any State's) law.  (New GM's Mem 3-7; New GM's Reply 2-3).  More specifically, New GM repeatedly

That means New GM provided parts and services to Old GM customers ("presumably" continuing to do so "even after warranties expired") and that, warranties aside, New GM was in "a position of ongoing communication with Old GM purchasers" by virtue of its "continuing [statutory] duty to monitor and notify Old GM purchasers of defects."  2015 WL 9582714, at *7. Additionally, there is evidence that New GM had "actual knowledge" of the ignition switch defect when it acquired the assets of Old GM.  *See Polius*, 802 F.2d at 84 & n.10 ("[C]ourts discussing a duty to warn have required actual knowledge of the defect . . . .").   It is true — as New GM notes (New GM's Reply 8 n.4) — that New GM's obligations were to Old GM "customers in general," but — as New GM itself concedes (*id.*) — courts, including those cited favorably in *Harris*, have looked at a successor's contacts not only with the relevant customer alone, but also with the predecessor's customers generally.  *See also Harris*, 243 Va. at 72 ("[C]ourts have looked to whether there was a direct and continuing relationship between the successor and the predecessor's *customers*." (emphasis added)).   And, in any event, there is no dispute that New GM had a statutory duty to warn Cockram herself of safety defects and that it did, in fact, do so, both prior to the accident in 2010 (regarding a power steering defect), and

_____

notes — as it did in *Scheuer* — that the Sale Agreement did not create third-party-beneficiary rights.  (New GM's Mem 3-6; New GM's Reply 2-3).  True enough, but as this Court has previously explained, New GM is being sued in tort for breach of a duty under state tort law, not in contract for breach of a duty under the Sale Agreement.  *See Scheuer Summ. J. Op.*, 2015 WL 9582714, at *9 n.8 ("As discussed, New GM's duty is grounded in the common law of torts, not the 2009 Sale Order, and thus does not rest on any third-party beneficiary status under the Sale Order (which, New GM rightly points out, would be inconsistent with Judge Gerber's rulings)."); *see also id.* at *5 n.4 (agreeing with New GM "that a post-sale duty to warn cannot be imposed solely on the basis of the 2009 Sale Agreement" under some kind of successor-in-bankruptcy theory).  New GM also argues that the Sale Agreement is irrelevant because it does not constitute New GM's "own, independent, *post-Closing* acts or conduct." (New GM's Mem. 7).  If New GM had a duty to warn under applicable state law, however, its "independent conduct" was in allegedly failing to fulfill that duty.  The "post-Closing acts or conduct" limitation applies to New GM's acts or omissions, not to whether a duty to warn existed.

after her accident in 2014 (regarding the ignition switch defect, albeit belatedly).  (*See* Pl.'s Opp'n 16; New GM's Reply 7).  Moreover, Cockram's car was sold in December 2005 with express warranties extending up to five years — including, most notably, a five-year warranty for the powertrain, which apparently covered the "Ignition System" (New GM's Ex. 4, at 4, 20) — which means that New GM assumed liability for *Cockram's* warranties in particular.

Those features do not appear to have been present in *Harris*.[5]  Undoubtedly, Truxmore assumed no Safety Act duties from Truxmore Industries.  And, although not entirely clear from the Court's opinion, it may well be that Truxmore did not even assume its predecessor's warranty or contract liabilities (if it ever had any) with respect to Cooper's vehicle.  *See id.* at 72 ("[C]ourts . . . have overwhelmingly rejected claims based upon the duty when there is no service obligation or there has been no actual service of the product."); Brief of Appellee Truxmore, 1991 WL 11262660, at 19-20 (stating that "Harris argues, without authority, that if 'the corporate successor should know of the defect, whether or not there is a service contract, or has actual knowledge of the defect, then the reason for placing importance on the service contract is overcome.'" (quoting Harris's brief, which is not available on Westlaw)); *see also Polius*, 802 F.2d at 84 (finding no duty to warn where "[t]he record establishes that Clark did not succeed to Baldwin's service contracts *and thus did not have one for the machine involved in this case*." (emphasis added)); *J & B Co. v. Bellanca Aircraft Corp.*, 911 F.2d 152, 154 (8th Cir.

---

[5]     The task of interpreting *Harris* is complicated by the fact that the Court engaged in more assertion than it did analysis.  After noting the factors that courts had used to determine if there was a duty to warn, the Court did little more than assert that the ongoing commercial relationship between Truxmore and Cooper (which involved multiple distinct interactions) was "a" (note the singular) "mere casual contact."  *Id.* at 72.  This lack of explicit reasoning, as well as the peculiar factual posture of the case (among other things, it is unclear whether the truck involved was defective at the time of sale and the plaintiff was not Truxmore's customer but rather a third party who had already settled with the driver of the truck) and more recent developments in the law, are reasons to be wary of putting too much weight here on the result reached in that case.

1990) (finding no duty to warn where the defendant "did not succeed to any of [the predecessor's] service contracts, *and plaintiffs' plane was not covered by any service contract with* [*the defendant*] *or in fact serviced by* [*the defendant*]" (emphasis added)), *cited in Harris*, 243 Va. at 72.  Thus, whereas the contact between Truxmore and Cooper in *Harris* was "casual," at best, the relationship between New GM and Old GM's customers (Cockram included) was "direct and continuing" and sufficiently "special" to give rise to a duty to warn under Virginia law.  *Harris*, 243 Va. at 72; *see also Sherlock v. Quality Control Equip. Co.*, 79 F.3d 731, 735 (8th Cir. 1996) (holding that there was sufficient evidence of a duty-to-warn relationship between a successor and its predecessor's customers where the successor "perceived it to be economically advantageous to foster relationships with [the predecessor's] customers; for, through these associations [the successor] would have the opportunity not only to peddle replacement parts, but to one day possibly benefit from the sale of new machines" to those same customers); *Sweatland v. Park Corp.*, 181 A.D.2d 243, 245-46 (N.Y. App. Ct. 1992) (finding, on summary judgment, that a failure-to-warn claim could proceed against a post-bankruptcy asset purchaser even though the asset purchaser's limited assumption of liability did not cover that claim and the defective product shipped "over 30 years before the closing").

Accordingly, New GM's motion for summary judgment with respect to Cockram's negligent failure-to-warn claim is denied.[6]  It follows that New GM's motion with respect to

---

[6]     New GM's remaining arguments are unpersuasive and warrant little discussion.  For instance, New GM states (without explanation or citation) that "warranties are not service contracts."  (New GM's Reply 6).  That may be true as a technical matter, *see, e.g.*, Federal Trade Commission, *Auto Service Contracts and Warranties* ("A service contract is a promise to perform (or pay for) certain repairs or services.  Sometimes called an 'extended warranty,' a service contract is not a warranty as defined by federal law.  A service contract may be arranged at any time and always costs extra; a warranty comes with a new car and is included in the purchase price."), *available at* https://www.consumer.ftc.gov/articles/0054-auto-service-contracts-and-warranties, but it is hard to see how it is relevant.  *But see Tracey by Tracey v.*

Plaintiff's negligence *per se* claim also fails, as New GM's arguments for dismissal of that claim — that New GM did not owe Cockram a duty and that Cockram cannot base her claim on a violation of the Sale Agreement (New GM's Mem. 11-13) — are little more than repeats of the arguments just discussed.  The same, however, cannot be said of New GM's motion with respect to Cockram's claim based on a failure to *recall*.  Cockram identifies no Virginia precedent recognizing a duty to recall.  (*See* Pl.'s Opp'n 18-19).  And even if the Virginia Supreme Court generally would, as the Court predicts, adopt the Third Restatement's approach when defining New GM's duties, the Third Restatement does not impose a duty to recall absent "a governmental directive issued pursuant to a statute or administrative regulation specifically requir[ing] the seller or distributor to recall the product."  Restatement (Third) of Torts: Prod. Liab. § 11(a)(1) (1998); *see also id.*, Comment a ("[E]ven when a product is defective within the meaning of § 2, § 3, or § 4, an involuntary duty to recall should be imposed on the seller only by a governmental directive issued pursuant to statute or regulation.  Issues relating to product recalls are best evaluated by governmental agencies capable of gathering adequate data regarding the ramifications of such undertakings.  The duty to recall or repair should be distinguished from a post-sale duty to warn . . . .").  Most significant for present purposes, "the governmental directive must require the defendant to recall the product *during the time period in which the plaintiff claims the defendant breached the duty to recall*."  *Id.*, Comment b (emphasis added).

---

*Winchester Repeating Arms Co.* 745 F. Supp. 1099, 1112 (E.D. Pa. 1990) (suggesting, without explanation, that there is a relevant distinction between warranties and service contracts for purposes of a duty to warn), *aff'd*, 928 F.2d 397 (3d Cir. 1991).  And *Baker* does not call for a different result, as it dealt with whether a repair service, not a successor, had a duty to warn, and it neither cited nor discussed *Harris*.  *See* 272 Va. at 685-86.

No such directive existed during that time period here — that is, *prior* to Cockram's accident. Accordingly, Cockram's failure-to-recall claim must be and is dismissed.[7]

## B.  Fraud

Next, New GM moves for summary judgment with respect to Cockram's fraud claims. Significantly, she pursues claims under Virginia law for both actual and constructive fraud.  A party pursuing a cause of action for *actual* fraud in Virginia "must prove by clear and convincing evidence all of the elements of fraud: (1) a false representation, (2) of material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) damages resulting from that reliance."  *Bank of Montreal v. Signet Bank*, 193 F.3d 818, 826 (4th Cir. 1999).  *Constructive* fraud differs primarily "in that the misrepresentation of material fact is not made with the intent to mislead, but is made innocently or negligently; the plaintiff must still prove the other elements of actual fraud — reliance and detriment — by clear and convincing evidence."  *Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 628 (4th Cir. 1999) (emphasis added); *accord Evaluation Research Corp. v. Alequin*, 247 Va. 143, 148 (1994).  In this case, Cockram expressly disavows any allegation that New GM engaged in "affirmative misrepresentations."  (*See* TAC ¶ 396 ("Plaintiff does not base [her fraud] claim on affirmative misrepresentations Old GM or New GM made to Plaintiff.")).  Instead, she bases her claims on a theory of fraud by omission.  (*See* Pl.'s Opp'n 20-24)  New GM contends that for such claims to succeed, Cockram must be able to show that New GM had a duty to disclose and that she cannot do so in this case. (New GM's Mem. 13-17; New GM's Reply 13-14).

---

[7]     Unlike Scheuer, Cockram does not pursue a claim for a negligently administered recall (since her accident predated New GM's recalls).  *See Scheuer Summ. J. Op.*, 2015 WL 9582714, at *9 (concluding that "[i]n any event, New GM also assumed a duty when it instituted the recall"); Restatement (Third) of Torts § 11(a)(2) (providing liability for a defendant if it "fails to act as a reasonable person in recalling the product").

The Court agrees with respect to Cockram's constructive-fraud claim.  First, there is no question that, under Virginia law, a constructive fraud-by-omission claim requires a duty to disclose.  *See, e.g.*, *Noell Crane Sys. GmbH v. Noell Crane and Serv., Inc.,* 677 F. Supp. 2d 852, 871 (E.D. Va. 2009); *see also LightSquared Inc. v. Deere & Co.*, No. 13-CV-5543 RMB, 2015 WL 585655, at *9 (S.D.N.Y. Feb. 5, 2015) (applying Virginia law), *aff'd sub nom. Harbinger Capital Partners LLC v. Deere & Co.*, 632 F. App'x 653 (2d Cir. 2015).  Second, as New GM points out, most — if not all — Virginia cases recognizing claims of constructive fraud have involved "a fiduciary or confidential relationship between plaintiff and New GM" or "a business transaction between them."  (New GM's Mem. 14-16 & n.24 (citing cases); New GM's Reply 13-14 (same)).  At a minimum, no Virginia court appears to have recognized a duty to disclose in circumstances remotely close to those here, involving a personal injury product liability claim. That may be because such claims are usually packaged as failure-to-warn claims.  *See, e.g.*, *Baker*, 272 Va. 677; *Harris*, 243 Va. 63.  But that observation merely underscores the point: Where, as here, the question is whether a manufacturer (or its successor) owed a duty "to disclose" — that is, to warn of — a latent product defect, that question is best answered with recourse to the principles of product liability.  *Cf. Wright v. Brooke Grp. Ltd.*, 652 N.W.2d 159, 176 (Iowa 2002) ("Principles of products liability law define the duties of disclosure owed by a manufacturer to a consumer arising out of their relationship as such.").  Put differently, the Court finds no basis to conclude that the Virginia Supreme Court would permit Cockram to repackage her failure-to-warn claim as a constructive fraud-by-omission claim.

That conclusion finds support in decisions from other jurisdictions dismissing nondisclosure claims as duplicative of failure-to-warn claims.  *See, e.g.*, *Waterhouse v. R.J. Reynolds Tobacco Co.*, 270 F. Supp. 2d 678, 684–85 (D. Md. 2003) (holding that the plaintiff's

claim for fraudulent concealment was "in large part nothing more than a failure-to-warn claim in different dress" and dismissing it as duplicative); *Hamner v. BMY Combat Sys.*, 869 F. Supp. 888, 893 (D. Kan. 1994) (dismissing the plaintiff's fraudulent concealment theory, the basis of which is "properly stated as a claim for a breach of defendants' duty to warn"); *Spangler v. Sears, Roebuck & Co.*, 759 F. Supp. 1337, 1338 (S.D. Ind. 1991) (concluding that fraudulent concealment and failure-to-warn claims were duplicative where the plaintiff alleged that a drug manufacturer had fraudulently misrepresented that a smoking cessation drug was safe and fraudulently concealed knowledge of the drug's dangers); *Kline v. Pfizer, Inc.*, No. 08–3238, 2009 WL 32477, at *4 (E.D. Pa. Jan. 6, 2009) (noting that the "very crux of [fraudulent concealment] claims rests on a failure to warn theory of liability").  Where courts have allowed the two claims to proceed in tandem, it has generally been because the fraud claim requires proof of intent to deceive or because the product liability claim sounds in strict liability rather than negligence.  *See, e.g.*, *In re Neurontin Mktg., Sales Practices & Products Liab. Litig.*, 618 F. Supp. 2d 96, 113 (D. Mass. 2009) ("In contrast to failure to warn claims, . . . claims based on a fraudulent concealment or misrepresentation require scienter.").  Yet in Virginia, constructive fraud has no *mens rea* requirement and strict products liability is not recognized.  *See Hitachi*, 166 F.3d at 628; *Harris*, 243 Va. at 71 (rejecting rules that "are based upon the doctrine of strict liability — a doctrine that is not recognized in Virginia").  Accordingly, the Court concludes that Virginia would not recognize a constructive-fraud-by-omission claim that either duplicates or conflicts with its failure-to-warn jurisprudence, and New GM's motion is granted with respect to Plaintiff's constructive fraud claim.

By contrast, New GM's arguments concerning Cockram's actual fraud claim are unpersuasive.  As an initial matter, the Court agrees with Plaintiff that, under Virginia law (as

under the common law generally), an actual fraud claim does not require a duty to disclose.  *Cf. Scheuer Summ. J. Op.*, 2015 WL 9582714, at *7 n.5 (noting that "it is unclear whether Oklahoma recognizes a claim for *actual* fraud based on the concealment of a material fact, as opposed to a *constructive* fraud claim, which requires a particular duty to disclose").  Admittedly, there is some dictum in *Bank of Montreal* that supports New GM's position (or, perhaps, assumption) that a duty to disclose is generally required for any fraud-by-omission claim, *see* 193 F.3d at 827 ("Silence does not constitute concealment in the absence of a duty to disclose."), but it appears to be based on a misreading of the Virginia Supreme Court's decision in *Norris v. Mitchell*, 255 Va. 235 (1998).  The *Norris* Court distinguished concealment, which "always involves *deliberate* nondisclosure *designed* to prevent another from learning the truth," from mere silence or nondisclosure.  255 Va. at 240 (emphasis added).  The former is actionable in itself.  *Id.*; *see also Hitachi*, 166 F.3d at 629 ("[C]oncealment, whether by word or conduct, may be *the equivalent* of a false representation because it always involves deliberate nondisclosure designed to prevent another from learning the truth." (emphasis added)); *Van Deusen v. Snead*, 247 Va. 324, 328 (1994) ("[C]oncealment of a material fact may constitute the element of misrepresentation."); *accord Crosby v. Buchanan*, 90 U.S. 420, 454 (1874) ("[D]eliberate concealment is equivalent to deliberate falsehood.").  The latter requires an "affirmative duty" to disclose.  *Norris*, 255 Va. at 241; *accord United States v. Colton*, 231 F.3d 890, 898-901 (4th Cir. 2000).  Here, of course, Cockram brings an actual fraud claim based on deliberate concealment.  *Cf. Norris*, 255 Va. 241 (dismissing a fraud claim where there was "no allegation of a deliberate decision to conceal" and

no duty to disclose "under the circumstances"). Thus, Cockram need not establish a duty to disclose.[8]

Perhaps recognizing the foregoing, New GM changes tack in its reply brief and appears to argue more broadly that an actual fraud *claim* — not just the purportedly requisite *duty to disclose* — may arise only from "a (i) confidential or fiduciary relationship or (ii) transaction between the parties." (New GM's Reply 11-13). That argument fails. For one thing, it is arguably procedurally improper. *See, e.g.*, *In re: Gen. Motors LLC Ignition Switch Litig.*, No. 14-MD-2543 (JMF), 2015 WL 7769524 (S.D.N.Y. Nov. 30, 2015) (enforcing against New GM the rule that arguments raised for the first time in a reply brief are waived); *In re: Gen. Motors LLC*, No. 14-MC-2543 (JMF), 2015 WL 7574460, at *9 (S.D.N.Y. Nov. 25, 2015) (same against Plaintiffs). For another, New GM's argument cannot be squared with cases holding that privity between the parties is not required for a fraud claim to be actionable in Virginia. *See Alexander v. Se. Wholesale Corp.*, 978 F. Supp. 2d 615, 623 (E.D. Va. 2013) ("In Virginia, a claim of fraud does not require direct contact or privity between the defendant and the plaintiff."); *Branin v. TMC Enters., LLC*, 832 F. Supp. 2d 646, 653 (W.D. Va. 2011) (upholding a fraud claim asserted against a remote seller of vehicle that had no direct relationship with plaintiff); *Harris v. Universal Ford*, Inc., No. 3:00-cv-693, 2001 U.S. Dist. LEXIS 8913, at *12 (E.D. Va. Feb. 5, 2001) (ruling that Virginia does not "insulate all parties who are one-step-removed from a

---

[8]     *McCabe v. Daimler AG*, — F. Supp. 3d —, 2015 WL 10091635 (N.D. Ga. Aug. 20, 2015), upon which New GM relies heavily (New GM's Mem. 15), is distinguishable for similar reasons. Specifically, whether because the plaintiffs in that case did not allege deliberate concealment or because the Court (perhaps understandably) misread applicable Virginia law, the *McCabe* Court did not address deliberate concealment — specifically, the fact that it does not require a duty to disclose — when it stated that "a fraud by omission claim carries with it a concomitant showing that the defendant owed the plaintiff a duty to disclose the information." *Id.* at *16.

transaction or activity, but who have to know the possible consequences of their fraudulent actions"); *Mortarino v. Consultant Eng'g Servs., Inc.*, 251 Va. 289, 294-95 (1996) (permitting the amendment of a pleading to allege fraud against a defendant who made no direct representation to plaintiff and with whom the plaintiff had no direct relationship).

In short, Cockram's constructive fraud claim is dismissed, but her actual fraud claim survives. Although the different outcomes might seem counterintuitive at first blush, they find ample support in Virginia law. First, as discussed, deliberate concealment does not require a duty to disclose. Thus, Plaintiff's deliberate concealment claim, unlike her constructive fraud claim, is not simply an awkward repackaging of a failure-to-warn claim. *See In re Neurontin*, 618 F. Supp. 2d at 113 (finding that fraudulent concealment was not duplicative of a failure-to-warn claim because the plaintiffs alleged "that defendants intentionally withheld material information about the side effects of Neurontin from both consumers and their prescribing physicians, with the intent to deceive"). To the contrary, the *sine qua non* of a claim for actual fraud is intent to deceive, something not required for either a failure-to-warn claim or a constructive-fraud-by-omission claim. *See Husky Int'l Elecs., Inc. v. Ritz*, 136 S. Ct. 1581, 1586 (2016) ("The word 'actual' has a simple meaning in the context of common-law fraud: It denotes any fraud that involves moral turpitude or intentional wrong. 'Actual' fraud stands in contrast to 'implied' fraud or fraud 'in law,' which describe acts of deception that may exist without the imputation of bad faith or immorality." (internal quotation marks, citation, and alterations omitted)); *In re Neurontin*, 618 F. Supp. 2d at 113 ("In contrast to failure to warn claims, . . . claims based on a fraudulent concealment or misrepresentation require scienter."). Second, Virginia views deliberate concealment to be "the equivalent of a false representation," *Hitachi*, 166 F.3d at 629; *see also Van Deusen*, 247 Va. at 328-29, a view that is well grounded in

traditional principles of tort law, *see, e.g.*, *Crosby*, 90 U.S. at 454; Dan B. Dobbs, et al., The Law

of Torts § 682 (2d ed.) ("Active and intentional concealment of a material fact is not mere

nonfeasance.  Intentional concealment is an active misrepresentation and is a form of fraud,

though it accomplished through appearances rather than through speech. Nondisclosure, in

contrast, is merely an omission to reveal material facts, very much in line with the traditional

notion of nonfeasance for which liability is imposed only when a special duty exists." (footnote

omitted)); 37 Am. Jur. 2d Fraud and Deceit § 8 ("Actual fraud is embraced, generally, under two

categories: suggestion of falsehood or false representation, and suppression of the truth or

concealment. . . .  [C]onstructive fraud differs from actual fraud in that it is based on a

confidential relationship rather than a specific misrepresentation." (footnote omitted)).  And

finally, as discussed, there is no privity requirement for false representations — and, by

extension, deliberate omissions.  Accordingly, while New GM's motion is granted with respect

to the constructive fraud claim, it is denied with respect to the actual fraud claim.

## C.  The VCPA

Finally, New GM moves for summary judgment on Cockram's claim under the VCPA.

(New GM's Mem. 17).  The VCPA prohibits certain "fraudulent acts or practices committed by a

supplier in connection with a consumer transaction," Va. Code Ann. § 59.1-200 — including,

most broadly, "[u]sing any . . . deception, fraud, false pretense, false promise, or

misrepresentation in connection with a consumer transaction," *id.* § 59.1-200 (A)(14).  Thus, by

its terms, the VCPA is limited to acts committed "in connection with a consumer transaction"

and by "a supplier," which it defines as "a seller, lessor or licensor who advertises, solicits or

engages in consumer transactions, or a manufacturer, distributor or licensor who advertises and

sells, leases or licenses goods or services to be resold, leased or sublicensed by other persons in

consumer transactions." Va. Code Ann. § 59.1-198.  Notwithstanding the foregoing, New GM

argues only that "Plaintiff's VCPA claim fails for the same reason as her fraud claim" —

namely, that it is "not actionable absent a duty to disclose."  (New GM's Mem. 17; New GM's

Reply 15).  Given the Court's denial of New GM's motion with respect to Cockram's actual

fraud claim, it follows that New GM's motion is also denied with respect to Cockram's VCPA

claim as well.[9]

## CONCLUSION

For the reasons stated above, New GM's motion for summary judgment is GRANTED in

part and DENIED in part.  Specifically, although Cockram's failure-to-recall claim and

constructive fraud claim are dismissed, her other Independent Claims survive.  As a result,

Cockram may seek punitive damages in this case.  The Clerk of Court is directed to terminate

14-MD-2543, Docket No. 2938; and 14-CV-8176, Docket No. 412.


SO ORDERED.

Dated: August 15, 2016
        New York, New York

_____
                JESSE M. FURMAN
             United States District Judge

---

[9]     In a footnote in its reply memorandum of law, New GM asserts that it argued in its initial
memorandum that the VCPA claim should be dismissed because "there was no transaction."
(New GM's Reply 15 n.10).  That assertion is disingenuous at best.  New GM plucks language
from the introduction of its initial memorandum out of context, and ignores the section of its
initial memorandum actually devoted to Cockram's VCPA claim.  That section argues only that
the claim should be dismissed "for the same reasons as her fraud claim" and does not rely on, let
alone quote, the language of the statute.  (*See* New GM's Mem. 17).