UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------------x

IN RE:

GENERAL MOTORS LLC IGNITION SWITCH LITIGATION

*This Document Relates To All Actions*

------------------------------------------------------------------------------x

14-MD-2543 (JMF)
14-MC-2543 (JMF)

<u>OPINION AND ORDER</u>

JESSE M. FURMAN, United States District Judge:

**[Regarding Economic Loss Plaintiffs' Motion for Reconsideration of the Court's Summary Judgment Ruling or, in the Alternative, for Certification of Interlocutory Appeal]**

This litigation, general familiarity with which is assumed, arises from alleged defects in the ignition switches and other features of certain General Motors vehicles. Some of the claims brought against General Motors LLC ("New GM") — those relevant to the present motion — are brought by Plaintiffs on behalf of putative classes of GM car owners and lessors whose vehicles were subject to recalls and who now seek to recover "economic losses," on the theory that they overpaid for their vehicles because "a car with a safety defect is worth less than a car without a safety defect." *In re Gen. Motors LLC Ignition Switch Litig.*, No. 14-MD-2543 (JMF), 2016 WL 3920353, at *7 (S.D.N.Y. July 15, 2016). After several rulings on the viability of economic loss claims under the law of various jurisdictions, the parties and the Court selected three "bellwether" states — California, Missouri, and Texas (collectively, the "Bellwether States") — for summary judgment, class certification, and *Daubert* motion practice. *See* ECF No. 4499, at 2; ECF No. 4521. Thereafter, New GM filed a motion for summary judgment with respect to the claims of the putative classes in each Bellwether State. *See* ECF No. 5858.

In an Opinion and Order entered on August 6, 2019, the Court granted New GM's motion in several noteworthy respects. *See* ECF No. 7019; *In re Gen. Motors LLC Ignition Switch*

*Litig.*, — F. Supp. 3d —, No. 14-MD-2543 (JMF), 2019 WL 3564698 (S.D.N.Y. Aug. 6, 2019) ("*Order*"). In particular, the Court reached three "significant conclusions." *Id.* at *1. First, the Court held "that, in all three Bellwether States, Plaintiffs' benefit-of-the-bargain damages are properly measured as the lesser of (1) the cost of repair or (2) the difference in fair market value between the Plaintiffs' cars as warranted and those same cars as sold." *Id.* Second, the Court explained: "[T]hat means that evidence of New GM's post-sale repairs is relevant to the calculation of Plaintiffs' damages and, indeed, could theoretically eliminate those damages altogether." *Id.* Third, and most significantly, the Court concluded that, "whether or not Plaintiffs' claims for 'cost-of-repair' damages could survive New GM's motion," Plaintiffs' "claims for 'difference-in-value' damages" could not because Plaintiffs' sole evidence of such damages — the expert testimony of Stefan Boedeker — was insufficient as a matter of Bellwether State law to establish the existence of damages, an essential element of any such claim. *Id.* at *1, *10-16. In closing, the Court acknowledged that its ruling "change[d] the landscape in dramatic ways," and predicted that Plaintiffs might "petition for certification of an interlocutory appeal." *Id.* at *17.

True to the Court's prediction, Plaintiffs now move for certification of an interlocutory appeal. *See* ECF No. 7055. But they do so only in the alternative. The primary relief they seek is reconsideration of several portions of the Court's ruling. For the reasons that follow, the Court concludes that there is no basis to that request and, thus, denies Plaintiffs' motion for reconsideration. But, in no small part because of the significance of the Court's ruling to resolution of this complex litigation, the Court concludes that appellate review would be worthwhile, and thus grants Plaintiffs' motion for certification of an interlocutory appeal.

## MOTION FOR RECONSIDERATION

The Court begins with Plaintiffs' motion for reconsideration. Plaintiffs' motion is governed by Federal Rule of Civil Procedure 59(e) and Local Civil Rule 6.3, which are meant to "ensure the finality of decisions and to prevent the practice of a losing party examining a decision and then plugging the gaps of a lost motion with additional matters." *Medism Ltd. v. BestMed LLC*, No. 10-CV-2463 (SAS), 2012 WL 1450420, at *1 (S.D.N.Y. Apr. 23, 2012) (quoting *Grand Crossing, L.P. v. U.S. Underwriters Ins. Co.*, No. 03-CV-5429 (RJS), 2008 WL 4525400, at *3 (S.D.N.Y. Oct. 6, 2008)). District courts "ha[ve] broad discretion in determining whether to grant a motion [for reconsideration]." *Baker v. Dorfman*, 239 F.3d 415, 427 (2d Cir. 2000). "The major grounds for justifying reconsideration are 'an intervening change in controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'" *Terra Sec. ASA Konkursbo v. Citigroup, Inc.*, 820 F. Supp. 2d 558, 560 (S.D.N.Y. 2011) (quoting *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992)). "The standard for granting [a motion for reconsideration] is strict, and [such a motion] will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked." *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995); *see also Montanile v. Nat'l Broad. Co.*, 216 F. Supp. 2d 341, 341 (S.D.N.Y. 2002) ("Reconsideration of a court's previous order is an extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources." (internal quotation marks omitted)). In short, Rule 59(e) and Local Civil Rule 6.3 must be "narrowly construed and strictly applied so as to avoid repetitive arguments on issues that have been considered fully by the Court." *United States v. Treacy*, No. 08-CR-366 (RLC), 2009 WL 47496, at *1 (S.D.N.Y. Jan. 8, 2009) (internal quotation marks omitted).

Here, Plaintiffs seek reconsideration of three aspects of the Court's summary judgment Opinion and Order. First, they challenge the Court's conclusion that, under California law, benefit-of-the-bargain damages may be mitigated, including through post-sale recalls and repairs. ECF No. 7056 ("Pls.' Mem."), at 3-8. Second, they argue that Texas law does not allow complete mitigation of benefit-of-the-bargain damages sustained by plaintiffs whose products manifested defects. Pls.' Mem. 8. Third, and most significantly, they urge the Court to reverse its holding that the evidence — in particular, Boedeker's expert analysis — is insufficient as a matter of law to establish benefit-of-the-bargain damages based on a difference in value. Pls.' Mem. 8-16. The Court will address each of these arguments in turn.

## A. Post-Sale Mitigation Under California Law

In its Opinion and Order, the Court held that in each of the Bellwether States, including California, "a plaintiff's duty to avoid or mitigate damages means that post-sale repairs are relevant to the calculation of benefit-of-the-bargain damages, even though such damages are initially calculated according to the bargain that was struck at the time of sale." *Order*, 2019 WL 3564698, at *4; *see also id.* at *6 ("California law also recognizes the relevance of post-sale mitigation . . . to the calculation of a monetary award under any of Plaintiffs' theories."). The California Plaintiffs argue that this holding contradicts California law and Ninth Circuit precedent. Pls.' Mem. 3-8. They further argue that, under *U.S. Bank Nat'l Ass'n v. Bank of Am., N.A.*, 916 F.3d 143 (2d Cir. 2019) and, more foundationally, under *Factors Etc., Inc. v. Pro Arts, Inc.*, 652 F.2d 278 (2d Cir. 1981), the Court was required to defer to that Ninth Circuit precedent. Pls.' Mem. 1, 4, 5 n. 3; *see* ECF No. 7299 ("Reply"), at 3.

The Court disagrees. As an initial matter, the California Plaintiffs may have waived their argument that *U.S. Bank Nat'l Ass'n* and *Factors* required this Court to give "conclusive

deference" to the Ninth Circuit's interpretation of California law because they did not raise that argument in their opposition to New GM's motion for summary judgment. *See, e.g.*, *Phillips v. City of New York*, 775 F.3d 538, 544 (2d Cir. 2015) (holding that "arguments . . . raised for the first time in [a] motion for reconsideration" are "not properly presented to the district court" and are therefore "waived"); *see also* ECF Nos. 6059, 6987 (failing to mention *Factors* or argue that conclusive deference is owed to the Ninth Circuit's interpretation of California law). To be sure, the precedential effect of authority is not generally subject to waiver. *See* Pls.' Mem. 2. If a district court failed to follow a Supreme Court precedent, for example, no one would say that the losing party waived the right to complain because it failed to cite a case for the basic proposition that a district court is bound by the Supreme Court. But *Factors* deference is not a conventional precedential rule of that sort, and, as the California Plaintiffs concede, it does not always apply. *See* Reply 3 (noting that *Factors* does not require deference to decisions that "disregarded clear signals from the state's highest court pointing toward a different rule" (quoting *Factors*, 652 F.2d at 283)); *see also Factors*, 625 F.2d at 283 ("A federal court in another circuit would be obliged to disregard a state law holding by the pertinent court of appeals if persuaded that . . . prior state court decisions had been inadvertently overlooked."). Thus, a party seeking to invoke *Factors* deference should — if only as a matter of prudence — bring it to the attention of the other side and the court and should not assume that a court will properly apply it *sua sponte*. The California Plaintiffs also contend that, even if *Factors* deference were subject to waiver, they did not waive the argument because they made it immediately after "the Court explicitly declined to follow Ninth Circuit precedent for the first time." Reply 1. But a party cannot excuse its failure to make an argument on the ground that the court has not yet rejected it. Were it otherwise, it would undermine the well-established proposition that a losing party may not use a motion for

reconsideration to "examin[e] a decision and then plug[] the gaps of a lost motion with additional matters." *Carolco Pictures, Inc. v. Sirota*, 700 F. Supp. 169, 170 (S.D.N.Y. 1988) (internal quotation marks omitted).

The Court need not decide whether Plaintiffs waived their argument about the deference owed to the Ninth Circuit's case law, however, because — contrary to their contention — that court has not held that mitigation is irrelevant to a party's entitlement to benefit-of-the-bargain damages under California law. Indeed, the Ninth Circuit did not even address mitigation in the two decisions the California Plaintiffs cite. In *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979 (9th Cir. 2015), the Ninth Circuit stated that damages calculations "need not account for benefits received after purchase." *Id*. at 989. The post-sale benefits at issue in *Pulaski*, however, were "direct economic benefits" derived from the advertisements that the plaintiffs claimed were displayed in less valuable locations than had been promised. *Id.* at 984; *see also id.* at 989. Similarly, in *Nguyen v. Nissan North America, Inc.*, 932 F.3d 811 (9th Cir. 2019), the Ninth Circuit criticized the district court for "focus[ing] the damages inquiry on [the] potential post-purchase value" the plaintiff derived from using the allegedly defective car, particularly because, as here, the plaintiff's theory was "centered on . . . the defective system itself." *Id*. at 819-21.[1] But the benefits derived from use of an allegedly defective product are very different

---

[1]     Plaintiffs also claim that the Ninth Circuit permitted purchasers who derived value from "selling [or] repurposing" the defective car to recover full benefit-of-the-bargain damages as measured at the time of sale. Reply 3. The Ninth Circuit did not, however, comment on that portion of the district court's opinion, nor did it hold that purchasers who sold the defective car before the market learned of the defect were nonetheless entitled to damages. *See Nguyen*, 932 F.3d at 819-22.

from the benefits that sellers confer in an effort to fix defects or compensate purchasers for them: While the former benefits are contemplated by and priced into a contract, the latter are not.[2]

The California Plaintiffs also rely on *Pulaski*, *Nguyen*, and other California cases for the proposition that benefit-of-the-bargain damages are measured at the time of purchase. *See* Pls.' Mem. 5 (quoting *Pulaski*, 802 F.3d at 989, and *Nguyen*, 932 F.3d at 821, and citing *Stout v. Turney*, 586 P.2d 1228, 1232 (Cal. 1978)); Reply 2-3 (citing *Pulaski*, *Nguyen*, and *In re Lenovo Adware Litig.*, No. 15-MD-2624-RMW, 2016 WL 6277245, at *21 (N.D. Cal. Oct. 27, 2016)). The Court agrees with that general proposition, but — as it explained — "it does not follow that subsequent events cannot mitigate or otherwise reduce a plaintiff's entitlement to such damages." *Order*, 2019 WL 3564698, at *4 n.5; *accord Victorino v. FCA US LLC*, No. 16-CV-1617-GPC (JLB), 2019 WL 5268670, at *7 (S.D. Cal. Oct. 17, 2019) ("According to . . . the same expert in *Nguyen*, the . . . defect can be remedied and class members can be made whole and receive the value they bargained for at the point of sale."). The California Plaintiffs argue that, as "a matter of substantive law" in California, post-sale repairs do not mitigate damages because of the state's "particular[] concern[] with protecting the safety of consumers." Pls.' Mem. 3-4; *see also id.* at 7-8. But it is not necessarily true that states pursue their interests using

---

[2]     A simple example illustrates the difference between these types of "benefits" and the logic of allowing damages to be mitigated by one, but not the other. Imagine that a local store decides to hold special promotional raffles in two consecutive weeks and that it sells raffle tickets in packs of ten, five tickets for each week. A customer purchases a pack of raffle tickets from the store, but, unbeknownst to her, the pack is missing one ticket for the second raffle. The day of the first raffle arrives, and the customer opens her pack and discovers the problem. If the customer were to sue the store, she would be entitled to one additional ticket for the second raffle. But she chooses not to and, when the first raffle is held, she wins the prize. If the customer were to sue the store after winning the raffle, she would *still* be entitled to one ticket for the second raffle because the possibility that she might win was part of the bargain. Instead of suing the store, however, the customer informs the owner of the error when she visits the store to claim her prize, and the owner gives her another ticket. It would be perverse to say that the customer is entitled to anything more as she has now received the full benefit of her bargain.

every possible policy tool and at all costs, and the California Plaintiffs cite no case indicating an intention to protect consumer safety by permitting double recovery. In fact, the Supreme Court of California has explicitly noted that "a party may ultimately be unable to prove a right to . . . restitution" or damages when its injury is fully mitigated. *Clayworth v. Pfizer, Inc.*, 233 P.3d 1066, 1087 (Cal. 2010); *see also In re Myford Touch Consumer Litig.*, No. 13-CV-3072 (EMC), 2016 WL 7734558, at *19 (N.D. Cal. Sept. 14, 2016) ("The California Supreme Court has noted that the defendant's mitigation of an injury may leave the plaintiff unable to prove a right to restitution." (internal quotation marks and alterations omitted) (quoting *Clayworth*, 233 P.3d at 1087)), *reconsideration granted on other grounds*, 2016 WL 6873453 (N.D. Cal. Nov. 22, 2016).

In a last-ditch effort, the California Plaintiffs assert that they would not receive a windfall if the Court were to adopt their position regarding post-sale mitigation. *See* Pls.' Mem. 6-8. According to the California Plaintiffs, the proposed damages model precludes a windfall by "account[ing] for the recall repairs and their timing, and demonstrates that the amount of overpayment damages increases or decreases according to the length of time between a consumer's purchase and the availability of recall repair." *Id.* at 6. The California Plaintiffs also assert that an "alternative construction" of the damages model, posited by another expert, Dr. Joshua Gans, would be "consistent with the theory of harm that between purchase and recall purchasers of at-issue vehicles were driving around at a greater degree of risk." *Id.*

These arguments fail. For one thing, the California Plaintiffs did not rely on Dr. Gans's "alternative construction" of damages in their earlier motion, and any such argument is therefore waived. *See* ECF No. 6059, at 21 (relying on Dr. Gans only for his opinion that the damages model offered by Boedeker is "conceptually appropriate"); *see also, e.g., Tachiona ex rel.*

*Tachiona v. Mugabe*, 186 F. Supp. 2d 383, 385 (S.D.N.Y. 2002) ("[Local Civil Rule 6.3] does not grant license for a party to advance new facts, issues or arguments not previously presented to the Court." (internal quotation marks omitted) (quoting *Morse/Diesel, Inc. v. Fidelity & Deposit Co. of Md.*, 768 F. Supp. 115, 116 (S.D.N.Y. 1991)).  Additionally, the theory of damages based on risk of *physical* harm is inconsistent with the California Plaintiffs' claims for *economic* loss.  *See Arroyo v. Chattem, Inc.*, 926 F. Supp. 2d 1070, 1079 n.11 (N.D. Cal. 2012) ("Financial loss cases typically arise when there is no alleged injury to the Plaintiff other than the financial loss itself."); *Whitson v. Bumbo*, No. C 07-05597-MHP, 2009 WL 1515597, at *5-6 (N.D. Cal. Apr. 16, 2009) (holding that the purchaser of a defective product lacked standing under the benefit-of-the-bargain theory because the safety risk neither materialized nor impeded performance, and the purchaser did not have to repair, replace, or sell the defective product at a reduced price).  The California Plaintiffs cite no cases holding that plaintiffs may recover damages for a risk of physical harm that did not materialize, let alone that such risk can be characterized as economic loss.  To the extent that the California Plaintiffs now assert that they actually experienced diminished performance of their vehicles and that such injuries cannot be mitigated by later repairs, their arguments falter for same reasons that the arguments of the Texas Plaintiffs — to which the Court turns next — falter.

In short, the Court is unpersuaded that it committed any error when it ruled that, under California law, "a plaintiff's duty to avoid or mitigate damages means that post-sale repairs are relevant to the calculation of benefit-of-the-bargain damages."  *Order*, 2019 WL 3564698, at *4.  More to the point for present purposes, Plaintiffs do not come close to meeting the strict standards that would call for reconsideration of that ruling.

## B. Mitigation of Plaintiffs' Injuries Under Texas Law

Plaintiffs devote a mere paragraph in their opening brief to their next argument: that the Court erred in holding that Texas law (1) measures damages by the lesser of cost of repair or the difference in fair market value and (2) does not permit benefit-of-the-bargain damages where a defendant has repaired a defective vehicle. *See* Pls.' Mem. 8; *see also Order*, 2019 WL 3564698, at *8-9. "The record," Plaintiffs contend, "shows that *all* the Texas Plaintiffs suffered ill-effects from the manifestation of the defects in their cars. Accordingly, the Texas Plaintiffs cannot be made whole by a belated repair as a matter of law; the repair (even if effective) does not compensate for the manifestation." Pls.' Mem. 8.

Putting aside whether Plaintiffs' scant briefing is adequate to raise their argument, the argument falls short for two independent reasons. First, as New GM contends, *see* Opp'n 11, this theory of damages is new and, thus, was waived. The Texas Plaintiffs contend that, throughout this litigation, they have asserted claims for "the difference in value between dangerously defective cars unwittingly purchased and . . . cars without known safety defects" and that such claims encompass damages from performance problems associated with the defects. Reply 5. Were that the case, however, their claims would lump together two very different types of damages: (1) lost asset value of a vehicle associated with physical divergence from the vehicle promised, and (2) damages associated with malfunctions actually experienced. *Cf. Nguyen*, 932 F.3d at 819 (differentiating a legal theory "based on the *performance* of the allegedly defective clutch system" from one based on the "system itself, which [the plaintiff] claims is defective"). Although, as a matter of linguistics, a claim for "the difference in value" might be sufficiently broad to encompass the latter type of damages, such a claim does not provide adequate notice of the performance-based theory of harm. *See Davis v. Perez*, No. 16-

CV -0784-NLH-JS, 2018 WL 2113267, at *9 n.7 (D.N.J. May 8, 2018) ("[I]ntroducing a new theory of injury at the summary judgment phase is highly prejudicial in that Defendant has had no notice of such a theory and therefore no ability to respond."). Additionally, the Texas Plaintiffs presented this theory of damages in their opposition to summary judgment only glancingly, noting merely that, "[w]hatever the efficacy of the recall repairs, they were too late to save Plaintiffs from the ill-effects of the defects." ECF No. 6059, at 32. Notably, in all of their briefing — that is, on summary judgment and here — Plaintiffs do not cite a single case holding that, under Texas law, damages related to manifested defects are even recoverable. *See id.*; Pls.' Mem. 8; Reply 4-5.

Second, and in any event, Plaintiffs' argument falls short on its own terms. For starters, Plaintiffs' new theory is entirely unsupported by expert evidence. Boedeker's testimony and model — Plaintiffs' sole evidence for their damages model — focus on Plaintiffs' willingness to pay at the point of sale and do not distinguish among Plaintiffs based on the nature or frequency of manifestation of defects. And, more fundamentally, as the Court previously held, no plaintiff can recover benefit-of-the-bargain damages under Texas law unless a defect manifests. *In re Gen. Motors Ignition Switch Litig.*, 257 F. Supp. 3d 372, 450-52 (S.D.N.Y. 2017). By definition, therefore, in every instance where Texas courts have applied the lesser-of rule, they have done so in a case involving manifestation. *See, e.g.*, *Orr Chevrolet, Inc. v. Courtney*, 488 S.W.2d 883 (Tex. Civ. App. 1972). Absent manifestation, a plaintiff would have had no claim in the first instance. That point makes Plaintiffs' failure to cite a single case holding that repairs cannot reduce damages to zero, or even holding that Texas courts should take manifested defects into account when calculating damages, all the more conspicuous — and damning.

The cases that Plaintiffs cite in their reply do not call for a different result — and not merely because they waited until their reply to cite them for the first time. *See Chepilko v. Cigna Life Ins. Co. of New York*, 952 F. Supp. 2d 629, 633 (S.D.N.Y. 2013) (holding that an argument "made for the first time in reply papers on a motion for reconsideration" is "plainly untimely"). Citing *Mays v. Pierce*, 203 S.W.3d 564, 579-80 (Tex. App. 2006), Plaintiffs claim that they may be entitled to "both benefit-of-the-bargain damages *and* out-of-pocket expenses (including repair costs)." Reply 5. But *Mays* did not implicate repair costs. Instead, the expenses at issue in *Mays* were incidental or consequential damages and were not incurred in order to obtain that which the defendant had promised but failed to provide. *See Mays*, 203 S.W.3d at 570, 579. In fact, in that case, the plaintiff never completed the work that the defendant had abandoned. *Id.* at 570. Second, relying on *Arthur Andersen & Co. v. Perry Equipment Corp.*, 945 S.W.2d 812, 817 (Tex. 1997), Plaintiffs claim — somewhat inconsistently — that, in cases involving deceit, Texas law allows a plaintiff to recover "the *greater* of out-of-pocket or benefit-of-the-bargain damages." Reply 5 (emphasis added). Plaintiffs thus suggest that the Texas Supreme Court meant that plaintiffs can recover the greater — not the lesser — of repair costs or diminution-in-value damages. But *Arthur Andersen* also did not involve repair costs. In that case, "out-of-pocket" damages referred to "the difference between the value the buyer has paid and the value of what he has received." *Arthur Andersen*, 945 S.W.2d at 817. "Benefit-of-the-bargain" damages, by contrast, "measure the difference between the value as represented and the value received." *Id.* The measures differ only when the buyer paid an amount other than the value as represented, which is not what Plaintiffs allege here. Thus, Plaintiffs' cases do not undermine the Court's conclusion that, as a matter of Texas law, plaintiffs are entitled to the lesser of diminution-in-value damages or the cost of repair.

In sum, Plaintiffs provide no reason to reconsider the Court's ruling with respect to mitigation of damages under Texas law either.

## C. Sufficiency of Plaintiffs' Difference-in-Value Evidence

That leaves Plaintiffs' most significant challenge to the Court's ruling. In the Opinion and Order, the Court held that, under each Bellwether State's law, the diminution in value caused by a vehicle's alleged hidden defect is calculated as the difference between the *market* value of a non-defective vehicle for which the plaintiff bargained and the *market* value of the vehicle had the defect been disclosed. *Order*, 2019 WL 3564698, at *5-6 (California); *id.* at *7-8 (Missouri); *id.* at *8-9 (Texas). Market value, in turn, is the price associated with the intersection of the demand curve (which reflects consumers' willingness to pay) and the supply curve (which reflects producers' willingness to sell). *Id.* at *11; *see* Black's Law Dictionary (11th ed. 2019) (defining "fair market value" as "[t]he price that a seller is willing to accept and a buyer is willing to pay on the open market and in an arm's-length transaction; the point at which supply and demand intersect"). In order to prove market value, then, a party must present evidence of *both* willingness to pay and willingness to sell. *Order*, 2019 WL 3564698, at *11 ("Evidence that fails to account for both [supply and demand] is not evidence of market value.").

Applying these principles, the Court held Plaintiffs' evidence was insufficient as a matter of law to support a claim for diminution-in-value damages under each Bellwether State's law. As the Court noted, to support their theory of damages, Plaintiffs relied only on Boedeker's conjoint analysis, which "measures consumer desires by asking survey respondents about their relative preferences for certain combinations of product features," *id.* at *11, and uses their responses to "estimate the amount that consumers would be willing to pay for a vehicle with a particular defect that was fully disclosed," *id.* at *12. Noting that other courts had rejected

conjoint analyses in similar circumstances, the Court held that Boedeker's conjoint analysis is insufficient evidence of diminution in value because it focuses entirely on consumers' willingness to pay and ignores producers' willingness to sell. *Id*. at *13. Without any evidence of the shape of the supply curve, the Court held, no reasonable jury could determine the price at which the supply and demand curves for vehicles with a known defect intersect — let alone conclude that the price would be lower than the one Plaintiffs paid, resulting in damages.

Plaintiffs urge the Court to reconsider this conclusion. They argue that the Court's conclusion is "contrary to fundamental principles of economics" and violates *Comcast v. Behrend*, 569 U.S. 27, 35 (2013), which "requires the damages model to be tethered to the plaintiffs' theory of liability." Pls.' Mem. 9, 10-12. They also contend that the Court's analysis and conclusion rests on a misinterpretation of other court decisions regarding conjoint analyses. *See id.* at 12-15. The Court will address each of these contentions in turn.

### 1. Consistency of Plaintiffs' Liability Theory and Damages Model

Plaintiffs begin by arguing that, "[u]nder the Court's reasoning, damages would be based on factors that have no relationship to the actual harm that the defendant did or did not cause." *Id.* at 9 (internal quotation marks and alteration omitted). This, they contend, "is contrary to fundamental principles of economics," violates the Supreme Court's decision in *Comcast*, and "effectively eliminates damages as a matter of law in certain cases when a defendant knowingly sells an inferior or even dangerous product . . . ." *Id.* These arguments are unpersuasive.

Plaintiffs' *Comcast* argument is most easily rejected because *Comcast* is simply inapposite. The question in *Comcast* was "whether certification was appropriate under Federal Rule of Civil Procedure 23(b)(3)." 569 U.S. at 29. Construing Rule 23, the Court held that, "at the class-certification stage (as at trial), any model supporting a plaintiff's damages case must be

consistent with its liability case." *Id.* at 35 (internal quotation marks and citation omitted).
There is, to put it mildly, something counterintuitive about Plaintiffs' relying on that holding to
argue that the Court held them to too high a burden. More fundamentally, however, the case is
irrelevant because this Court's ruling was based on substantive Bellwether State law and
concerned neither Rule 23 nor class certification. Finally, and in any event, the Court's Opinion
and Order did not create "a mismatch" between Plaintiffs' liability theory and damages model, as
Plaintiffs contend. Pls.' Mem. 10. Plaintiffs' liability theory is indeed "that they paid GM for
one thing (defect-free safe vehicles) but received another (dangerously defective vehicles)." *Id*.
But — contrary to their assertion — their damages model and evidence does not, under
applicable Bellwether State law, "measure[] the difference between what Plaintiffs . . . thought
they were buying . . . and what they received." *Id.*

The fatal flaw in Plaintiffs' difference-in-value claims is that they have no evidence of
the market price of "what they received." Market price, as Plaintiffs concede, "arises from the
intersection between supply and demand." *Id.* That, in turn, requires consideration of the
quantity of products suppliers might be willing to sell at a given price that consumers are willing
to pay and, if that quantity is lower than the quantity actually sold, the likelihood that the
difference in market price would be different than the difference in consumer willingness to pay.
In its Opinion and Order, the Court mentioned quantity because each point on the supply curve,
including the point at which the supply curve intersects with the demand curve, has both a
coordinate indicating sellers' willingness to accept and a coordinate indicating quantity sold.
Indeed, as Boedeker's own report makes clear, sellers' willingness to accept — and, by
extension, price — is dependent on quantity sold. *See* ECF No. 5848, Exhibit 214 ("Boedeker
Rep."), ¶¶ 41-46. As Boedeker explains, a manufacturer's willingness to accept "is equal to the

marginal cost of the manufacturer," and marginal cost is "the cost the manufacturer incurred when producing the last or marginal unit of the product." *Id.* ¶ 41. A manufacturer's marginal cost, in turn, varies depending on the number of units produced. *See Northeastern Tel. Co. v. Am. Tel. and Tel. Co.*, 651 F.2d 76, 87 (2d Cir. 1981) ("In most industries, marginal cost is low at low levels of output. It may decline slightly as output increases, but soon reaches a minimum, and then increases continuously with further increases in production."). Thus, the supply curve is merely an aggregation of manufacturers' willingness to accept. Boedeker Rep. ¶ 42. In short, quantity and price go hand-in-hand. An economist must consider the relationship between willingness to accept and quantity supplied because that relationship *is* the supply curve.

A simple graph makes the point clear:



Were the Court to agree with Plaintiffs that economists need not consider the quantity of products that would be sold with known defects (at least where, as here, there is no direct market

evidence of market price of the defective product), it would blatantly disregard the requirement that diminution-in-value damages must be measured by the difference in market price. That is because the sellers might not be willing to accept the price that the quantity of buyers of non-defective products are willing to pay for defective products, except at much lower quantities. In other words, sales of products with known defects *would not occur* in the market at that price. That amount is, therefore, not the but-for market price.

Plaintiffs' other arguments regarding the implications of the Court's holding are also easily dismissed. Contrary to Plaintiffs' assertion, the Court's holding does not cause "consumers who have suffered identical harm [to be] compensated differently." Pls.' Mem. 11. Plaintiffs claim that, under the Court's logic, consumers who purchase identical steel that is produced by different manufacturers but that turns out to have the very same defect would be compensated differently merely because one manufacturer might be willing to sell at a lower price than the other. *Id.* But damages are determined by the price in the market writ large, not the prices that one or two idiosyncratic sellers might be willing to accept. Plaintiffs also argue that the Court's ruling "untethers the amount of damages from the severity of the wrongful conduct." *Id.* But that is not the case. Instead, it ties the measurement of damages to the difference in market value, as required by Bellwether State law. *Order*, 2019 WL 3564698, at *3 ("[E]ach Bellwether State measures benefit-of-the-bargain damages in cases like this one as the lesser of the cost to repair the defective vehicle or the difference in market value between the vehicle as bargained for and the vehicle as it was actually sold."). And the state law that compels the Court's holding compensates injured parties for the market value they lost and, under appropriate circumstances, permits punitive damages awards to deter willful conduct.

Finally, Plaintiffs argue that Boedeker's analysis "approximat[es] the but-for market price" by using a vertical supply curve, which they claim is permissible in light of the "mandate to construe damages broadly" and the proposition that a plaintiff need only provide "some reasonable basis of computation of damages." Pls.' Mem. 9 (citing *Nguyen*, 932 F.3d at 817-18 and *Pulaski*, 802 F.3d at 989). For reasons explained below, however, under Bellwether State law, a diminution in market value cannot be calculated without reference to willingness to sell. General statements to the effect that the law should be "liberally construed," *Nguyen*, 932 F.3d at 817-18 (internal quotation marks omitted) (quoting Cal. Civ. Code § 1760), do not allow the Court to assume a vertical supply curve and a seller willing to sell at any price. A damages model incorporating a vertical supply curve could conceivably succeed if it were supported by evidence that, in fact, sellers would accept anything consumers are willing to pay. Here, however, Plaintiffs point to no such evidence. To the contrary, Boedeker himself testified that the supply curve is *not* vertical. ECF No. 6075, Exhibit 34 ("Boedeker Dep."), at 63 ("In general, cars as a good do have an elastic supply curve."); *see also* ECF No. 7334-5. Thus, Plaintiffs' assertion that Boedeker's analysis approximates but-for market price is plainly incorrect.

## 2. Interpretation of Other Conjoint Analysis Cases

That leaves Plaintiffs' contention that the Court misinterpreted several cases to support its conclusion that Boedeker's conjoint analysis is insufficient evidence of market price because it entirely neglects the supply curve. *See* Pls.' Mem. 12-15. Once again, Plaintiffs fail to persuade.

Plaintiffs first argue that the Court mistakenly relied on *Saavedra v. Eli Lilly & Co.*, No. 2:12-CV-9366 (SVW) (MANx), 2014 WL 7338930 (N.D. Cal. Dec. 18, 2014). That case was a putative class action in which the plaintiffs sought economic damages, on the theory that

the prescription drugs they received "had less value than the value of the [drug] as class members expected to receive it" because the drug carried a higher risk of side effects than represented. *See Saavedra*, 2014 WL 7338930, at *3. Importantly, the plaintiffs in *Saavedra* "use[d] the term 'value' to mean consumer utility — a concept distinct from [both] price" and "the fair market value concept commonly used when calculating benefit-of-the-bargain damages." *Id.* at *4. Plaintiffs claim that *Saavedra* is inapposite because, there, the court noted that insurance plans and healthcare regulations complicate the relationship between "value" — that is, consumer utility — and the price paid by consumers. Pls.' Mem. 12; *see Saavedra*, 2014 WL 7338930, at *4 ("Plaintiffs use the term 'value' to mean consumer utility — a concept distinct from price."); *id.* at *5 (noting that, due to the "complex array of contracts" between various entities, "depending on her insurance plan, an individual might pay nothing, a percentage of a 'full price' determined by a contract between her insurance provider and another entity, a flat co-payment, or some other 'full' price"). Because of the "disconnect between the price paid" and consumers' "valuation of the product," a conjoint analysis would not accurately measure damages even under the plaintiffs' lost utility theory. *Saavedra*, 2014 WL 7338930, at *7.

But, of course, the fact that a conjoint analysis under such circumstances might not accurately reflect market demand says nothing about whether it accurately reflects willingness to sell and supply. In fact, Plaintiffs admit that the *Saavedra* court also criticized the conjoint analysis for "looking only to consumer demand while ignoring supply," thereby "convert[ing] the lost-expectation theory from an objective evaluation of relative fair market values to a seemingly subjective inquiry of what an average consumer wants." *Id.* at *5 (further criticizing plaintiffs' lost utility theory because "[t]he Court . . . found no case holding that a consumer may recover based on consumers' willingness to pay irrespective of what would happen in a

functioning market (i.e. what could be called sellers' willingness to sell)."); *see* Pls.' Mem. 13. This comment is neither "unclear" nor "misplaced," *see* Pls.' Mem. 13; instead, it is an independent, and sufficient reason for the court's rejection of the conjoint analysis. That is, the expert's failure to consider supply was itself dispositive; that failure was made *worse* by the fact that, in the *Saavedra* court's view, "the prescription drug market is not an efficiently functioning market," *Saavedra*, 2014 WL 7338930, at *5, but it was a fatal flaw in its own right.

Plaintiffs seek to undermine *Saavedra*'s persuasive force by noting that it approvingly cited *Apple, Inc. v. Samsung Electronics Co.*, No. 11-CV-1846 (LHK), 2014 WL 976898 (N.D. Cal. Mar. 6, 2014), in which the plaintiffs asserted claims for patent infringement. Plaintiffs argue that *Apple* is inapposite because damages for patent infringement are measured "based on a defendant's wrongful profits . . . and are unrelated to whether the end consumer received the benefit of the bargain." Pls.' Mem. 13. But that reads too much into *Apple*. There, the court considered whether the plaintiffs had provided sufficient evidence of a causal nexus between Samsung's infringement of Apple's patents and alleged irreparable harm to support an injunction. *See Apple*, 2014 WL 976898, at *9. To demonstrate a causal nexus, a party may, *inter alia*, present "evidence that a patented feature significantly increases the price of a product." *Id.* at *12 (internal quotation marks omitted). The existence of a causal nexus, like the measure of benefit-of-the-bargain damages, thus turns on the relevant product's market price had the defendant not acted wrongfully. *See id.* at *7 (noting that "evidence show[ing] that a feature significantly increases the price of a product . . . would be relevant to show that the feature drives demand for the product" and therefore demonstrates a causal nexus between infringement and the alleged harm (internal quotation marks omitted)). In cases like this one, Plaintiffs must provide evidence of the vehicles' market price had their alleged defects been disclosed. *Order,*

2019 WL 3564698, at *10 (noting that, under Bellwether State law, "Plaintiffs must have some evidence of, among other things, market value of the allegedly defective vehicles that they actually received"). In patent cases like *Apple*, the plaintiffs must provide evidence of the product's market price had it not included infringing features. *Apple*, 2014 WL 976898, at *11-12 (considering whether conjoint analysis provided sufficient evidence of price premiums associated with infringing features). For that reason, although the context in *Apple* was different, the critical question was the same: Does a conjoint analysis measuring consumers' willingness to pay accurately measure market price? *See Apple*, 2014 WL 976898, at *11. The *Apple* court, like this Court, answered "no," because the "survey evidence measures only demand . . . and does not account for supply at all." *Id.* at *12.

Plaintiffs float one other reason the Court should not apply *Apple*'s holding to benefit-of-the-bargain damages: because the judge who decided *Apple* later issued two opinions allegedly "*approving* the use of actual real-world supply in *consumer* litigation." Pls.' Mem. 13, 14-15 (citing *Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1104-06 (N.D. Cal. 2018) and *In re Arris Cable Modem Consumer Litig.*, 327 F.R.D. 334, 372-73 (N.D. Cal. 2018)). Putting aside the potentially false premise that two opinions written by the same judge must be consistent with one another, Plaintiffs incorrectly characterize both *Hadley* and this Court's Order as holding "that it is only proper to use actual quantity supplied to calculate damages when the 'inferior' product is already on the market." Pls.' Mem. 14. Neither *Hadley* nor this Court held that it is *ever* proper to assume a vertical supply curve when measuring damages. Instead, both opinions require plaintiffs to present evidence of willingness to sell to determine market price (and then multiply the quantity actually supplied, held constant, by the price premium to determine total damages for the class). As this Court explained, *Hadley* also held that the particular conjoint

analysis at issue *did* "adequately account[] for supply-side factors," *Hadley*, 324 F. Supp. 3d at 1106, because the survey estimated consumers' preferences for various features by asking about a "range of prices . . . mirror[ing] those actually observed in the market" for products with or without those features, *id.* at 1103. *See Order*, 2019 WL 3564698, at *15. That is, the plaintiffs in *Hadley* had real-world evidence of the inferior product's price and, thus, willingness to sell.[3]

Plaintiffs encourage the Court to adopt a broader reading of *Hadley* because, in *Arris*, the same judge approved the use of a conjoint analysis to measure damages associated with a defective modem, and "no company advertises that it is selling a defective modem." Pls.' Mem. 14; *see Arris*, 327 F.R.D. at 367.[4] But this argument is flawed for two reasons. First, in *Arris*, "the theory of liability [wa]s that latency defects in the Modem cause[d] various performance issues, and the conjoint survey attempt[ed] to measure how much less consumers would pay for a Modem with those performance issues." *Id.* at 370. It is not impossible, or even unlikely, that companies would sell modems with varying specifications and, thus, varying performance levels.

---

[3]     Plaintiffs may be arguing that *Hadley* suggested that conjoint analyses provide sufficient evidence of market price if the survey incorporates real-world prices of the product as bargained for but not the product as actually received. If so, the Court disagrees, because such analyses would not provide any evidence of willingness to sell and approval of such analyses would be hard to square with the *Hadley* court's observation that ignoring willingness to sell "convert[s] what is properly an objective evaluation of relative fair market values into a seemingly subjective inquiry of what an average consumer wants." *Hadley*, 324 F. Supp. 3d at 1104-05 (internal quotation marks omitted) (quoting *In re NJOY, Inc. Consumer Class Action Litig.*, 120 F. Supp. 3d 1050, 1119 (C.D. Cal. 2015)). In any event, as discussed below, even if the Court's interpretation of *Hadley* were wrong, the Court's ultimate conclusion would not change.

[4]     Plaintiffs also invoke *Arris* to argue that the Court erroneously held that whether a conjoint analysis properly includes evidence of supply turns on the existence or non-existence of an inferior product on the market. *See* Pls.' Mem. 15. But the Court did no such thing. It merely held — and now reaffirms — that, in order to prove market price, a plaintiff must show evidence of both demand (willingness to pay) and supply (willingness to accept). Conjoint analyses do not always account for supply, but a particular analysis might if it incorporated real-world prices of the inferior product because it shows that sellers are willing to accept such prices. To say that real-world transaction data regarding the price of an inferior product may be sufficient, however, is not to say that such data is necessary.

Although *Arris* does not indicate that the prices referenced in conjoint analyses were based on such other modems, there is also no indication that they were not. That is because of the second, more significant flaw in Plaintiffs' argument, which the Court noted in its summary judgment ruling: *Arris* includes no discussion whatsoever of whether the conjoint analysis accounted for supply-side factors or how supply-side factors influence market price. *See Order*, 2019 WL 3564698, at *15. The Court will not read into *Arris*'s silence.

Finally, the Court also disagrees with Plaintiffs' assertion that its conclusion is supported by neither *Zakaria v. Gerber Products Co.*, No. LA-CV-15-200 (JAK), 2017 WL 9512587 (C.D. Cal. Aug. 9, 2017), nor *In re NJOY, Inc.*, 120 F. Supp. 3d 1050 (C.D. Cal. 2015). Plaintiffs claim that *Zakaria* "expressly distinguished cases, like this one, in which an expert uses real-world prices and real-world supply." Pls.' Mem. 14. But *Zakaria* distinguished cases in which an expert had used real-world prices *of products known to have the inferior attribute*, not of the challenged product. *Zakaria*, 2017 WL 9512587, at *19-20. Such questions enable "hedonic regression[s] that account[] for supply and market factors." *Id.* at *20 (quoting *In re NJOY*, 120 F. Supp. 3d at 1121). *Zakaria* distinguished the *Hadley* line of cases, and Plaintiffs do not argue that Boedeker's analysis is consistent with that line. *See* Pls.' Mem. 14-15. Moreover, in *Zakaria* itself, as here, the conjoint analysis "showed only how much consumers subjectively valued [the alleged mislabel], not what had occurred to the actual market price of [the challenged product] with or without the label. Thus, regardless [of] whether consumers were willing to pay a higher price for the labelled product, the expert's opinion did not contain any evidence that such a higher price was actually paid; hence, no evidence of restitution or actual damages was proffered." *Zakaria v. Gerber Products Co.*, 755 F. App'x 623, 625 (9th Cir. 2018), *aff'g* 2017 WL 9512587.

In Plaintiffs' view, *In re NJOY* is inapposite because the court "reached no conclusion about whether it would be appropriate to calculate damages based on actual, historical supply provided that the conjoint survey included other real-world considerations." Pls.' Mem. 14. But, of course, the "other real-world considerations" that the *In re NJOY* court held expert analysis must consider included not only "brand," *id.*, but also willingness to sell. *See In re NJOY*, 120 F. Supp. 3d at 1119-1120 (criticizing the proffered conjoint analysis because it "completely ignore[d] the price for which [the defendant] is willing to sell its products, what other . . . manufacturers say about their products, and the prices at which those entities are willing to sell their products"). Like the *Zakaria* court and this Court, the *In re NJOY* court noted that conjoint analyses have succeeded where they incorporate actual market prices of products with and without the alleged misrepresentation, because those prices incorporate sellers' willingness to accept and therefore allow for a regression that measures market value, not only willingness to pay. *See id.* at 1121-22 (distinguishing *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 1027-29 (C.D. Cal. 2015), in which the "proposed hedonic regression account[ed] for . . . supply and market factors" (internal quotation marks omitted)). And, like the *Zakaria* court and this Court, the *In re NJOY* court found that the proffered conjoint analysis "completely ignore[d]" the defendant's willingness to sell and the attributes and prices of competing products. *Id.* at 1120. For these reasons, the analysis did "not permit the court to calculate the *true market price*" of the challenged product "absent the purported misrepresentations." *Id.* at 1122.

In short, Plaintiffs fail to demonstrate that the Court misinterpreted the relevant case law addressing conjoint analyses — let alone that the Court did so to a degree that would support

reconsideration.[5]  Moreover, even if Plaintiffs were correct and the Court did misinterpret each of the foregoing cases, they would still not be entitled to relief, for the simple reason that none of these cases are "controlling."  *Shrader*, 70 F.3d at 257; *see, e.g.*, *Analytical Surveys, Inc. v. Tonga Partners, L.P.*, 2009 WL 1514310, at *3 n.9 (S.D.N.Y. May 29, 2009) (noting that "nonbinding authority from other circuits," even if persuasive, "does not constitute a point of law or fact that mandates reconsideration" (internal quotation marks omitted)); *Rose v. Barnhart*, 392 F. Supp. 2d 669, 671 (S.D.N.Y. 2005) (denying reconsideration because the purportedly overlooked case was "not binding" on the court).  In the final analysis, the Court's conclusion is compelled not by the non-binding decisions of other federal district courts, but by binding Bellwether State law, which defines market value to mean "the price that a willing buyer would pay to a willing seller, neither being under compulsion to buy or sell."  *Children's Hosp. Cent. Cal. v. Blue Cross of Cal.*, 172 Cal. Rptr. 3d 861, 872 (Ct. App. 2014) (internal quotation marks omitted); *accord Peterson v. Continental Boiler Works, Inc.*, 783 S.W.2d 896, 900 (Mo. 1990) (en banc) (defining fair market value as "the price which property will bring when it is offered for sale by an owner who is willing but under no compulsion to sell and is bought by a buyer who is willing or desires to purchase but is not compelled to do so" (internal quotation marks

---

[5]      Plaintiffs cite *Pulaski* in connection with their discussion of difference-in-value damages, *see* Pls.' Mem. 4-5, but it is not clear if that is meant to suggest that the Court's conclusion is in conflict with the Ninth Circuit's decision.  If that is Plaintiffs' suggestion, the Court is unpersuaded.  Among other things, the Ninth Circuit later clarified that, under California law, benefit-of-the-bargain damages are measured by diminution in market value, not by consumers' willingness to pay.  *See Zakaria*, 755 F. App'x at 625 (affirming the district court's rejection of a conjoint analysis that "showed only how much consumers subjectively valued" the alleged misrepresentation, "not what had occurred to the actual market price" as a result of the misrepresentation).  The *Zakaria* court distinguished *Pulaski*, noting that, in that case, the challenged product had been sold at auction, and so the "bids — i.e., demand — [had] fixed the price" for the challenged product.  *Id.*  In *Zakaria*, as here, "the subjective value consumers place" on the product did "not set the price."  *Id.*

omitted)); *Factory Mut. Ins. Co. v. Alon USA L.P.*, 705 F.3d 518, 521 (5th Cir. 2013) (noting that, under Texas law, "[m]arket value is the amount a willing buyer, who is under no obligation to buy, would pay to a willing seller, who is under no obligation to sell") (citing *Thomas v. Oldham*, 895 S.W.2d 352, 359 (Tex. App. 1995)).  Given that definition, Boedeker's testimony is insufficient as a matter of law to support the essential element of damages because he assumes that the supply curve is vertical, reimagining sellers as conscripted to produce and sell their products at whatever price consumers are willing to pay.  *See Order*, 2019 WL 3564698, at *16 (noting that "Boedeker simply assumes that New GM would be willing to sell the *same* quantity anyway, notwithstanding the lower price" and citing *In re MyFord Touch Consumer Litig.*, 291 F. Supp. 3d 936, 970 (N.D. Cal. 2018), in which the court determined that a similar damages model proposed by Boedeker assumed a vertical supply curve).

**D.  Conclusion**

For the foregoing reasons, Plaintiffs' arguments for reconsideration fall short.  Accordingly, their motion for reconsideration must be and is DENIED in its entirety.

## MOTION FOR CERTIFICATION OF INTERLOCUTORY APPEAL

The Court turns, then, to Plaintiffs' alternative motion: for certification of an interlocutory appeal.  *See* ECF No. 7055, at 2; Pls.' Mem. 16-18.  Pursuant to 28 U.S.C. § 1292(b), district courts have "first line discretion to allow interlocutory appeals."  *Swint v. Chambers Cty. Comm'n*, 514 U.S. 35, 47 (1995); *see also Koehler v. Bank of Bermuda Ltd.*, 101 F.3d 863, 866 (2d Cir. 1996) (recognizing "the special ability a trial court possesses to assess the efficiency of an immediate appeal").  A district court may certify an order for such an appeal if the moving party shows that the order (1) "involves a controlling question of law" about which (2) "there is substantial ground for difference of opinion," and (3) "an immediate appeal from the

order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b); *see Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*, No. 12-CV-8852 (JMF), 2014 WL 1881075 (S.D.N.Y. May 9, 2014). District courts must weigh each of those factors and determine whether, taken together, certification of interlocutory appeal is appropriate. *See Figueiredo Ferraz Consultoria e Engenharia de Projeto Ltda. v. Republic of Peru*, No. 08-CV-492 (WHP), 2009 WL 5177977, at *2 (S.D.N.Y. Dec. 15, 2009) (holding that failure to establish one factor "is not fatal to certification, particularly when other factors strongly counsel in favor of a consolidated appeal"). Applying those standards in the unique circumstances of this case — complex and substantial multidistrict litigation — the Court concludes interlocutory appeal is appropriate.

First, the Court has no difficulty finding that its Opinion and Order decides questions that are "controlling" within the meaning of Section 1292(b). "[T]he resolution of an issue need not necessarily terminate an action to be controlling." *Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Ammistrazione Straordinaria*, 921 F.2d 21, 24 (2d Cir. 1990) (internal quotation marks omitted). It is enough that the Court's determination "could significantly affect the conduct of the action." *S.E.C. v. Credit Bancorp, Ltd.*, 103 F. Supp. 2d 223, 227 (S.D.N.Y. 2000). That is the case here, as the Court's Opinion and Order foreclosed Plaintiffs' ability to prove diminution-in-value damages as a matter of law in the three Bellwether States. *Order*, 2019 WL 3564698, at *16; *id.* at *17 (noting that the Court's ruling "change[d] the landscape in dramatic ways"). In any trial that might follow, Plaintiffs' proof of benefit-of-the-bargain damages would necessarily be limited to the costs of repair (if any). As a result, the value of Plaintiffs' claims may be substantially compromised. And because settlement pressure is particularly acute in multidistrict litigation such as this, *see* Andrew D. Bradt, *The*

*Long Arm of Multidistrict Litigation*, 59 Wm. & Mary L. Rev. 1165, 1224 (2018) ("In most large

MDLs, what actually happens is that a settlement agreement is eventually negotiated by the lead

lawyers, and it is likely to be one that leaves the plaintiff little practical choice but to accept."),

the Court's ruling not only may be controlling but, for all intents and purposes, may also be final,

*cf. Mei Xing Yu v. Hasaki Rest., Inc.*, 319 F.R.D. 111, 117 (S.D.N.Y. 2017) (certifying an

interlocutory appeal and noting that "it would be difficult (although perhaps not impossible) for

the issue to get to the Circuit absent an interlocutory appeal"), *rev'd on other grounds*, — F.3d

—, 2019 WL 6646618 (2d Cir. Dec. 6, 2019).

Whether the questions decided by the Court are questions "of law" is a closer issue. New

GM argues that an appeal would not present "pure question[s] of law that the reviewing court

could decide quickly and cleanly without having to study the record." Opp'n 25 (internal

quotation marks omitted) (quoting *In re Facebook, Inc. IPO Sec. and Deriv. Litig.*, 986 F. Supp.

2d 524, 536 (S.D.N.Y. 2014)). There is some force to that contention, but the Court ultimately

disagrees. An appeal would not, as New GM argues, require the Second Circuit to particularly

"study the record." There is no dispute, for example, that Boedeker's report intends to measure

diminution in market value on a per-vehicle basis by measuring consumers' willingness to pay

for vehicles known to have specified defects and assuming that New GM or other sellers would

accept that amount. On appeal, therefore, the question for the Second Circuit would be purely

legal: Under Bellwether State law, is such an assumption permissible? This question does not

require review of the record, and thus does not preclude certification of interlocutory appeal. *See*

16 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure*

§ 3930 (3d ed. 2008) ("If summary-judgment rulings depend more on questions of law than

investigation of the record for genuine issues . . . interlocutory appeal may be appropriate.").

Next, the Court concludes that the question is one about which there is a substantial difference of opinion. As the Court's summary judgment Opinion and Order makes clear, many district courts have held that conjoint analyses may validly be used to measure diminution in market value. *Order*, 2019 WL 3564698, at *15-16. Although the Court believes that, for the reasons discussed previously and above, such cases are ultimately distinguishable, the result reached by the Court is certainly in tension with some of them. And while it is true that "disagreement among courts outside the circuit does not *alone* support the certification of an interlocutory appeal," *In re Barclays Liquidity Cross and High Frequency Trading Litig.*, No. 14-MD-2589 (JMF), 2019 WL 3202745, at *2 (S.D.N.Y. Jul. 16, 2019) (emphasis added) (internal quotation marks and alteration omitted), there is more here, *see In re Flor*, 79 F.3d 281, 284 (2d Cir. 1996) ("[I]t is the duty of the district judge . . . to analyze the strength of the arguments in opposition to the challenged ruling when deciding whether the issue for appeal is truly one on which there is a *substantial* ground for dispute." (internal quotation marks omitted)). In the Court's view, Plaintiffs' arguments are sufficiently forceful to merit interlocutory appellate review.

Finally, the Court concludes that interlocutory appeal would substantially advance the litigation. "Although technically the question of whether there is a controlling issue of law is distinct from the question of whether certification would materially advance the ultimate termination of the litigation, in practice the two questions are closely connected." *Credit Bancorp, Ltd.*, 103 F. Supp. 2d at 227. The third factor is therefore satisfied for many of the same reasons as the first. In addition, immediate appeal serves the interests of judicial economy, because reversal after trial might well require a new trial, as there will be no evidence of diminution-in-value damages in the trial record. And because the Court's summary judgment

ruling arises in the context of an MDL, the efficiencies to be gained by interlocutory appeal are particularly substantial. For example, if any of the cases affected are remanded, appeals may be taken in any of the circuits in which they originated. The likelihood of duplicative appeals and potentially conflicting conclusions is inconsistent not only with the purposes of Section 1292(b), but also the MDL procedure. *See Hill v. Henderson*, 195 F.3d 671, 678 (D.C. Cir. 1999) ("An appeal before re-transfer enhances the likelihood of achieving the coordination benefits sought by § 1407 (the 'just and efficient conduct' of multidistrict actions), as the circuit of the § 1407 transferee court can give the issues a unified treatment, and its interlocutory decision is likely to be accepted as binding law of the case once the cases are transferred back to their courts of origin."); *In re WorldCom, Inc. Sec. Litig.*. Nov. 02-CV-3288 (DLC), 2003 WL 22953644, at *8 (S.D.N.Y. Dec. 16, 2003) ("In multidistrict litigation . . . the better practice may be to allow appeal of appropriate issues before the transferred cases are returned for trial."). The fact that the Court's ruling likely impacts a large number of claims further counsels in favor of appeal. *See Klinghoffer*. 921 F.2d at 24 ("[T]he impact that an appeal will have on other cases is a factor that we may take into account in deciding whether to accept an appeal that has been properly certified by the district court."); *Long Island Lighting Co. v. Transamerica Delaval, Inc.*, 648 F. Supp. 988, 991 (S.D.N.Y. 1986) ("Certification may possibly be more freely granted in big cases." (citing 16 Wright, Miller, & Cooper § 3929) (internal quotation marks omitted)).

In the Court's judgment, the weight of these factors, taken together, supports certification. Admittedly, had the questions decided by the Court arisen in the context of simpler, more conventional litigation, the Court would not have found the need for immediate appeal as pressing. In weighing the statutory factors, the Court is mindful that, as a result of certain structural features of large multidistrict litigation, if appellate review of the summary

judgment ruling is to be had, it would likely have to be interlocutory. As others have recognized, "the usual object of MDL management, especially with bellwether trials, is to incentivize rational settlements." *In re DuPuy Orthopaedics, Inc.*, 870 F.3d 345, 358 (5th Cir. 2017) (Jones, J., concurring in part and dissenting in part). And the vast majority of MDL cases are, in fact, resolved by settlement. *See* Bradt, *supra*, at 1206 ("[MDL cases] are almost always — in fact, over 97 percent of the time — resolved in the MDL court, either by dispositive motion or through mass-settlement agreement."). This result is due, at least in part, to the sheer magnitude of the risk, in terms of dollar value, of trials. *Cf. Coopers & Lybrand v. Livesay*, 437 U.S. 463, 476 (1978) (recognizing that the mere "[c]ertification of a large class may so increase the defendant's potential damages liability and litigation costs that he may find it economically prudent to settle and to abandon a meritorious defense"); Judith Resnick, *Aggregation, Settlement, and Dismay*, 80 Cornell L. Rev. 918, 929 (1995) ("[L]ike Rule 23, MDL functions to aggregate cases and parties, which in turn helps propel judges toward global settlements."). Whatever the reasons for these statistics, the practical reality is that a broad swath of Plaintiffs' claims are likely to be resolved by settlement, and the value of that settlement will be heavily influenced by the Court's Opinion and Order. These dynamics, along with others frequently discussed in academic literature, make final judgments rare and district court opinions largely unreviewed (if not unreviewable). *See* Abbe R. Gluck, *Unorthodox Civil Procedure: Modern Multidistrict Litigation's Place in the Textbook Understandings of Procedure*, 165 U. Pa. L. Rev. 1669, 1706 (2017) (noting the "lack of appellate review" of pretrial orders in MDLs and that it causes, among other things "the inability for error correction relating to pretrial rulings that can have enormous significance for many litigants"); Andrew S. Pollis, *The Need for Non-Discretionary Interlocutory Appellate Review in Multidistrict Litigation*, 79 Fordham L. Rev.

1643, 1673 (2011) (noting that the "likely result" of an erroneous district court ruling "is a settlement at a price that reflects a trial court's mistaken articulation of the governing law, perhaps adjusted slightly to reflect the potential for reversal on appeal that will never come").

In short, because the issue to be appealed "is a close one," *Order*, 2019 WL 3564698, at *11, the consequences of the ruling are "dramatic," *id.* at *17, and the likelihood of review after a final judgment slim — due to the pressures exerted by the realities of litigation of this size and complexity — the Court finds it appropriate to resolve doubt in favor of certification.

## CONCLUSION

For the reasons stated above, Plaintiffs fail to persuade the Court that it erred in its summary judgment ruling, and they certainly do not satisfy the strict standards that govern motions for reconsideration. Nevertheless, although the question is a close one, the Court concludes that certification of an interlocutory appeal is appropriate. The Court does not make this decision lightly. An interlocutory appeal (if the Second Circuit accepts it) would result in potentially lengthy delay, and this litigation is already in its sixth year, with no end in sight absent a settlement. But the Court is not infallible. And, in the judicial system of this Nation, it is not intended to be final. *Cf. Brown v. Allen*, 344 U.S. 443, 540 (1953) (Jackson, J., concurring) (observing that the Supreme Court is "not final because [it is] infallible, but [is] infallible only because [it is] final"). Yet, absent an interlocutory appeal, the Court might well have the only — and thus final — word on these important issues.

Moreover, an interlocutory appeal would not necessarily mean a halt to the steady progress of this litigation. Even if the Second Circuit were to grant a petition for interlocutory appeal, the Court may well be able to move forward on other fronts. There are, after all, other disputes pending, *see, e.g.*, ECF Nos. 7095 (New GM's renewed motion for summary judgment

against Plaintiffs), 7100 (New GM's motion to exclude the opinions of another of Plaintiffs' experts), and Plaintiffs bring claims under the laws of forty-seven other states and the District of Columbia. Additionally, further settlement negotiations can and should proceed in the shadow of any interlocutory appeal. Indeed, in the Court's humble view, after five-plus years of litigation, hundreds of depositions, millions of documents exchanged in discovery, and untold trees felled and ink spilled by the parties and the Court, the parties should have enough data to agree on a settlement value for this litigation; the risks of delay and reversal are merely additional data to factor into the calculus. The parties should be prepared to address these issues — at least preliminarily — at the status conference on December 18, 2019.

The Clerk of Court is directed to terminate ECF No. 7055.


SO ORDERED.

Dated: December 12, 2019
      New York, New York
                             JESSE M. FURMAN
                      United States District Judge