## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

IN RE:

GENERAL MOTORS LLC IGNITION
SWITCH LITIGATION

This Document Relates to:

*ALL ECONOMIC LOSS ACTIONS*

No. 14-MD-2543 (JMF)

## MEMORANDUM IN SUPPORT OF THE PARTIES' JOINT MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT, CERTIFICATION OF CLASS FOR PURPOSES OF SETTLEMENT, APPROVAL OF NOTICE PROCEDURES, AND APPOINTMENT OF CLASS COUNSEL & CLASS <u>REPRESENTATIVES</u>

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................ 1

BACKGROUND ............................................................................................... 4

    A.    This Case Has Been Intensively Litigated for More Than Five Years. ................. 4

    B.    The Proposed Settlement Resulted from Extensive Arm's-Length Negotiations Before a Highly Experienced and Respected Mediator. ............... 10

SUMMARY OF PROPOSED SETTLEMENT TERMS ........................................... 11

    A.    The Proposed Class Definition ........................................................... 11

    B.    The Proposed Settlement Fund ........................................................... 12

    C.    Plan of Allocation ............................................................................. 13

    D.    Releases............................................................................................. 15

    E.    Notice and Class Action Settlement Administrator ............................ 15

    F.    Attorneys' Fees and Expenses ........................................................... 16

    F.    Plaintiff Incentive Awards ................................................................. 16

ARGUMENT .................................................................................................... 17

I.     THE SETTLEMENT WILL LIKELY BE APPROVED AS FAIR, REASONABLE, AND ADEQUATE UNDER RULE 23(e)(2) ..................................... 17

    A.    As the Product of Arm's-Length Negotiations by Informed and Knowledgeable Counsel, the Settlement Is Presumptively Fair.......................... 19

    B.    The Terms of the Settlement Are Substantively Fair.......................... 21

II.    CERTIFICATION OF THE CLASS, INCLUDING EACH SUBCLASS, AT FINAL APPROVAL IS LIKELY..................................................................... 35

    A.    The Proposed Class Meets the Requirements of Rule 23(a)............................... 36

    B.    The Class Meets Rule 23(b)(3)'s Predominance and Superiority Requirements. ...................................................................................... 43

III.   THE COURT SHOULD APPOINT MR. BERMAN AND MS. CABRASER AS COUNSEL FOR THE CLASS, AND SUBCLASS COUNSEL AS COUNSEL FOR THE SUBCLASSES. .................................................................... 47

IV.   THE PROPOSED FORMS AND MANNER OF NOTICE COMPLY WITH RULE 23 AND DUE PROCESS................................................................... 49

    A.    The Proposed Combination of Individual Mailed Notice, an Extensive Multimedia Notice Program, and a Settlement Website Is Reasonably Directed to Apprising Class Members of Their Rights. ...................................... 49

B.     The Proposed Notice Clearly and Concisely Informs Class Members About the Settlement's Terms and Their Rights........................................... 52

C.     The Parties Have Selected an Experienced Class Action Settlement Administrator After a Competitive Bidding Process. ......................................... 53

V.     PROPOSED SCHEDULE ............................................................................. 54

CONCLUSION............................................................................................................ 55

# TABLE OF AUTHORITIES

**Page**

## CASES

*Amchem Prods., Inc. v. Windsor,*
521 U.S. 591 (1997)..................................................................................*passim*

*Bd. of Trustees of City of Birmingham Employees' Ret. Sys. v. Comerica Bank,*
No. 09-CV-13201, 2013 WL 12239522 (E.D. Mich. Dec. 27, 2013) ...................................... 20

*Berni v. Barilla G. e R. Fratelli, S.p.A.,*
332 F.R.D. 14 (E.D.N.Y. 2019) ..................................................................... 34

*Cardiology Assocs., P.C. v. Nat'l Intergroup, Inc.,*
No. 85 CIV. 3048 (JMW), 1987 WL 7030 (S.D.N.Y. Feb. 13, 1987) ....................... 24

*Carriuolo v General Motors Co.,*
823 F.3d 977 (11th Cir. 2016) ..................................................................... 45

*Chamberlan v. Ford Motor Co.,*
223 F.R.D. 524 (N.D. Cal. 2004)............................................................ 38, 45

*City of Detroit v. Grinnell Corp.,*
495 F.2d 448 (2d Cir. 1974) ....................................................................... 21

*Clark v. Ecolab Inc.,*
Nos. 07 Civ. 8623, 04 Civ. 4488, 06 Civ. 5672, 2010 WL 1948198
(S.D.N.Y. May 11, 2010)............................................................................ 19

*Clemens v. Hair Club for Men, LLC,*
No. 15-01431-WHA, 2016 WL 1461944 (N.D. Cal. April 14, 2016).................... 48

*Consol. Rail Corp. v. Town of Hyde Park,*
47 F.3d 473 (2d Cir. 1995) ......................................................................... 36

*Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.,*
502 F.3d 91 (2d Cir. 2007) ......................................................................... 41

*D'Amato v. Deutsche Bank,*
236 F.3d 78 (2d Cir. 2001) ......................................................................... 18

*Daffin v. Ford Motor Co.,*
458 F.3d 549 (6th Cir. 2006) ...................................................................... 40

*Denney v. Jenkens & Gilchrist,*
230 F.R.D. 317 (S.D.N.Y. 2005) ................................................................. 46

*Dewey v. Wolkswagen Aktiengesellschaft,*
681 F.3d 170 (3d Cir. 2012) ....................................................................... 42

*Dornberger v. Metro. Life Ins. Co.,*
203 F.R.D. 118 (S.D.N.Y. 2001) ....................................................... 33, 34, 52

*Doyle v. Chrysler Grp. LLC*,
No. SACV 13-00620 JVS, 2014 WL 7690155 (C.D. Cal. Oct. 9, 2014) ................................ 39

*Edwards v. N. Am. Power & Gas, LLC*,
No. 3:14-cv-01714 (VAB), 2018 WL 3715273 (D. Conn. Aug. 3, 2018) .............................. 50

*Fleisher v. Phoenix Life Insurance*,
Nos. 11-cv-8405, 14-cv-8714, 2015 WL 10847814 (S.D.N.Y. Sept. 9, 2015) ...................... 34

*Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*,
301 F.R.D. 116 (S.D.N.Y. 2014) ......................................................................................... 37

*Frank v. Eastman Kodak Co.*,
228 F.R.D. 174 (W.D.N.Y. 2005) ........................................................................................ 45

*Ge Dandong v. Pinnacle Performance Ltd.*,
No. 10 Civ. 8806(JMF), 2013 WL 5658790 (S.D.N.Y. Oct. 17, 2013) ................................ 42

*Gen. Motors Corp. v. Bryant*,
285 S.W.3d 634 (Ark. 2008) ............................................................................................... 45

*Gen. Tel. Co. of Sw. v. Falcon*,
457 U.S. 147 (1982) ........................................................................................................... 37

*Godson v. Eltman, Eltman, & Cooper, P.C.*,
328 F.R.D. 35 (W.D.N.Y. 2018) .......................................................................................... 35

*Gortat v. Capala Bros.*,
257 F.R.D. 353 (E.D.N.Y. 2009) ......................................................................................... 35

*Green v. Wolf Corp.*,
406 F.2d 291 (2d Cir. 1968) ............................................................................................... 45

*Hanlon v. Chrysler Corp.*,
150 F.3d 1011 (9th Cir. 1998) ............................................................................................ 47

*Hernandez v. Immortal Rise, Inc.*,
306 F.R.D. 91 (E.D.N.Y. 2015) .......................................................................................... 33

*In re "Agent Orange" Prod. Liab. Litig.*,
597 F. Supp. 740 (E.D.N.Y. 1984) ................................................................................. 28, 52

*In re AOL Time Warner ERISA Litig.*,
No. 02 Civ. 8853, 2006 WL 2789862 (S.D.N.Y. Sept. 27, 2006) ....................................... 20

*In re AOL Time Warner, Inc.*,
No. 02 CIV. 5575 (SWK), 2006 WL 903236 (S.D.N.Y. Apr. 6, 2006) ................................. 25

*In re Austrian & German Bank Holocaust Litig.*,
80 F. Supp. 2d 164 (S.D.N.Y. 2000) ................................................................................... 22

*In re Bear Stearns Cos. Sec., Derivative & ERISA Litig.*,
999 F. Supp. 2d 259 (S.D.N.Y. 2012) ................................................. 20

*In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, & Prod. Liab. Litig.*,
No. 17-MD-02777-EMC, 2019 WL 536661 (N.D. Cal. Feb. 11, 2019) .......................... 38, 39

*In re EVCI Career Colls. Holding Corp. Sec. Litig.*,
No. 05 Civ. 10240 (CM), 2007 WL 2230177 (S.D.N.Y. July 27, 2007) ......................... 17, 30

*In re Gen. Motors LLC Ignition Switch Litig.*,
257 F. Supp. 3d 372 (S.D.N.Y. 2017) ................................................. 9

*In re Gen. Motors LLC Ignition Switch Litig.*,
339 F. Supp. 3d 262 (S.D.N.Y. 2018) ................................................. 9

*In re Gen. Motors LLC Ignition Switch Litig.*,
No. 14-MD-2543 (JMF), 2016 WL 3920353 (S.D.N.Y. July 15, 2016) ..................... 9

*In re Gen. Motors LLC Ignition Switch Litig.*,
No. 14-MD-2543 (JMF), 2017 WL 3382071 (S.D.N.Y. Aug. 3, 2017) ..................... 9

*In re Gen. Motors LLC Ignition Switch Litig.*,
No. 14-MD-2543 (JMF), 2017 WL 6509256 (S.D.N.Y. Dec. 19, 2017) ..................... 9

*In re Giant Interactive Grp., Inc. Sec. Litig.*,
279 F.R.D. 151 (S.D.N.Y. 2011) ................................................. 19, 20

*In re Global Crossing Securities and ERISA Litig.*,
225 F.R.D. 436 (S.D.N.Y. 2004) ................................................. 26

*In re IMAX Sec. Litig.*,
283 F.R.D. 178 (S.D.N.Y. 2012) ................................................. 31

*In re Initial Public Offering Secs. Litig.*,
671 F. Supp. 2d 467 (S.D.N.Y. 2009) ................................................. 28, 30

*In re Literary Works*,
654 F.3d 242 (2d Cir. 2011) ................................................. 42

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
246 F.R.D. 156 (S.D.N.Y. 2007) ................................................. 51

*In re Michael Milken and Assocs. Sec. Litig.*,
150 F.R.D. 57 (S.D.N.Y. 1993) ................................................. 21

*In re Motors Liquidation Co.*,
529 B.R. 510 (Bankr. S.D.N.Y. 2015) ................................................. 4

*In re Motors Liquidation Co.*,
580 B.R. 319 (Bankr. S.D.N.Y. 2018) ................................................. 7

*In re Motors Liquidation Co.*,
  591 B.R. 501 (Bankr. S.D.N.Y. 2018) ................................................................. 7

*In re MyFord Touch Consumer Litig.*,
  No. 13-CV-03072-EMC, 2019 WL 1411510 (N.D. Cal. Mar. 28, 2019) .............................. 52

*In re Nissan Motor Corp. Antitrust Litig.*,
  552 F.2d 1088 (5th Cir. 1977) ...................................................................... 49

*In re Nissan Radiator/Transmission Cooler Litig.*,
  No. 10 CV 7493 VB, 2013 WL 4080946 (S.D.N.Y. May 30, 2013) ................................. 36, 39

*In re PaineWebber Ltd. Partnerships Litig.*,
  171 F.R.D. 104 (S.D.N.Y. Mar. 20, 1997) .......................................................... 19

*In re Payment Card Interchange Fee & Merchant Disc. Antitrust Litig.*,
  986 F. Supp. 2d 207 (E.D.N.Y. 2013) ............................................................... 31

*In re Platinum and Palladium Commodities Litig.*,
  10-CV-3617, 2014 WL 3500655 (S.D.N.Y. July 15, 2014) ........................................... 18

*In re Prudential Inc. Secs. Ltd. P'ships Litig.*,
  MDL No. 1005, M-21-67, 1995 WL 798907 (S.D.N.Y. Nov. 20, 1995) ................................ 29

*In re Sturm, Ruger, & Co., Inc. Sec. Litig.*,
  No. 3:09CV1293 VLB, 2012 WL 3589610 (D. Conn. Aug. 20, 2012) .................................. 32

*In re Telik Inc. Sec. Litig.*,
  576 F. Supp. 2d 570 (S.D.N.Y. 2008) ............................................................... 31

*In re Warner Commc'ns Sec. Litig.*,
  618 F. Supp. 735 (S.D.N.Y. 1985) .................................................................. 27

*In re: Motors Liquidation*,
  829 F.3d 135 (2d Cir. 2016) ........................................................................ 6

*In re: Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*,
  No. 2672 CRB (JSC), 2016 WL 4010049  (N.D. Cal. July 26, 2016) ............................... 38, 40

*Jermyn v. Best Buy Stores, L.P.*,
  No. 08 CIV. 214 CM, 2012 WL 2505644 (S.D.N.Y. June 27, 2012) .................................. 35

*Karic v. Major Auto. Cos.*,
  No. 09 CV 5708 (ENV), 2015 WL 9433847 (E.D.N.Y. Dec. 22, 2015) ................................ 43

*Keegan v. Am. Honda Motor Co.*,
  284 F.R.D. 504 (C.D. Cal. 2012) ................................................................ 37, 45

*Kindle v. Dejana*,
  308 F. Supp. 3d 698 (E.D.N.Y. 2018) ............................................................... 35

*Klay v. Humana*, Inc.,
  382 F.3d 1241 (11th Cir. 2004) ............................................................ 44

*Lipuma v. Am. Express Co.*,
  406 F. Supp. 2d 1298 (S.D. Fla. 2005) ................................................ 24

*Maley v. Del Global Techs. Corp.*,
  186 F. Supp. 2d 358 (S.D.N.Y. 2002) .................................................. 24

*Marcus v. BMW of N. Am., LLC*,
  687 F.3d 583 (3d Cir. 2012) ................................................................. 40

*Marisol A. v. Giuliani*,
  126 F.3d 372 (2d Cir. 1997) ................................................................. 39

*Maywalt v. Parker & Parsley Petroleum Co.*,
  67 F.3d 1072 (2d Cir. 1998) ................................................................. 17

*Mba v. World Airways, Inc.*,
  369 F. App'x 194 (2d Cir. 2010) ........................................................... 18

*McBean v. City of New York*,
  228 F.R.D. 487 (S.D.N.Y. 2005) .......................................................... 44

*McReynolds v. Richards-Cantave*,
  588 F.3d 790 (2d Cir. 2009) ................................................................. 17

*Moore v. PaineWebber, Inc.*,
  306 F.3d 1247 (2d Cir. 2002) ............................................................... 44

*Morris v. Affinity Health Plan, Inc.*,
  859 F. Supp. 2d 611 (S.D.N.Y. 2012) .................................................. 19

*Mullane v. Cent. Hanover Bank & Trust Co.*,
  339 U.S. 306 (1950) ............................................................................... 53

*n re Marsh & McLennan, Cos. Sec. Litig.*,
  No. 04 Civ. 8144(CM), 2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009) ............................ 24, 25

*Nobles v. MBNA Corp.*,
  No. C 06-3723 CRB, 2009 WL 1854965 (N.D. Cal. June 29, 2009) ....................................... 31

*Norflet ex rel. Norflet v. John Hancock Life Ins. Co.*,
  658 F. Supp. 2d 350 (D. Conn. 2009) .................................................. 34

*Parkinson v. Hyundai Motor Am.*,
  258 F.R.D. 580 (C.D. Cal. 2008) .......................................................... 45

*Ramirez v. Riverbay Corp.*,
  39 F. Supp. 3d 354 (S.D.N.Y. 2014) .................................................... 36

*Reade-Alvarez v. Eltman, Eltman & Cooper P..C.*,
237 F.R.D. 26 (E.D.N.Y. 2006) ................................................................ 22

*Ries v. Ariz. Beverages USA LLC*,
287 F.R.D. 523 (N.D. Cal. 2012) ............................................................. 37

*Robidoux v. Celani*,
987 F.2d 931 (2d Cir. 1993) .................................................................... 39

*Rosen v. J.M. Auto Inc.*,
270 F.R.D. 675 (S.D. Fla. 2009) ............................................................. 45

*Rossini v. Ogilvy & Mather, Inc.*,
798 F.2d 590 (2d Cir. 1986) .................................................................... 44

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
293 F.R.D. 287 (E.D.N.Y. 2013) ............................................................ 41

*Simerlein v. Toyota Motor Corp.*,
No. 3:17-CV-1091 (VAB), 2019 WL 1435055 (D. Conn. Jan. 14, 2019) ............................. 42

*Spann v. AOL Time Warner, Inc.*,
No. 02 Civ. 8238, 2005 WL 1330937 (S.D.N.Y. June 7, 2005).............................. 17

*Strougo ex rel Brazilian Equity Fund, Inc. v. Bassini*,
258 F. Supp. 2d 254 (S.D.N.Y. 2003) .............................................. 18, 23

*Sykes v. Mel Harris & Assocs. LLC*,
285 F.R.D. 279 (S.D.N.Y. 2012), *aff'd*, 780 F.3d 70 (2d Cir. 2015)................... 38, 46

*Thompson v. Metro. Life Ins. Co.*,
216 F.R.D. 55 (S.D.N.Y. 2003) ............................................................... 22

*Torres v. Toback, Bernstein & Reiss LLP*,
No. 11-CV-1368 NGG VVP, 2014 WL 1330957 (E.D.N.Y. Mar. 31, 2014) ...................... 34

*Velez v. Majik Cleaning Serv., Inc.*,
No. 03 Civ. 8698(SAS)(KNF), 2007 WL 7232783 (S.D.N.Y. June 25, 2007) ................ 28

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
396 F.3d 96 (2d Cir. 2005) ......................................................... 17, 19, 49

*Wolin v. Jaguar Land Rover N. Am., LLC*,
617 F.3d 1168 (9th Cir. 2010) ................................................. 37, 40, 45, 47

*Zivkovic v. Laura Christy LLC*,
329 F.R.D. 61 (S.D.N.Y. 2018) ............................................................... 37

## RULES

Fed. R. Civ. P. 23(a)(2)........................................................................ 36

**TABLE OF AUTHORITIES**
(continued)

Fed. R. Civ. P. 23(a)(4) ................................................................................. 38

Fed. R. Civ. P. 23(b)(3) ............................................................................ 40, 43

Fed. R. Civ. P. 23(b)(3)(D) ......................................................................... 43

Fed. R. Civ. P. 23(c)(1)(B) .......................................................................... 45

Fed. R. Civ. P. 23(c)(2)(B) ..................................................................... 46, 50

Fed. R. Civ. P. 23(e)(2) ............................................................................... 17

Fed. R. Civ. P. 23(e)(2)(A) .......................................................................... 19

Fed. R. Civ. P. 23(e)(2)(A) & (B) advisory committee's note ..................... 18

Fed. R. Civ. P. 23(e)(2)(C)(iii) .................................................................... 30

Fed. R. Civ. P. 23(g) ................................................................................... 38

Fed. R. Civ. P. 23(g)(1)(A) .......................................................................... 45

<u>**PRELIMINARY STATEMENT**[1]</u>

The Economic Loss Plaintiffs ("Plaintiffs"), on behalf of themselves and other members of the proposed Settlement Class,[2] are pleased to present their proposed Settlement with General Motors LLC ("New GM") and the Motors Liquidation Company GUC Trust (the "GUC Trust") to the Court.  This proposed Settlement would resolve all economic loss claims, whether asserted as class, mass, or individual actions, that are consolidated for pretrial proceedings in the MDL Court in *In re: General Motors Ignition Switch Litigation*, Case No. 14-MD-2543 (JMF) (the "MDL" or "MDL 2543"),[3] as well all economic loss claims, including all Late Claims Motions and all Proposed Proofs of Claims involving alleged economic loss, filed or asserted in the Bankruptcy Case[4] pending before Judge Martin Glenn of the United States Bankruptcy Court for the Southern District of New York (together, the "Actions").  Plaintiffs are current and/or former owners/lessees of New GM or General Motors Corporation ("Old GM") vehicles containing defective ignition switches, side airbags, or electric power steering systems that were included in certain National Highway Traffic Safety Administration recalls (the "Subject Vehicles").[5]

The proposed Settlement follows six years of litigation, including multiple rounds of Fed. R. Civ. P. 12(b)(6) and summary judgment motions; complex litigation in this Court, the

---

[1] Capitalized terms have the same meanings as in the Settlement Agreement.  The Declaration of Elizabeth J. Cabraser ("Cabraser Decl."), the Declaration of Steve W. Berman ("Berman Decl.") the Declaration of The Honorable Layn R. Phillips ("Phillips Decl."), and the Declaration of Jennifer M. Keough ("Keough Decl.") are being submitted contemporaneously in support of this motion.

[2] Unless otherwise indicated, all references to the Class refer to the overall Class as well as the five Subclasses, as detailed in the Settlement Agreement and Section III(A), *infra*.

[3] These include those listed in Exhibit 1 to the Settlement Agreement and all economic loss claims relating to the Recalls filed in the past, present or future in any federal or state court.

[4] *In re Motors Liquidation Company, et al., f/k/a General Motors Corp.*, Bankr. No. 09-50026.

[5] Those recalls are NHSTA Recall Nos. 14v049; 14v355, 14v394, 14v400; 14v346; 14v153; and 14v118 (collectively, the "Recalls").

Bankruptcy Court, and the Second Circuit; extensive fact and expert discovery, including production and review of over 23.4 million pages of documents and hundreds of depositions; and multiple mediation sessions over two years. The Parties have now reached a favorable resolution for the Class that avoids the substantial risks and expense of continued litigation, including the risk of recovering less than the Settlement amount, or nothing at all. The proposed Settlement Agreement resulted from arm's-length, good faith negotiations between and among experienced counsel under the auspices of a respected and experienced Court-ordered mediator, the Hon. Layn Phillips. It provides a fair, reasonable, and adequate resolution of this litigation, which will substantially reduce costs and the expenditure of resources, eliminate the risk of uncertain litigation outcomes, and prevent further delay in remedying the harms suffered by Class Members. Further, this Settlement, along with the personal injury/wrongful death settlements and judgments, and New GM's resolution of government enforcement actions and payment of fines, not only resolves Plaintiffs' claims but goes much of the way to facilitating the end of Old GM's long-running bankruptcy, this MDL, and the closing of a chapter that opened with the revelation of GM's alleged misconduct leading up to the 2014 recalls.

Accordingly, Plaintiffs respectfully request that the Court enter a Preliminary Approval Order, substantially in the form attached as Exhibit 6 to the Settlement Agreement: (1) granting preliminary approval of the proposed Settlement Agreement entered into between the Parties, including establishing and creating the Common Fund as a Qualified Settlement Fund Trust pursuant to Internal Revenue Code § 468B and the Regulations issued thereto; (2) determining that the Court, at the final approval stage, will likely certify the Class as defined in the Settlement Agreement; (3) directing that notice be provided to proposed Class Members in the form and manner specified in the Settlement Agreement; (4) appointing Plaintiffs as

representatives of the proposed Class for purposes of disseminating notice, and certain Plaintiffs as representatives of the proposed Subclasses; (5) appointing Steve W. Berman, of Hagens Berman Sobol Shapiro LLP ("Hagens Berman") and Elizabeth J. Cabraser of Lieff Cabraser Heimann & Bernstein, LLP ("Lieff Cabraser," and together with Hagens Berman, "Plaintiffs' Class Counsel") as Class Counsel for the proposed Class; (6) appointing the Allocation Counsel and certain counsel appointed by the MDL Court to the Executive Committee (ECF No. 249) as Subclass Counsel; (7) authorizing the retention of Jennifer M. Keough of JND Legal Administration as Class Action Settlement Administrator, and directing Ms. Keough to carry out the duties and responsibilities of the Class Action Settlement Administrator specified in the Settlement Agreement; (8) appointing Flora Bian of JND as Qualified Settlement Fund Administrator and Trustee to carry out all duties and responsibilities of the Qualified Settlement Fund Administrator and Trustee as set forth in the Settlement Agreement and the Qualified Settlement Fund Trust Agreement; (9) establishing certain dates and procedures in connection with final approval of the Settlement Agreement, including but not limited to deadlines and procedures for Settlement objections, Opt-Outs, and Settlement Claims; and (10) scheduling a Fairness Hearing to determine whether the Settlement is fair, reasonable, and adequate under Rule 23(e)(2), and whether the Class should be certified.

## BACKGROUND

**A.** **This Case Has Been Intensively Litigated for More Than Five Years.**

The Court is familiar with this longstanding Action and the allegations and claims in it. Plaintiffs therefore reference such facts below to the extent pertinent to the issues raised in the Motion.[6]

### 1. Old GM's Bankruptcy and Sale to New GM

This case arises from GM's years-long concealment of multiple serious safety defects in its vehicles. These hidden defects caused hundreds of fatalities and injuries, but were not disclosed until a series of unprecedented recalls (the "NHTSA Recalls") in 2014.

In June 1, 2009, prior to the NHTSA Recalls, General Motors Corporation ("Old GM") and certain of its affiliates (collectively, the "Debtors") filed for chapter 11 relief in the Bankruptcy Court and entered into an agreement (the "Sale Agreement") to sell substantially all of its assets to New GM in exchange for, *inter alia*, New GM common stock and warrants. *See In re Motors Liquidation Co.*, 529 B.R. 510, 557 (Bankr. S.D.N.Y. 2015). The Sale Agreement was approved on July 10, 2009 pursuant to the Sale Order. A few months later, the Bankruptcy Court established November 30, 2009 as the deadline for filing proofs of claim against Old GM (the "Bar Date"). Old GM did not inform owners and lessees of the Subject Vehicles about the Bar Date at the time—despite its knowledge of the Subject Vehicle defects. Subsequently, in February 2012, the Bankruptcy Court entered the Late Filed Claims Order, providing that any claims filed after entry of the Late Filed Claims Order would be deemed disallowed unless, *inter*

---

[6] The background summarized in this section covers only a portion of the lengthy and complex litigation history of this case. Additional information and key case documents from MDL 2543 are available at the official website for the GM ignition switch litigation, https://gmignitionmdl.com/, as well as the case docket.

*alia*, the claimant obtained leave of the Bankruptcy Court or written consent of the GUC Trust. *See* Bk. Doc. No. 11394.

### 2. The Recalls

In February and March 2014, five years after its purchase of Old GM assets, New GM announced the recall of certain General Motors vehicles that had been manufactured with a defective ignition switch. The ignition switch could accidentally turn off while the car was in motion, shutting down the engine, disabling power steering and braking, and deactivating airbags. The initial wave of recalls impacted approximately 2.2 million vehicles. In the subsequent months, New GM issued additional recalls concerning defective ignition switches affecting approximately 10 million additional vehicles. New GM also issued a recall in March 2014 pertaining to over 1.1 million vehicles with defective side airbags, and another recall in March 2014 pertaining to over 1.3 million vehicles with defective power steering. Overall, the GM defects at issue are alleged to have been linked to more than 120 deaths and more than 270 injuries.[7]

### 3. The Old GM Bankruptcy Case

In the wake of the first wave of recalls, dozens of lawsuits were filed against New GM by owners and lessees of defective GM vehicles. On April 21, 2014, New GM filed its first of three motions with the bankruptcy court seeking a ruling that owners of Old GM vehicles that were the subject of recalls were barred from asserting claims against New GM due to the "free and clear" sale provision.[8] New GM's request precipitated years of litigation in the Bankruptcy Court

---

[7] *See* Clifford Atiyeh, *GM Ignition Switch Review Complete: 124 Fatalities, 274 Injuries*, Car and Driver (Aug. 3, 2015), https://www.caranddriver.com/news/a15353429/gm-ignition-switch-review-complete-124-fatalities-274-injuries/.

[8] See *Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Court's July 5, 2009 Sale Order and Injunction, dated April 21, 2014* (Bk. Doc. No. 12620); *Motion of General Motors LLC*

involving numerous parties and a host of complex issues, including whether certain Plaintiffs should be granted authority to file proofs of claim after the Bar Date given Old GM's concealment of the vehicle defects, and whether the bankruptcy claims asserted by those owners or lessees were equitably moot.

In April 2015, the Bankruptcy Court ruled that Old GM failed to provide a subset of plaintiffs (the "Delta Ignition Switch Bankruptcy Plaintiffs" or the "Ignition Switch Plaintiffs") with constitutionally adequate notice of the Bar Date, but nonetheless concluded that the Sale Order could be used to enjoin claims related to the majority of GM vehicle defects. The Bankruptcy Court also invoked equitable mootness to bar relief for potential claims against the GUC Trust.

On July 13, 2016, the Second Circuit reversed that ruling in part. Specifically, the Second Circuit held that the timing of the disclosure of the Subject Vehicle defects by New GM effectively denied owners and lessees the right to weigh in on the Sale in violation of due process: "Our lack of confidence, however, is not imputed on plaintiffs denied notice but instead bolsters a conclusion that enforcing the Sale Order would violate procedural due process." *In re: Motors Liquidation*, 829 F.3d 135, 164 (2d Cir. 2016). The Second Circuit also vacated as advisory the Bankruptcy Court's decision on equitable mootness.

On December 22, 2016, certain Plaintiffs filed a motion seeking authority to file late class claims against the Old GM estate. Bk. Doc. No. 13806. On April 24, 2018, Plaintiffs filed amended exhibits to the motion to file late proofs of claim on behalf of the Subject Vehicle

---

*Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Court's July 5, 2009 Sale Order and Injunction Against Plaintiffs in Pre-Closing Accident Lawsuits*, dated Aug. 1, 2014 (Bk. Doc. No. 12807); and *Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Court's July 5, 2009 Sale Order and Injunction (Monetary Relief Actions, Other Than Ignition Switch Actions), dated Aug. 1, 2014* (Bk. Doc. No. 12808).

Owners. Bk. Doc. No. 14280. These proposed proofs of claim include substantially similar claims to those asserted against New GM in the Fifth Amended and Consolidated Complaint filed against New GM. Subsequently, counsel for the Economic Loss Plaintiffs, certain other Plaintiffs, the GUC Trust, and the Participating Unitholders engaged in good faith, arm's-length negotiations concerning a potential settlement that would resolve the many disputes related to the late claims motions. However, GUC Trust decided not to execute the agreement, and, after conducting a trial, the Bankruptcy Court determined that the unexecuted settlement agreement was unenforceable.[9]

After the GUC Trust retained new counsel and enacted management changes, a new settlement agreement was entered into by certain Plaintiffs and the GUC Trust on April 24, 2018 (and amended on May 22, 2018). The Court held that that settlement as drafted could not be approved unless those Plaintiffs could certify one or more classes for settlement under Rule 23, and denied the motion without prejudice. *See In re Motors Liquidation Co.*, 591 B.R. 501 (Bankr. S.D.N.Y. 2018).

Following that decision, further negotiations ensued and in February 2019, a substantially similar settlement was reached between certain Plaintiffs and the GUC Trust that included class certification for settlement purposes. However, before the Bankruptcy Court considered the motion to approve that settlement agreement, the MDL Court entered the August 6 Summary Judgment Ruling (defined below). As a result of the August 6 Summary Judgment Ruling, the GUC Trust terminated the February 2019 settlement agreement and agreed to participate in mediation with New GM and Plaintiffs. Various issues remain outstanding in the Bankruptcy Case, however, including litigation of (a) late claims, class, and mootness issues for certain

---

[9] *See In re Motors Liquidation Co.*, 580 B.R. 319 (Bankr. S.D.N.Y. 2018).

Ignition Switch Plaintiffs; (b) whether a due process violation exists with respect to other defects; and (c) assorted other matters, including remedies.[10]

### 4.    **MDL 2543**

In the wake of the Recalls and in parallel with the Old GM bankruptcy proceedings summarized above, numerous owners and lessees of defective vehicles filed suit against New GM. In 2014, those lawsuits were consolidated in this Court by the Judicial Panel on Multidistrict Litigation, which established separate tracks for the personal injury and economic loss claims and appointed separate legal teams to lead each track. Steve W. Berman of Hagens Berman Sobol Shapiro LLP and Elizabeth J. Cabraser of Lieff Cabraser Heimann & Bernstein, LLP were appointed Plaintiffs' Co-Lead Counsel with respect to the economic loss claims.

In the MDL action, Plaintiffs brought claims on behalf of putative classes of GM car owners and lessees whose vehicles were subject to those recalls, seeking to recover for "economic losses." Specifically, the Complaint (as amended) alleges that Old GM and New GM knew about various defects in their vehicles for years but concealed the defects, causing Plaintiffs to overpay for defective vehicles, incur lost time and incidental damages, and (pre-Recalls) bear the costs of repairs while GM reaped the benefit of selling defective vehicles at inflated prices and avoiding the costs of a recall. Plaintiffs sought monetary relief for their overpayments for the defective cars they purchased.

The operative complaint — the Fifth Amended Consolidated Complaint ("5ACC") — runs nearly 1700 pages and 7500 paragraphs, and includes state law claims in all fifty states and

---

[10] Simultaneous with this motion, Plaintiffs, New GM, and the GUC Trust are filing a *Joint Motion to Withdraw the Reference of the Economic Loss Plaintiffs' Motion for an Order Granting Authority to File Late Class Proofs of Claim and Related Filings* in the Old GM Bankruptcy action.

the District of Columbia.  *See* ECF No. 4838.[11]  Over the past five years that the MDL has been

ongoing, Plaintiffs have reviewed more than 23 million pages of documents produced by the

Defendants, and more than 750 witnesses have been deposed, including experts, fact witnesses,

and plaintiffs.  The Parties have also engaged in multiple rounds of briefing on motions to

dismiss, summary judgment, class certification, and discovery issues.

After several rulings on the viability of economic loss claims under the law of various

jurisdictions,[12] the parties and the Court selected three "bellwether" states — California,

Missouri, and Texas (collectively, the "Bellwether States") — for summary judgment, class

certification, and Daubert motion practice.  *See* ECF No. 4499; ECF No. 4521.  Thereafter, the

parties filed a wide array of motions relating to Plaintiffs in these Bellwether States.  Plaintiffs

filed a motion to certify classes in each Bellwether State pursuant to Rule 23 of the Federal Rules

of Civil Procedure; New GM filed a motion for summary judgment with respect to the claims of

each putative class; and each side filed various Daubert motions challenging the testimony of

certain experts for the other side.  *See, e.g.*, ECF No. 5846; ECF No. 5859; ECF No.; ECF No.

6131.

New GM moved for summary judgment against the bellwether plaintiffs in July 2018.

In an Opinion and Order entered on August 6, 2019, the Court granted New GM's motion in

part, concluding in relevant part that Plaintiffs' evidence of the fair market value of the allegedly

defective vehicles they had purchased was insufficient as a matter of Bellwether State law, and

---

[11]  Except where otherwise indicated, references to "ECF No. ___" are to docket entries in the MDL.

[12]  *See, e.g.*, *In re Gen. Motors LLC Ignition Switch Litig.*, 339 F. Supp. 3d 262 (S.D.N.Y. 2018); *In re Gen. Motors LLC Ignition Switch Litig.*, No. 14-MD-2543 (JMF), 2017 WL 3382071 (S.D.N.Y. Aug. 3, 2017); *In re Gen. Motors LLC Ignition Switch Litig.*, 257 F. Supp. 3d 372, 392-94 (S.D.N.Y. 2017); *In re Gen. Motors LLC Ignition Switch Litig.*, No. 14-MD-2543 (JMF), 2017 WL 6509256 (S.D.N.Y. Dec. 19, 2017); *In re Gen. Motors LLC Ignition Switch Litig.*, No. 14-MD-2543 (JMF), 2016 WL 3920353 (S.D.N.Y. July 15, 2016).

therefore failed to create a triable issue of fact on the issue of benefit-of-the-bargain damages (the "August 6 Summary Judgment Ruling"). *See* ECF No. 7019. In light of the ruling, the Court advised that "it may well make sense for the parties to revisit the issue of settlement." *Id.* at 43. The Court subsequently denied Plaintiffs' motion for reconsideration, but certified an order for interlocutory appeal with the acknowledgment that the issue on appeal "is a close one." *See* ECF 7616. Plaintiffs filed a petition for interlocutory appeal on December 23, 2019, which remains pending. *See In re: General Motors LLC Ignition Switch Litigation*, No. 19-4314 (2d Cir. Dec. 23, 2019) (Doc. No. 1). Other issues in the Action also remain pending, including New GM's renewed motion for summary judgment (ECF No. 7095), New GM's motion to exclude expert opinion (ECF No. 7100), and Plaintiffs' claims under the laws of forty seven other states and the District of Columbia.

**B.    The Proposed Settlement Resulted from Extensive Arm's-Length Negotiations Before a Highly Experienced and Respected Mediator.**

Section I A(3) above addresses the multiple efforts between Plaintiffs and the GUC Trust to reach resolution following the Second Circuit's July 13, 2016 ruling on due process. In addition to, and at some point parallel to, those discussions, this Court appointed the Hon. Layn R. Phillips, a retired federal judge, as the Economic Loss Settlement Mediator. ECF No. 4525. Plaintiffs and New GM, who had engaged in earlier less formal (and non-fruitful) settlement discussions, participated in in-person mediation sessions with Judge Phillips in December 2017 and two sessions in October 2018, but were unable to resolve the claims. *See* Phillips Decl. ¶¶ 10, 12-13.

After the Court's August 6 Summary Judgment Ruling, Plaintiffs and New GM, joined by GUC Trust and the Participating Unitholders, recommenced active settlement discussions. *Id.* ¶ 16. On September 11, 2019, the parties met for an in-person mediation session, and later

participated in two additional in-person sessions with Judge Phillips on December 10, 2019 and January 8, 2020, and engaged in multiple communications outside the presence of Judge Phillips. *Id.* ¶¶ 20, 27, 29. On January 8, 2020, the Parties agreed to certain key terms that could form the basis of a settlement, subject to Class Counsel and New GM reaching an agreement as to attorneys' fees and expenses and the Parties reaching a definitive, written Settlement Agreement, with other material terms yet to be negotiated. *Id.* ¶ 29. After the January 8, 2020 mediation session, the Parties then proceeded to negotiate the terms of the Settlement Agreement, *id.* ¶ 31, which was fully executed on March 27, 2020.

In parallel to the Parties' negotiations over other terms of the Settlement Agreement, Judge Phillips also presided over discussions regarding the manner in which the Common Fund would be allocated among the various Subclasses of the Class. Judge Phillips held a session on February 21, 2020 relating to allocation of the Common Fund amongst the Subclasses, at which Allocation Counsel[13] made presentations as to the Subclasses each was representing for purposes of the development of an allocation plan. *Id.* ¶ 14. Following this session, Judge Phillips issued an Allocation Decision on March 25, 2020.

## SUMMARY OF PROPOSED SETTLEMENT TERMS

### A. The Proposed Class Definition

The Class is defined as:

All persons, entities or organizations who, at any time as of or before the date of the applicable recalls, own or owned, purchase(d), or lease(d) a Subject Vehicle identified as "personal," "commercial," "financial," and "other" in the IHS Markit "Polk" data (but not purchasers and lessees identified as "rental" or "governmental" in the Polk data) in any of the fifty States, the District of Columbia, Puerto Rico, Guam, the U.S. Virgin Islands, and all other United States territories and/or possessions.

---

[13] A Court-appointed duty of the Plaintiffs' Executive Committee is to serve as allocation counsel. *See* ECF No. 304.

The Subject Vehicles are defined as the GM vehicles subject to the Recalls as defined by the VINs provided by New GM to the Class Action Settlement Administrator.[14]

Additionally, the Settlement Agreement defines five Subclasses (the "Subclasses"):

- <u>Subclass 1</u>: The Delta Ignition Switch Subclass, comprised of those Class Members who own(ed), purchase(d), and/or lease(d) a Subject Vehicle subject to NHTSA Recall No. 14v047.
- <u>Subclass 2</u>: The Key Rotation Subclass, comprised of those Class Members who own(ed), purchase(d), and/or lease(d) a Subject Vehicle subject to NHTSA Recall Nos. 14v355, 14v394, and 14v400.
- <u>Subclass 3</u>: The Camaro Knee-Key Subclass, comprised of those Class Members who own(ed), purchase(d), and/or lease(d) a Subject Vehicle subject to NHTSA Recall No. 14v346.
- <u>Subclass 4</u>: The Electric Power Steering Subclass, comprised of those Class Members who own(ed), purchase(d), and/or lease(d) a Subject Vehicle subject to NHTSA Recall No. 14v153.
- <u>Subclass 5</u>: The Side Airbag Subclass, comprised of those Class Members who own(ed), purchase(d), and/or lease(d) a Subject Vehicle subject to NHTSA Recall No. 14v118.

## B.    The Proposed Settlement Fund

The Settlement Agreement provides that New GM and the GUC Trust[15] will contribute $120 million (the "Settlement Amount") in cash to a non-reversionary Common Fund (the "Common Fund" or the "Settlement Fund") for the benefit of Class Members.[16]  The Common Fund will be established and created as a Qualified Settlement Fund Trust, pursuant to Internal Revenue Code § 468B and the Regulations issued thereto.  The Settlement Amount plus interest,

---

[14]  These are comprised of the vehicles set forth in Paragraph 70(a)-(j) of the Settlement Agreement.

[15]  Plaintiffs and New GM will continue to seek a monetary contribution by Motors Liquidation Company Avoidance Action Trust ("AAT"), which will not receive releases under the Settlement absent a contribution. If AAT makes a payment to resolve claims asserted by Plaintiffs, the Class, and/or New GM, against, or recoverable from, the AAT (the "AAT Contribution Amount"), that payment will be split 50/50 between New GM and the Plaintiffs.

[16]  Specifically, within 30 days after entry of the Preliminary Approval Order, New GM will deposit into the Escrow Account $8,800,000 and the GUC Trust will deposit into the Escrow Account $2,000,000.  Within 30 days of the Final Effective Date, GM will deposit into the Escrow Account the sum of $61,200,000, and the GUC Trust will deposit into the Escrow Account the sum of $48,000,000.

after the deduction of Settlement Implementation Expenses (including, *inter alia*, Taxes and the fee for the Court-Appointed Economic Loss Mediator and his staff to conduct the Allocation Counsel mediation and prepare the Allocation Decision) and any Plaintiff Incentive Awards (the "Net Common Fund"), will be distributed among Class Members who submit timely and valid claim forms in accordance with the Plan of Allocation to be approved by the Court. To serve the interest of public safety, no Class Member who is a current owner, purchaser, or lessee of a Subject Vehicle shall receive a settlement payment of any kind under the Settlement unless and until the applicable Recall repair(s) have been performed on the Class Member's Subject Vehicle by an authorized GM dealer.

### C. Plan of Allocation

Pursuant to the Plan of Allocation and Allocation Decision, the entire Net Common Fund will be distributed to Class Members with approved Settlement Claims. Members of Subclass 1 will receive twice (2x) the amount paid to members of Subclasses 3, 4 and 5, and members of Subclass 2 will receive 1.5x the amount paid to members of Subclasses 3, 4, and 5. The calculation process works as follows:

*First*, the number of all approved Settlement Claims will be divided into the Net Common Fund to determine an initial "Base Payment Amount" for calculation purposes.

*Second*, pursuant to the Allocation Decision, an "Adjusted Base Payment Amount" will be determined by multiplying the Base Payment Amount by a factor of 2 for Subclass 1 claimants, by a factor of 1.5 for Subclass 2 claimants, and by a factor of 1 for Subclass 3, 4, and 5 claimants.

*Third*, the Adjusted Base Payment Amount for each Subclass will be multiplied by the number of claimants for each Subclass to determine the total value of the claims for each Subclass.

*Fourth*, the total value of the claims for each Subclass will be totaled so that the value of total claims for each Subclass can be assigned a percentage.

*Fifth*, each Subclass's percentage will be applied to the Net Common Fund in order to determine a prorated value of claims for each Subclass.

*Sixth*, for the final step, each Subclass's prorated value of claims is divided by the number of all approved claims for that Subclass to determine the payment amount for each Subclass claimant.

Thus, and put another way, the final Base Payment Amount—that is, the one that forms the basis for payments to individual claimants—is as follows:  [Net Common Fund]/ [(2)(no. of approved Settlement Claims in Subclass 1) + (1.5)(no. of approved Settlement Claims in Subclass 2) + (1) (no. of approved Settlement Claims in Subclass 3) + (1)(no. of approved Settlement Claims in Subclass 4) + (1)(no. of approved Settlement Claims in Subclass 5)].  Again, members of Subclass 3, 4, and 5 receive this Base Payment Amount, and members of Subclasses 1 and 2 receive the Adjustment Base Payment Amounts.

### D. Releases

In exchange for the benefits provided under the Settlement Agreement, upon entry of the Final Order and Final Judgment, Class Members will release any and all claims against New GM and the GUC Trust related to or arising from any of the facts alleged in the Actions filed in this litigation and in the Bankruptcy Case.[17]  Notably, however, Class Members do not release claims for personal injury, wrongful death, or actual physical property damage arising from any accident.

### E. Notice and Class Action Settlement Administrator

The Settlement contains robust Class Notice programs designed to satisfy all applicable laws, including Rule 23 and constitutional due process.  Notifying Class Members of the Settlements will be accomplished through a combination of (i) direct mailed notices based on comprehensive vehicle registration data; (ii) distribution of two nationwide press releases, in both English and Spanish, containing the Summary Settlement Notice, first at the launch of the Class Notice program and again just prior to the end of the Settlement Claim Period; and (iii) publication of the Summary Settlement Notice in a leading consumer magazine (*People* magazine) to extend reach to Class Members for whom direct notice is not possible. Additionally, the Class Action Settlement Administrator shall establish a toll-free telephone number that will provide settlement-related information to Class Members, and a Settlement website that will inform Class Members of the terms of the Settlement Agreement, their rights, dates and deadlines, and related information.  The details of each form of notice are set forth in

---

[17]  The AAT shall not constitute a Released Party and the Releasing Parties and New GM shall not release the AAT from any rights, claims or causes of action that the Releasing Parties or New GM have or may assert against the AAT.  Additionally, the Releasing Parties and New GM shall not, and shall not be deemed to, release Old GM or the Old GM Bankruptcy Estates from any Actions or claims solely to the extent that such Actions or claims are asserted only against, or recoverable only from, the AAT.

the accompanying Declaration of Jennifer M. Keough of JND, the proposed Class Action Settlement Administrator.

The Class Action Settlement Administrator is charged with administering all aspects of the Settlement, including delivering notice to Class Members, corresponding with Class Members regarding their claims, and overseeing and administering the Settlement Claims Process. The Parties agree that Ms. Keough should serve as Class Action Settlement Administrator, subject to the Court's approval.

### F.     Attorneys' Fees and Expenses

The Parties did not negotiate Attorneys' Fees and Expenses until after agreeing to the principal terms set forth in the Settlement Agreement.  Plaintiffs' Class Counsel will seek an award of reasonable Attorneys' Fees and Expenses, in an amount not to exceed $34.5 million, to be paid solely by New GM and which New GM has agreed not to oppose.  The award of fees and expenses will not come from the Common Fund nor the GUC Trust, and will not reduce Class Members' recovery in any way.  Additionally, the award of attorneys' fees and expenses will be entered as a separate order so that any appeal or invalidation of the fees would not affect the Final Order of Settlement.

Plaintiffs' Class Counsel will provide detailed information in support of its application for Attorneys' Fees and Expenses, which will be filed at least 21 days before the deadline to object to or opt out of the Settlement so that Class Members will have sufficient opportunity to comment on or object to the requested fees prior to the Fairness Hearing.

### F.     Plaintiff Incentive Awards

Plaintiffs' Class Counsel will also seek incentive awards for Plaintiffs to reimburse their time and expenses in representing the Class.  The Plaintiff Incentive Awards shall be paid by the

Qualified Settlement Fund Administrator and Trustee out of the Common Fund as follows: $2000 for a Plaintiff who was deposed, $1000 for a Plaintiff who was not deposed.

## ARGUMENT

Rule 23(e) requires judicial approval for the settlement of claims brought on a class basis. Fed. R. Civ. P. 23(e). Rule 23, as revised as of December 1, 2018, directs that the Court grant preliminary settlement approval and direct notice to the class if it "will likely be able to" grant final approval under Rule 23(e)(2) and certify a settlement class. Fed. R. Civ. P. 23(e)(1)(B).

The approval of a proposed class action settlement is a matter of discretion for the trial court. *See Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1079 (2d Cir. 1998). In exercising that discretion, courts are mindful of the "strong judicial policy favoring settlements' of class action suits." *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 116 (2d Cir. 2005); *see also Spann v. AOL Time Warner, Inc.*, No. 02 Civ. 8238, 2005 WL 1330937, at *6 (S.D.N.Y. June 7, 2005) ("[P]ublic policy favors settlement, especially in the case of class actions."); *McReynolds v. Richards-Cantave*, 588 F.3d 790, 804 (2d Cir. 2009) (noting "strong judicial policy in favor of settlements particularly in the class action context"). Due to the presumption in favor of settlement, "[a]bsent fraud or collusion," courts "should be hesitant to substitute [their] judgment for that of the parties who negotiated the settlement." *In re EVCI Career Colls. Holding Corp. Sec. Litig.*, No. 05 Civ. 10240 (CM), 2007 WL 2230177, at *4 (S.D.N.Y. July 27, 2007).

## I. THE SETTLEMENT WILL LIKELY BE APPROVED AS FAIR, REASONABLE, AND ADEQUATE UNDER RULE 23(e)(2)

A court should approve a class action settlement if it is "fair, adequate, and reasonable, and not a product of collusion." *Visa U.S.A.*, 396 F.3d at 116 (citation and quotation marks omitted). In conducting a preliminary approval inquiry, a court considers both the "'negotiating

process leading up to the settlement, *i.e.*, procedural fairness, as well as the settlement's substantive terms, *i.e.*, substantive fairness.'" *In re Platinum and Palladium Commodities Litig.*, 10-CV-3617, 2014 WL 3500655, at *11 (S.D.N.Y. July 15, 2014). Procedural evidence includes whether the settlement is the product of arm's length negotiations between experienced counsel and is untainted by collusion. *See D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001). Substantive evidence includes a comparison of the substantive terms of the settlement with the likely rewards of litigation. *Mba v. World Airways, Inc.*, 369 F. App'x 194, 197 (2d Cir. 2010). Importantly, given the prevailing policy in favor of settlement, there is a strong, bedrock presumption that a negotiated settlement is fair and reasonable. *See id.* Absent "evidence of fraud or overreaching, courts have consistently refused to act as Monday morning quarterbacks in evaluating the judgment of counsel." *Strougo ex rel Brazilian Equity Fund, Inc. v. Bassini*, 258 F. Supp. 2d 254, 257 (S.D.N.Y. 2003) (citations omitted).

Pursuant to the recent amendments to Rule 23(e)(2), a court may approve a settlement as "fair, reasonable, and adequate" after considering the following four factors:

> (A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3); and (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2). Those factors are readily satisfied here. The Settlement Agreement resulted from extensive, good faith, arm's length negotiations between experienced counsel to reasonably resolve the many issues arising in this litigation. Furthermore, the Settlement will substantially reduce the sizable costs of this protracted litigation and eliminate the risk of unfavorable litigation outcomes, while providing immediate, adequate compensation to Class

Members. The proposed Settlement would provide a fair, reasonable, and adequate resolution of this litigation, and should be granted preliminary approval by the Court.

### A. As the Product of Arm's-Length Negotiations by Informed and Knowledgeable Counsel, the Settlement Is Presumptively Fair.

"To determine procedural fairness, courts examine the negotiating process leading to the settlement." *Morris v. Affinity Health Plan, Inc.*, 859 F. Supp. 2d 611, 618 (S.D.N.Y. 2012). "A 'presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery.'" *Visa U.S.A., Inc.*, 396 F.3d at 116 (citation omitted). Moreover, in such circumstances, "great weight is accorded to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation." *In re PaineWebber Ltd. Partnerships Litig.*, 171 F.R.D. 104, 125 (S.D.N.Y. Mar. 20, 1997); *see also Clark v. Ecolab Inc.*, Nos. 07 Civ. 8623, 04 Civ. 4488, 06 Civ. 5672, 2010 WL 1948198, at *4 (S.D.N.Y. May 11, 2010) ("In evaluating the settlement, the Court should keep in mind the unique ability of class and defense counsel to assess the potential risks and rewards of litigation"). This Settlement embodies all hallmarks of a procedurally fair resolution.

*First*, Plaintiffs' Class Counsel's settlement posture was informed by more than five years of highly active litigation, which included reviewing more than 23.4 million pages of documents, taking or defending more than 750 depositions, and fully briefing class certification, 12(b)(6), summary judgment, and discovery motions. Counsel thus unquestionably possessed sufficient information about the case to negotiate a fair, reasonable, and adequate Settlement. *See, e.g.*, *In re Giant Interactive Grp., Inc. Sec. Litig.*, 279 F.R.D. 151, 160 (S.D.N.Y. 2011) (presumption of fairness where parties were represented by experienced counsel and the case "proceeded well into both class certification and merits discovery before settlement was

reached."); *In re AOL Time Warner ERISA Litig.*, No. 02 Civ. 8853, 2006 WL 2789862, at *5 (S.D.N.Y. Sept. 27, 2006) (approving settlement where negotiations were conducted by counsel well-informed of the merits of the claims at that stage of litigation).

*Second*, the parties' settlement negotiations were at arm's length, protracted, and facilitated by an experienced court-appointed mediator. *See* Fed. R. Civ. P. 23(e)(2)(A) & (B) advisory committee's note ("[T]he involvement of a neutral or court-affiliated mediator or facilitator in those negotiations may bear on whether they were conducted in a manner that would protect and further the class interests."); *Giant Interactive*, 279 F.R.D. at 160 (approving settlement that was the product of "arms-length negotiation . . . facilitated by a respected mediator."). The Hon. Layn R. Phillips, a highly-respected former federal judge, presided over eight in-person mediation sessions and remained engaged with the parties throughout the course of their ongoing negotiations. *See In re Bear Stearns Cos. Sec., Derivative & ERISA Litig.*, 999 F. Supp. 2d 259, 265 (S.D.N.Y. 2012) (approving settlement where parties "engaged in extensive arm's length negotiations, which included multiple sessions mediated by retired federal judge Layn R. Phillips, an experienced and well-regarded mediator"); *Bd. of Trustees of City of Birmingham Employees' Ret. Sys. v. Comerica Bank*, No. 09-CV-13201, 2013 WL 12239522, at *5 (E.D. Mich. Dec. 27, 2013) (approving settlement where "the record is clear that the parties engaged in extensive negotiations with Judge Layn Phillips, a highly respected mediator with substantial experience with complex actions"); *Giant Interactive*, 279 F.R.D. at 160 (approving settlement and finding it was entitled to a presumption of fairness where the "settlement was the product of prolonged, arms-length negotiation" facilitated by Judge Layn R. Phillips, "a respected mediator"). At those sessions, the parties extensively, and often contentiously, discussed the merits of the claims and defenses and the relief available to the Class. *See* Phillips

Decl. ¶ 37 ("The two-and-a-half-years-mediation process was an extremely hard-fought and lengthy negotiation from beginning to end. . . . At each step of the way, over the course of several years, counsel for the Parties advocated zealously on behalf of their clients working to maximize the settlement outcome to the benefit of their respective clients in a highly adversarial set of mediations."). These discussions were followed by lengthy telephone conferences, as well as exchanges of multiple drafts and related materials.

*Third*, Plaintiffs and Plaintiffs' Class Counsel have prosecuted this action on behalf of the Class with vigor and dedication for over five years. As detailed above, Plaintiffs' Class Counsel engaged in significant motion practice in both the MDL Court and the Bankruptcy Court, and massive offensive discovery efforts in the MDL Court to prosecute the Class claims. *See supra*, § II. Counsel defended against multiple rounds of motions to dismiss, multiple rounds of motions for summary judgment, and moved for and extensively litigated class certification and attendant expert issues. *See id.* The proposed Class representatives were likewise actively engaged—they completed extensive fact sheets, produced documents, in many cases sat for depositions, and have regularly communicated with counsel. *See id.* Under these circumstances, there is "a strong initial presumption that the compromise is fair and reasonable." *In re Michael Milken and Assocs. Sec. Litig.*, 150 F.R.D. 57, 66 (S.D.N.Y. 1993).

### B. The Terms of the Settlement Are Substantively Fair.

In evaluating the substantive fairness of a class action settlement, courts in the Second Circuit consider the nine factors set forth in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974):

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the

range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Grinnell*, 495 F.2d at 463. In finding that a settlement is fair, not every factor must weigh in favor of settlement; "rather, the court should consider the totality of these factors in light of the particular circumstances." *Thompson v. Metro. Life Ins. Co.*, 216 F.R.D. 55, 61 (S.D.N.Y. 2003). Taken together, the *Grinnell* factors and Rule 23(e)(3) weigh heavily in favor of preliminary approval of the proposed Settlement Agreement.[18]

### 1. The complexity, expense, and likely duration of this litigation favor preliminary approval.

Prosecuting the Action would necessarily entail a lengthy and expensive legal battle involving complex legal and factual issues. This sprawling, multidistrict and bankruptcy litigation has been ongoing for years, consuming large sums of money and countless hours of labor for the Parties, the Bankruptcy Court, and this Court. In the absence of settlement, there is a high likelihood of even more expensive, protracted and contentious litigation that will consume significant funds and expose the Plaintiffs to risk and uncertainty.

Class actions are generally complex and time-consuming. *See, e.g.*, *In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 174 (S.D.N.Y. 2000), *aff'd*, 236 F.3d 78 (2d Cir. 2001). But this particular case has involved an especially extensive litigation process – even when compared to average class actions. As this Court has accurately observed, "this litigation is already in its sixth year, with no end in sight absent a settlement." ECF No. 7616.

---

[18] The second *Grinnell* factor, the reaction of the class to the settlement agreement, is generally inapplicable prior to the dissemination of notice and therefore will not be addressed. *See Reade-Alvarez v. Eltman, Eltman & Cooper P.C.*, 237 F.R.D. 26, 34 (E.D.N.Y. 2006). In the event objections are received after notice is disseminated, Plaintiffs' Class Counsel will address them in connection with the motion for final approval of the Settlement Agreement.

The conduct underlying this lawsuit dates back nearly 20 years. Discovery in the MDL required years of extensive investigations, in which Plaintiffs reviewed more than 23 million pages of documents and took and defended more than 750 depositions of experts, plaintiffs, and fact witnesses. *See* ECF No. 7029. The litigation in the Bankruptcy Court is still in its early stages. Thus, while the Parties have already engaged in vigorous litigation before this Court, many critical issues remain pending both here and in the Bankruptcy Court. These include New GM's renewed motion for summary judgment (ECF No. 7095), New GM's motion to exclude expert opinion (ECF No. 7100), Plaintiffs' motion for class certification, and Plaintiffs' claims under the laws of forty seven other states and the District of Columbia; additionally, the Bankruptcy Court must first decide threshold issues regarding whether late claims are allowed to be filed, and then if late claims were to be filed, the parties would only then begin the process of adjudicating the merits of those claims, along with class certification issues An interlocutory appeal is also pending with the Second Circuit which, the Court has recognized, could result in "potentially lengthy delay." ECF No. 7616. If that interlocutory appeal is not taken up or is denied on the merits, Plaintiffs will need to significantly revise previously submitted briefing, including their motion for class certification.

Although the Parties have incurred great expenses and burdens in this litigation already, they would certainly incur much more going forward. *See Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassini*, 258 F. Supp. 2d 254, 261 (S.D.N.Y. 2003) ("[E]ven if a shareholder or class member was willing to assume all the risks of pursuing the actions through further litigation . . . the passage of time would introduce yet more risks . . . and would in light of the time value of money, make future recoveries less valuable than this current recovery."). Even if, in the best case scenario, the many pending motions were resolved in Plaintiffs' favor, in the absence of

settlement the Plaintiffs would still face a long road to recovery, including trial, post-trial motions, and an inevitable appeal, with no guarantee of success. *See In re Marsh & McLennan, Cos. Sec. Litig.*, No. 04 Civ. 8144(CM), 2009 WL 5178546, at *5 (S.D.N.Y. Dec. 23, 2009) (noting the additional expense and uncertainty of "inevitable appeals" and the benefit of Settlement, which "provides certain and substantial recompense to the Class members now"); *Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298, 1322 (S.D. Fla. 2005) (likelihood that appellate proceedings could delay class recovery "strongly favor[s]" approval of a settlement).

Additionally, as a matter of economic reality and proportionality, this litigation involves older vehicles, which continue to depreciate and reach the end of their useful lives in the normal course. Already, many have gone out of service and they will continue to do so as the litigation proceeds. Continuing litigation will take time, and that time impacts the damages models, and decreases the value and utility of economic remedies to the class. As courts have recognized, "[d]elay not just at the trial stage, but through post-trial motions and the appellate process, would cause Settlement Class Members to wait years for any recovery, further reducing its value." *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 362 (S.D.N.Y. 2002) (citing *Grinnell*, 495 F.2d at 467). The cost of delay to Class Members is particularly damaging here.

Simply put, the proposed Settlement Agreement avoids several more years of complex and expensive litigation. *See Cardiology Assocs., P.C. v. Nat'l Intergroup, Inc.*, No. 85 CIV. 3048 (JMW), 1987 WL 7030, at *3 (S.D.N.Y. Feb. 13, 1987) ("[E]ven assuming a favorable jury verdict, if the matter is fully litigated and appealed, any recovery would be years away."). This factor therefore weighs in favor of preliminary approval.

### 2. The stage of the proceedings and the amount of discovery completed favor final approval.

The advanced stage of the proceedings also supports approval of the settlement. Under the third *Grinnell* factor, settlement is especially favored when the litigation is at an "advanced stage" and an "extensive amount of discovery [has been] completed." *In re Marsh & McLennan*, 2009 WL 5178546, at *6. This factor goes to "whether the plaintiffs have obtained a sufficient understanding of the case to gauge the strengths and weaknesses of their claims and the adequacy of the settlement." *In re AOL Time Warner, Inc.*, No. 02 CIV. 5575 (SWK), 2006 WL 903236, at *10 (S.D.N.Y. Apr. 6, 2006).

This matter has been intensely litigated including, *inter alia*, all merits and class discovery, motions for summary judgment and class certification, multiple appearances before in the MDL and the Bankruptcy Courts regarding a wide variety of substantive and procedural issues, discovery disputes and briefing, renewed motions for summary judgment, and intensive settlement negotiations. In the Bankruptcy Case, there have been years of motion practice and three separate attempts by certain Plaintiffs and the GUC Trust to reach a settlement agreement to resolve these disputes. As a result of these years of litigation, including the completion of class and merits discovery, the parties and their counsel are fully cognizant of the relative strengths and weaknesses of various claims and defenses, as well as the risks and potential outcomes absent settlement. Indeed, this Court has recognized that "after five-plus years of litigation, hundreds of depositions, millions of documents exchanged in discovery, and untold trees felled and ink spilled by the parties and the Court, the parties should have enough data to agree on a settlement value for this litigation." ECF No. 7616. The Court should find that this factor weighs heavily in support of preliminary approval of the Settlement Agreement. *See In re Marsh & McLennan*, 2009 WL 5178546, at *7 (finding the third *Grinell* factor weighed in favor

of settlement approval where, based on their extensive litigation history, the parties were "clearly in a position to realistically evaluate the strengths and weaknesses of the claims, and . . . the fairness of the proposed Settlement.").

### 3. The substantial risks of litigation—establishing liability, damages, and maintaining the Actions through trial—also favor approval of the Settlement Agreement.

The substantial risk of proceeding with litigation also weighs in favor of approving the Settlement Agreement. Courts approve settlements where "plaintiffs would have faced significant legal and factual obstacles to proving their case." *In re Global Crossing Securities and ERISA Litig.*, 225 F.R.D. 436, 459 (S.D.N.Y. 2004). Particularly in light of the Court's August 6 Summary Judgment Ruling, those obstacles are substantial here.

*First*, as this Court recognized, the August 6 Summary Judgment Ruling "change[d] the landscape in dramatic ways." ECF No. 7616. Judge Furman's ruling—with which Plaintiffs continue to respectfully disagree—effectively discarded Plaintiffs' primary theory of damages. Pursuing litigation with respect to the remaining states' claims, which adhere to the same theory of damages that the Court previously rejected, would require an entirely new theory of damages and come with a high-degree of risk. While Plaintiffs are hopeful that the Second Circuit will reverse on appeal, it is unclear that the Circuit will even take the case. If they decline interlocutory review or affirm this Court's decision, Plaintiffs will need to re-assess their entire damages theory in both this Court and the Bankruptcy Court, and revise all attendant briefing, including the class certification motion.[19]

---

[19] In the Bankruptcy Case, Plaintiffs relied on damages analysis that the Court rejected in the August 6 Ruling to establish that their claims are worth the amount necessary to require payment of the Adjustment Shares. Like Judge Furman, Judge Glenn acknowledged that the August 6 Summary Judgment had "change[d] the landscape greatly" both in the MDL and the Bankruptcy Court.

*Second*, even setting aside the August 6 Summary Judgment Ruling, the litigation has reached a critical inflection point. Plaintiffs face a number of serious challenges, including pending class certification and renewed summary judgment motions. If, for example, the Court were to deny class certification—a distinct possibility given its rejection of Plaintiffs' damages theory—the case would be dead, both here and in the Bankruptcy Court, and Class Members would receive nothing.

*Third*, even if Plaintiffs survived the minefield of pending motions, the Class would face the risk and uncertainty of trial and a potentially lengthy appellate process. Liability and damages have been hotly contested throughout this litigation, and Defendants are well-financed and represented by highly-skilled counsel; they will undoubtedly raise vigorous challenges to both at trial or on appeal. For example, if the case went to trial, Plaintiffs would face the difficulties and complexities inherent in proving damages to the jury. Class Plaintiffs' theory of damages would be strongly contested at trial, as it has been in pretrial proceedings, and there is no doubt that at trial the issue would inevitably involve a "battle of the experts." "In this 'battle of experts,' it is virtually impossible to predict with any certainty which testimony would be credited, and ultimately, which damages would be found to have been caused by actionable, rather than the myriad nonactionable factors . . . ." *In re Warner Commc'ns Sec. Litig.*, 618 F. Supp. 735, 744-45 (S.D.N.Y. 1985). Thus, there is a substantial risk that a jury might accept one or more of Defendants' damage arguments, or award substantially less than the total settlement amount of $120,000,000—or nothing at all.

*Fourth*, numerous complex issues remain outstanding in the Bankruptcy Case. These include litigation of (a) late claims, class, and mootness issues for certain Ignition Switch Plaintiffs; (b) whether a due process violation exists with respect to other defects; and (c)

remedies.  Plaintiffs asserting claims against the GUC Trust have been arguing over their ability to even file late claims in the Bankruptcy Case and related matters for over five years.  Thus, even if Plaintiffs are able to establish economic losses in the Bankruptcy Case, in order to collect any portion of those purported losses against the GUC Trust and New GM they face a long and challenging road to recovery.

Evaluated against these risks, the proposed Settlement is an excellent result for the Class: it "benefits each plaintiff in that he or she will recover a monetary award immediately, without having to risk that an outcome unfavorable to the plaintiffs will emerge from a trial." *Velez v. Majik Cleaning Serv., Inc.*, No. 03 Civ. 8698(SAS) (KNF), 2007 WL 7232783, at *6 (S.D.N.Y. June 25, 2007).

### 4. The Settlement Amount is reasonable in light of the best possible recovery and all attendant risks of litigation.

The Court must also balance the risks of establishing liability and damages against the benefits afforded to the Class, and the immediacy and certainty of a substantial recovery against the risks of continuing litigation.  *Grinnell*, 495 F.2d at 463.  In considering the reasonableness of a Settlement Amount, "[d]ollar amounts are judged not in comparison with the possible recovery in the best of all possible worlds, but rather in light of the strengths and weaknesses of plaintiffs' case." *In re "Agent Orange" Prod. Liab. Litig.*, 597 F. Supp. 740, 762 (E.D.N.Y. 1984), *aff'd* 818 F.2d 145 (2d Cir. 1987).  Consequently, the Second Circuit has recognized that "[t]here is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth of a single percent of the potential recovery." *Grinell*, 495 F.2d at 455 n.2.[20]

---

[20] Consistent with that principle, courts often approve class settlements even where the benefits represent "only a fraction of the potential recovery." *See, e.g., In re Initial Public Offering Secs. Litig.*, 671 F. Supp. 2d

In this Action, the proposed Class will receive a meaningful and tangible present recovery—$120 million in monetary relief—from the Settlement. With Court approval, this money plus interest will likely be distributed in a matter of months—rather than years, or never. *See AOL Time Warner*, 2006 WL 903236, at *13 (concluding that where settlement fund is in escrow earning interest, "the benefit of the Settlement will . . . be realized far earlier than a hypothetical post-trial recovery"). And the Settlement is just one piece of a broader set of activities that, in totality, address New GM's conduct while making its victims whole. The relief for economic loss is in addition to the substantial benefits that have been paid to those who suffered personal injury or death; a $595 million voluntary personal injury/wrongful death fund; and a $900 million penalty GM has paid in connection with federal probes. In its structure, the Settlement also incentivizes Class Members who still possess Subject Vehicles to make the necessary repairs, thereby serving an important public safety interest.

By contrast, as discussed, Plaintiffs would face a lengthy, challenging, and unpredictable path pursuing litigation. For a successful path forward in the MDL Court and the Bankruptcy Court, realistically Plaintiffs would first need to prevail on an appeal in the Second Circuit. Especially to the extent the appeals implicates California state law, this could also involve litigation in the California Supreme Court. This would be a lengthy and uncertain process. If the Second Circuit declines to take the appeal, Plaintiffs and Defendants would have to litigate, among other things, the propriety and admissibility of revised economic loss damage models. All of this is against the backdrop that the Court expressly declined to rule on various

467, 483-85 (S.D.N.Y. 2009) (approving settlement which provided only 2 percent of defendants' maximum possible liability, observing that "the Second Circuit has held that even a fraction of the potential recovery does not render a proposed settlement inadequate"); *In re Prudential Inc. Secs. Ltd. P'ships Litig.*, MDL No. 1005, M-21-67, 1995 WL 798907 (S.D.N.Y. Nov. 20, 1995) (approving settlement of between 1.6 percent and 5 percent of claimed damages).

outstanding issues in the earlier-filed summary judgment motion, and has not ruled on class certification at all. Surviving the class certification stage, defeating summary judgment, and then achieving a litigated verdict at trial (and sustaining any such verdict in the appeals that would inevitably ensue) would be a prolonged, complex, and risky undertaking that would require substantial additional time and expense. *See In re Initial Pub. Offering Secs. Litig.*, 671 F. Supp. 2d at 481 (finding that the complexity, expense and duration of continued litigation supports final approval where, among other things "motions would be filed raising every possible kind of pre-trial, trial and post-trial issue conceivable").

Achieving a favorable resolution in the Bankruptcy Court would present similar challenges. Plaintiffs and the GUC Trust would need to litigate the late claims motions, equitable mootness, and other disputed issues about whether Non-Ignition Switch Plaintiffs have suffered the same due process violation as the Delta Ignition Switch Plaintiffs. Even if the Plaintiffs were ultimately successful in establishing damages against the GUC Trust, those damage claims would only pay out a small percentage of their total amount pursuant to the distribution mechanism established in the Old GM Plan for allowed claims. By way of example, current allowed claims against the GUC Trust have only received payment of thirty percent of their allowed claim.

By contrast to ongoing litigation in two courts, "[s]ettlement at this juncture results in a substantial and tangible present recovery, without the attendant risk and delay." *In re EVCI Career Coll.*, WL 2230177, at *6 (internal citations omitted). The $120 million recovery readily falls within the range of reasonable results given the complexity of the Action and the significant barriers that stand between the present juncture of the litigation and final judgment. *See In re Payment Card Interchange Fee & Merchant Disc. Antitrust Litig.*, 986 F. Supp. 2d 207, 212

(E.D.N.Y. 2013) ("In assessing the Settlement, the Court should balance the benefits afforded the Class, including the ***immediacy*** and ***certainty*** of a recovery, against the continuing risks of litigation." (emphasis in original)); *Nobles v. MBNA Corp.*, No. C 06-3723 CRB, 2009 WL 1854965, at *2 (N.D. Cal. June 29, 2009) ("The risks and certainty of recovery in continued litigation are factors for the Court to balance in determining whether the Settlement is fair.").

> **5.** **The proposed Plan of Allocation is an effective and equitable means of distributing relief to the Class.**

The Court must also assess the Settlement's effectiveness in distributing relief to the Class. Fed. R. Civ. P. 23(e)(2)(C)(ii). A plan for allocating settlement proceeds, like the Settlement itself, should be approved if it is fair, reasonable, and adequate. *See, e.g., In re IMAX Sec. Litig.*, 283 F.R.D. 178, 192 (S.D.N.Y. 2012). "An allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel." *Maley v. Del Global Technologies Corp.*, 186 F.Supp.2d 358, 367 (S.D.N.Y. 2002); *see also In re Flag Telecom Holdings, Ltd. Sec. Litig.*, No. 02-CV-3400 CM PED, 2010 WL 4537550, at *21 (S.D.N.Y. Nov. 8, 2010) (approving allocation plan that was recommended by "experienced and competent counsel" and based on assessments of the strengths and weaknesses of the claims asserted and the likelihood of recovery). A plan of allocation that reimburses class members differentially based on the relative strength or value of their claims may be reasonable, even if certain class members ultimately recover more that others. *See In re Telik Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 580 (S.D.N.Y. 2008) ("A reasonable plan may consider the relative strengths and values of different categories of claims.").

The proposed Plan of Allocation provides for a reasonable and rational means of distributing the Common Fund to the Class Members: based on the relative strength of each Subclass's claims, as determined by a neutral, third-party mediator. *See Danieli v. IBM*, No. 08

Civ. 3688, 2009 WL 6583144, at *4-5 (S.D.N.Y. Nov. 16, 2009) (granting preliminary approval where proposed allocation plan is "rationally related to the relative strengths and weaknesses of the respective claims asserted"); *Curtiss-Wright Corp. v. Helfand*, 687 F. 2d 171, 173-75 (7th Cir. 1982) (permitting an unequal allocation of a class action settlement fund based on different defenses available against different class members). Specifically, after zealous advocacy by experienced and knowledgeable Allocation Counsel on behalf of each Subclass, Judge Phillips—on the basis of Allocation Counsel's presentations and drawing on his extensive experience as a Judge and mediator in complex class actions—issued an Allocation Decision, which reflected his assessment of the relative strength of the liability claims of each of the five proposed Subclasses that comprise the proposed Class. Consistent with that Allocation Decision, the Plan of Allocation provides for the greatest recovery to the Subclass with the strongest liability claims—Subclass 1—followed by the next strongest liability case, Subclass 2, and then the remaining Subclasses 3, 4, and 5. "Although some class members will benefit more from this allocation formula that is ultimately appropriate as it recognizes the strengths and weaknesses of each class members' individual claims." *In re Sturm, Ruger, & Co., Inc. Sec. Litig.*, No. 3:09CV1293 VLB, 2012 WL 3589610, at *8 (D. Conn. Aug. 20, 2012); *see also Vargas v. Ford Motor Co.*, No. CV1208388ABFFMX, 2020 WL 1164066, at *10 (C.D. Cal. Mar. 5, 2020) ("[W]hile the Settlement was structured to deliver the most complete relief to those Class Members that experienced persistent defects (e.g., those with more service visits will receive a greater cash payment), this is an objective and logical explanation for the variations in monetary recovery.").

> **6. The anticipated request for Attorneys' Fees and Expenses poses no hurdle to finding the Settlement adequate.**

The Court must also consider the award of attorneys' fees in assessing whether to grant preliminary settlement approval. Fed. R. Civ. P. 23(e)(2)(C)(iii). Here, the Settlement

Agreement explicitly separates the Settlement terms from the award of Attorneys' Fees and Expenses: "[t]he proceedings for the MDL Court to determine the amount of Attorneys' Fees and Expenses to award to plaintiffs' counsel and the MDL Court's award of any Attorneys' Fees and Expenses *are to be considered by the MDL Court separately from the MDL Court's consideration of the fairness, reasonableness, and adequacy of the Settlement*." Settlement Agreement ¶ 153 (emphasis added). The Attorney's Fees and Expenses awarded will be set forth in an order separate from the Final Settlement Order, and none of the Settlement benefits will be reduced to pay Court-awarded attorneys' fees or costs to Plaintiffs' Class Counsel. Thus, nothing about Plaintiffs' Class Counsel's fee award and costs should prevent notice from issuing.[21] *See* Fed. R. Civ. P. 23(e)(2)(C)(iii).

### 7. The anticipated request for Plaintiff Incentive Awards is well within the range approved for similar cases in this Circuit.

Plaintiff incentive awards "are common in class action cases and are important to compensate plaintiffs for the time and effort expended in assisting the prosecution of the litigation, the risks incurred by becoming and continuing as a litigant, and any other burdens sustained by plaintiffs." *Hernandez v. Immortal Rise, Inc.*, 306 F.R.D. 91, 101 (E.D.N.Y. 2015) (internal quotation marks and citation omitted); *see also Dornberger v. Metro. Life Ins. Co.*, 203 F.R.D. 118, 124 (S.D.N.Y. 2001) ("An incentive award is meant to compensate the named plaintiff for any personal risk incurred by the individual or any additional effort expended by the individual for the benefit of the lawsuit."). Courts in this Circuit have recognized that named plaintiffs who are deposed may be entitled to more substantial incentive awards as compensation

---

[21] Plaintiffs' Class Counsel will make, on behalf of all plaintiffs' counsel, a separate application for an award of Attorneys' Fees and Expenses not to exceed $34.5 million, to be paid by New GM in addition to, and not from, the $120 million to be paid by New GM and the GUC Trust detailed above. New GM has agreed not to oppose the $34.5 million award. Class Members will have ample opportunity to weigh in on the proposed fee request.

for the additional time and expense required of them. *See, e.g.*, *Norflet ex rel. Norflet v. John Hancock Life Ins. Co.*, 658 F. Supp. 2d 350, 354 (D. Conn. 2009) (approving $20,000 incentive award after considering "the time she spent in deposition, responding to discovery, and/or otherwise working with Class Counsel to prosecute and resolve this case"); *Fleisher v. Phoenix Life Insurance*, Nos. 11-cv-8405, 14-cv-8714, 2015 WL 10847814, at *24 (S.D.N.Y. Sept. 9, 2015) (approving an incentive award of $25,000 to named plaintiff who spent "at least 88 hours actively fulfilling his obligations as a Class representative," including by attending all-day deposition, and approving $5,000 incentive awards to other named plaintiffs); *Dornberger*, 203 F.R.D. at 124-25 (approving an award of $10,000, for named plaintiff who provided assistance to class counsel for six years, including by "traveling to New York for her deposition at her own cost," and approving awards of $1,500 each for eight additional subclass representatives); *see also Torres v. Toback, Bernstein & Reiss LLP*, No. 11-CV-1368 NGG VVP, 2014 WL 1330957, at *3 (E.D.N.Y. Mar. 31, 2014) ("An incentive award may also be warranted when a named plaintiff has dedicated significant time and effort to the litigation, for example by preparing and sitting for a deposition.").

Plaintiffs have devoted considerable time and effort to this litigation, including the production of extensive fact sheets, participation in discovery where requested, and regular communication with counsel. Plaintiffs in the Bellwether States have also sat for depositions. Under such circumstances, the proposed Plaintiff Incentive Awards to be paid from the Net Common Fund—$2000 for Plaintiffs who were deposed, and $1000 for Plaintiffs who were not deposed—are reasonable, and fall squarely within the range approved for similar cases in this Circuit. *See, e.g.*, *Berni v. Barilla G. e R. Fratelli, S.p.A.*, 332 F.R.D. 14, 20, 25 (E.D.N.Y. 2019) (approving award of $1,500 for each named plaintiff and noting that the amount was "modest

relative to others awarded in our Circuit"); *Jermyn v. Best Buy Stores, L.P.*, No. 08 CIV. 214 CM, 2012 WL 2505644, at \*8 (S.D.N.Y. June 27, 2012) (approving a "modest" incentive award of $1,000 where "the class representative "participated in discovery," and, "[t]hroughout the long progress of this case, he stayed in contact with Class Counsel"); *Godson v. Eltman, Eltman, & Cooper, P.C.*, 328 F.R.D. 35, 68 (W.D.N.Y. 2018) (approving a $10,000 incentive award because named plaintiff had "been actively involved in the litigation of this case since its inception" and "provided counsel with assistance"); *Kindle v. Dejana*, 308 F. Supp. 3d 698, 718 (E.D.N.Y. 2018) (awarding named plaintiff $10,000 and collecting cases granting incentive awards in this amount).

## II. CERTIFICATION OF THE CLASS, INCLUDING EACH SUBCLASS, AT FINAL APPROVAL IS LIKELY.

Certification of a settlement class is a two-step process. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613 (1997). First, the Court must find that the proposed settlement class satisfies Rule 23(a)'s four prerequisites to class certification: (i) numerosity, (ii) commonality, (iii) typicality, and (iv) adequacy of representation. *Id.* (citing Fed. R. Civ. P. 23(a)). Second, the Court must find that a class action may be maintained under either Rule 23(b)(1), (2), or (3). *Id.* "The Second Circuit has emphasized that Rule 23 should be 'given liberal rather than restrictive construction,' . . . and 'it seems beyond peradventure that the Second Circuit's general preference is for granting rather than denying class certification.'" *Gortat v. Capala Bros.*, 257 F.R.D. 353 at 361-62 (E.D.N.Y. 2009).

The proposed Class here, including all Subclasses,[22] satisfies all Rule 23(a)(1)-(4) and 23(b)(3) certification requirements. The record amply demonstrates that (1) the proposed Class fulfills Rule 23(a)'s requirements of numerosity, commonality, typicality, and adequacy, and (2) as prescribed by Rule 23(b)(3), common questions of law or fact predominate over any questions affecting only individual Class Members, and a class action is superior to any alternative method of litigating these claims for the fair and efficient adjudication of the controversy.

### A.      The Proposed Class Meets the Requirements of Rule 23(a).

### 1.      The Proposed Class is Sufficiently Numerous.

Rule 23(a) requires that the members of the Class be so numerous that joinder of all members is impracticable. While numerosity does not require a fixed number of class members, "numerosity is presumed at a level of 40 members." *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995).

Here, it is undisputed that millions of Subject Vehicles were sold or leased nationwide, and that the proposed Class—which includes current and former owners and lessees of those Vehicles—also includes millions of members. Each Subclass also contains, at a minimum, tens of thousands of members. Under such circumstances, joinder is plainly impracticable. *See In re Nissan Radiator/Transmission Cooler Litig.*, No. 10 CV 7493 VB, 2013 WL 4080946, at *18 (S.D.N.Y. May 30, 2013).

### 2.      Questions of Law and Fact Are Common to Class Members.

Rule 23(a)(2) mandates the existence of "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The purpose of the commonality requirement is to test "whether the

---

[22] Rule 23(c)(5) authorizes the creation of subclasses "that are each treated as a class" and, as such, that are subject to Rule 23's requirements. Fed. R. Civ. P. 23(c)(5); *see, e.g., Ramirez v. Riverbay Corp.*, 39 F.Supp.3d 354, 362 (S.D.N.Y. 2014) (citations omitted).

named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982). "The claims for relief need not be identical for them to be common." *Zivkovic v. Laura Christy LLC*, 329 F.R.D. 61, 69 (S.D.N.Y. 2018). Rather, Rule 23(a)(2) is a "low hurdle," *Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 131 (S.D.N.Y. 2014), that may be satisfied by even a single question of law or fact common to the Class. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 369 (2011). Importantly, "variation among class members in their motivation for purchasing the product, the factual circumstances behind their purchase, or the price that they paid does not defeat the relatively 'minimal' showing required to establish commonality." *Ries v. Ariz. Beverages USA LLC*, 287 F.R.D. 523, 537 (N.D. Cal. 2012) (citing *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)).

Plaintiffs easily satisfy the "low hurdle" of demonstrating commonality. Within each Subclass, the claims of all members involve the same common defect. In this case, as in other automobile defect cases, commonality may be found based upon a common question concerning the existence of a defect. *See, e.g.*, *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1172 (9th Cir. 2010) (proposed representatives of a class of purchasers of vehicles with alleged alignment defects "easily satisf[ied] the commonality requirement" because all of their claims "involve[d]," among other things, "the same alleged defect," which was "found in vehicles of the same make and model."); *Keegan v. Am. Honda Motor Co.*, 284 F.R.D. 504, 524 (C.D. Cal. 2012) (finding commonality relating to uniform rear suspension defect, noting that "[t]he fact that some vehicles have not yet manifested premature or excessive tire wear is not sufficient, standing alone, to defeat commonality"); *Chamberlan v. Ford Motor Co.*, 223 F.R.D. 524, 526

(N.D. Cal. 2004) (finding commonality when Ford knew but concealed the risk that intake manifolds would prematurely crack).

The Class claims are also rooted in "[GM's] common course of conduct," including common questions of fact as to Defendants' knowledge of the Subject Vehicle defects and failure to disclose those defects.[23] *In re: Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, No. 2672 CRB (JSC), 2016 WL 4010049, at *10 (N.D. Cal. July 26, 2016); *In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, & Prod. Liab. Litig.*, No. 17-MD-02777-EMC, 2019 WL 536661, at *6 (N.D. Cal. Feb. 11, 2019) ("In the case at bar, the commonality requirement is satisfied because Plaintiffs' claims arise from [Defendants'] common course of conduct."). As the Class's "injuries derive from [D]efendants' alleged 'unitary course of conduct,'" Plaintiffs have "identified a unifying thread that warrants class treatment." *Sykes v. Mel Harris & Assocs. LLC*, 285 F.R.D. 279, 290 (S.D.N.Y. 2012), *aff'd*, 780 F.3d 70 (2d Cir. 2015).[24] Conversely, without class certification, individual Class Members would be forced to litigate the same issues of law and fact arising from GM's failure to disclose known defects—including conducting the same fact discovery and presenting the same legal arguments. This is precisely the sort of inefficient outcome that the class mechanism aims to minimize. *See In re: Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, 2016 WL 4010049, at *10.

---

[23] Plaintiffs have alleged the same causes of action in both the 5ACC and proposed proofs of claim filed in the Bankruptcy Case.

[24] Additional common issues include: whether GM's omissions were material; whether GM engaged in fraudulent concealment, violated consumer protection statutes, and breached implied warranties; whether GM's law violations harmed Plaintiffs and the members of the Settlement Class; and what relief, if any, are Plaintiffs and the Settlement Class entitled to. "These issues, which can be resolved on a class-wide basis, are indeed central to the validity of the claims in this litigation," *Ge Dandong*, 2013 WL 5658790, at *5, and the commonality requirement is thus met.

### 3.    The Proposed Class Representatives' Claims are Typical.

Typicality requires that the claims of the class representatives be typical of those of the putative class members. Fed. R. Civ. P. 23(a)(2).  The commonality and typicality requirements of Rule 23(a) tend to merge, and demonstrating typicality under Rule 23(a)(3) requires only that "each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997).  "[D]ifferences in the degree of harm suffered, or even in the ability to prove damages, do not vitiate the typicality of a representative's claims."  *In re Nissan Radiator/Transmission Cooler Litig.*, No. 10 CV 7493 VB, 2013 WL 4080946, at *19 (S.D.N.Y. May 30, 2013).  Rather, "the typicality requirement requires that the disputed issue of law or fact occupy essentially the same degree of centrality to the named plaintiff's claim as to that of other members of the proposed class." *Id.*  Typicality is therefore satisfied "irrespective of minor variations in the fact patterns underlying individual claims." *Robidoux v. Celani*, 987 F.2d 931, 937 (2d Cir. 1993); *see also Marisol*, 126 F.3d at 376-77 (affirming typicality finding where plaintiffs alleging deprivation of child welfare services suffered "broad range of injuries").

Typicality is readily satisfied in cases like this one, where "all class members are alleged to have suffered injury as a result of the same conduct by [GM]." *Doyle v. Chrysler Grp. LLC*, No. SACV 13-00620 JVS, 2014 WL 7690155, at *7 (C.D. Cal. Oct. 9, 2014); *In re Chrysler-Dodge-Jeep Ecodiesel*, 2019 WL 536661, at *6 ("Plaintiffs meet the typicality requirement because their claims 'are based on the same pattern of [FCA's] and Bosch's wrongdoing as those brought on behalf of Class Members.' Plaintiffs and the class were subject to the same misconduct and suffered the same injury.").  Plaintiffs' claims here arise from a common course of conduct and common legal theories: GM sold vehicles with known, concealed defects and, in so doing, violated consumer protection laws, committed fraudulent concealment, and breached

implied warranties. Further, Plaintiffs' vehicles have the same defect as all other vehicles in the particular Subclass for which Plaintiffs are proposed representatives. Because each Class member's claims arise from the same course of GM's conduct, and each Class member must make similar (if not identical) legal arguments to prove GM's liability in both the MDL and Bankruptcy Case, the typicality requirement is satisfied. *See, e.g., Wolin*, 617 F.3d at 1175 (typicality satisfied because plaintiffs alleged that they, like all class members, were injured by the vehicles' common alignment defect, and plaintiffs sought recovery under the same legal theories as the class); *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 599 (3d Cir. 2012) ("When a class includes purchasers of a variety of different products, a named plaintiff that purchases only one type of product satisfies the typicality requirement if the alleged misrepresentations or omissions apply uniformly across the different product types."); *Daffin v. Ford Motor Co.*, 458 F.3d 549, 552 (6th Cir. 2006) (Daffin's claim is typical "because the class members' theory is that Ford breached its express warranty by providing vehicles with defectively designed throttle body assemblies, causing Daffin and other class members to receive vehicles worth less than vehicles that conform to the promises allegedly contained in the warranty agreement. Daffin is typical because her car has the same defective throttle body assembly as the other class members."); *Volkswagen*, 2016 WL 4010049, at *11 ("The Settlement Class Representatives, as well as Class Members, purchased or leased an Eligible Vehicle equipped with a defeat device. Their claims are typical because they were subject to the same conduct as other Class Members, and as a result of that conduct, the Settlement Class Representatives and Class Members suffered the same injury.").

### 4. The Proposed Class Representatives and Class Counsel Will Fairly and Adequately Protect the Class's Interests.

The final Rule 23(a) prerequisite requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4); *id.* at 23(g) (adequacy of counsel). "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem*, 521 U.S. at 625. Adequacy under Rule 23(a)(4) therefore turns on "whether '(1) plaintiff's interests are antagonistic to the interest of other members of the class and (2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation.'" *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 99 (2d Cir. 2007). The named Plaintiffs need not have expert knowledge of the details or legal underpinnings of the case, and are entitled to rely on the expertise of their counsel. *See Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 293 F.R.D. 287, 302 (E.D.N.Y. 2013).

*First*, no conflicting interests between the Plaintiffs and the proposed Class exist here; to the contrary, Plaintiffs are all members of the proposed Class and have suffered economic loss from the same course of conduct as other members of the proposed Class. The interests of Plaintiffs and proposed Class Members are co-extensive given that each Plaintiff, like each Class Member, has a strong interest in obtaining redress for the harm caused by New GM and the GUC Trust. *See Amchem*, 521 U.S. at 625-26 (named plaintiffs must "possess the same interest [s] and suffer the same injur[ies] as the class members.").

The lengthy record in the MDL and Bankruptcy Case further confirms Plaintiffs' adequacy to represent the interests of the proposed Class. All Plaintiffs have actively participated in the litigation by producing extensive fact sheets, participating in discovery where requested, and communicating with counsel. Plaintiffs in the Bellwether States have sat for

depositions. Plaintiffs have demonstrated an understanding of the nature of their claims and their duties as class representatives and have remained "at least somewhat active in monitoring the litigation." *Ge Dandong v. Pinnacle Performance Ltd.*, No. 10 Civ. 8806(JMF), 2013 WL 5658790, at *7 (S.D.N.Y. Oct. 17, 2013). Plaintiffs will continue to diligently protect the interests of the proposed Class, as they have throughout this litigation.

*Second*, there is no fundamental conflict between the Subclasses. While "conflict concerning the allocation of remedies amongst class members with competing interests can be fundamental and can thus render a representative plaintiff inadequate," *Dewey v. Wolkswagen Aktiengesellschaft*, 681 F.3d 170, 184 (3d Cir. 2012), "[w]here such a conflict does exist, it can be cured by dividing the class into separate 'homogeneous subclasses . . . with separate representation to eliminate conflicting interests of counsel.'" *In re Literary Works*, 654 F.3d 242, 249 (2d Cir. 2011). Here, the Class has been divided into five Subclasses, each of which was represented by experienced, Court-appointed allocation counsel.

*Third*, proposed Class Counsel and Subclass Counsel are well-qualified, experienced, and have diligently prosecuted the proposed Class claims for more than five years. Mr. Berman and Ms. Cabraser have extensive experience in litigating complex consumer protection class actions, and have recovered billions of dollars in class litigation on behalf of consumers, including in automotive defect-related class claims.[25] *Simerlein v. Toyota Motor Corp.*, No. 3:17-CV-1091 (VAB), 2019 WL 1435055, at *12 (D. Conn. Jan. 14, 2019) (proposed class counsel who "appear to be well-experienced and to have litigated complex class actions in the past" would adequately protect class interests). Further, Proposed Class Counsel have undertaken an enormous amount of work, effort, and expense in this MDL and the Bankruptcy Case. They

---

[25] *See* Cabraser Decl. ¶¶ 5-6; Berman Decl. ¶¶ 9, 13.

have demonstrated their willingness to devote whatever resources necessary to reach a successful outcome throughout the six years since filing the Consolidated Complaint and appearing in the Bankruptcy Case. They, too, satisfy Rule 23(a)(4). *See, e.g.*, *Karic v. Major Auto. Cos.*, No. 09 CV 5708 (ENV), 2015 WL 9433847, at *6 (E.D.N.Y. Dec. 22, 2015) (finding proposed class counsel adequately represented class interests where counsel had "done substantial work identifying, investigating, prosecuting, and settling the claims over the past four years"), *report and recommendation adopted Karic v. Major Auto. Cos.*, No. 09CIV5708ENVCLP, 2016 WL 323673 (E.D.N.Y. Jan. 26, 2016). Similarly, Subclass Counsel are members of the Executive Committee and their partners. The Executive Committee members are highly experienced attorneys, selected by the Court, who have been involved with the case for its duration. They have provided substantial assistance to Plaintiffs' Class Counsel and the Court at all stages of litigation, and have heavily invested their time and financial resources into securing a favorable outcome for the Class. The proposed Subclass Counsel also include Allocation Counsel, who zealously represented each of the five Subclasses for the purpose of advocating allocation of the Net Common Fund to members of each Subclass.

### B. The Class Meets Rule 23(b)(3)'s Predominance and Superiority Requirements.

Rule 23(b)(3) requires that common questions of law or fact "predominate over any questions affecting only individual members and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). This inquiry examines "whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. That Plaintiffs easily meet the Rule 23(a) criteria is a strong indicator that Rule 23(b)(3) is satisfied. *Rossini v. Ogilvy & Mather,*

*Inc.*, 798 F.2d 590, 598 (2d Cir. 1986) (satisfaction of Rule 23(a) "goes a long way toward satisfying the Rule 23(b)(3) requirement of commonality").

### 1.   Common issues predominate over any individual ones.

Rule 23(b)(3)'s predominance requirement focuses on whether the defendant's liability is common enough to be resolved on a class basis, and whether the proposed class is "sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. "Class-wide issues predominate if resolution of some of the legal or factual questions . . . can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002). Where plaintiffs are "unified by a common legal theory" and by common facts, the predominance requirement is satisfied. *McBean v. City of New York*, 228 F.R.D. 487, 502 (S.D.N.Y. 2005).

Here, questions of law and fact common to the claims of the Class Members predominate over any questions affecting only individual members. A uniform scheme to mislead regulators and consumers by concealing the defects in the Subject Vehicles is central to the claims asserted in both the 5ACC and the Proposed Proofs of Claim. The key evidence necessary to establish Plaintiffs' claims is common to Plaintiffs and all members of each Subclass—they all seek to prove, among other things, that GM's vehicles within each Subclass have a common defect and that GM's conduct was uniformly wrongful. The evidentiary presentation changes little if there are 100 Class members or millions: in either instance, Plaintiffs would present the same evidence in both the MDL and the Bankruptcy Case of Old GM's marketing and promised warranties, and the same evidence of the Subject Vehicles' alleged defects. *Klay v. Humana*, Inc., 382 F.3d 1241, 1255 (11th Cir. 2004) ("[I]f common issues truly predominate over individualized issues in a lawsuit, then 'the addition or subtraction of any of the plaintiffs to or from the class [should

not] have a substantial effect on the substance or quantity of evidence offered.'") (quoting *Alabama v. Blue Bird Body Co.*, 573 F.2d 309, 322 (5th Cir. 1978)). Courts routinely find that such issues predominate in automotive defect class actions.[26] Predominance is therefore satisfied.

## 2. A class action is superior to thousands of individual actions.

The second part of the Rule 23(b)(3) analysis is a relative comparison examining whether "the class action device [is] superior to other methods available for a fair and efficient adjudication of the controversy." *Green v. Wolf Corp.*, 406 F.2d 291, 301 (2d Cir. 1968). Rule 23(b)(3) sets forth a non-exclusive list of relevant factors, including whether individual class members wish to bring, or have already brought, individual actions, and the desirability of concentrating the litigation of the claims in the particular forum. Fed. R. Civ. P. 23(b)(3).[27]

---

[26] *See, e.g.*, *Wolin*, 617 F.3d at 1173 (common issues predominate such as whether Land Rover was aware of and had a duty to disclose the defect and violated consumer protection laws); *Keegan*, 284 F.R.D. at 532-34 (predominance found under UCL and CLRA based on common evidence of the nature of the defect, the defect's impact on vehicle safety, Honda's knowledge, and what Honda disclosed to consumers); *Parkinson v. Hyundai Motor Am.*, 258 F.R.D. 580, 596-97 (C.D. Cal. 2008) (predominating common issues under the CLRA and UCL include defendant's knowledge of the alleged defect, whether it had a duty to disclose and did so, whether the alleged failure to disclose was material to a reasonable consumer; and whether the conduct violated the CLRA and UCL); *Chamberlan v. Ford Motor Co.*, 223 F.R.D. at 526-27 (common questions predominate such as "whether the design of the plastic intake manifold was defective, whether Ford was aware of the alleged design defects, whether Ford had a duty to disclose its knowledge, whether it failed to do so, whether the facts that Ford allegedly failed to disclose were material, and whether the alleged failure to disclose violated the CLRA"), *petition denied*, 402 F.3d 952 (9th Cir. 2005); *Rosen v. J.M. Auto Inc.*, 270 F.R.D. 675, 681-82 (S.D. Fla. 2009) (the "critical issue of whether the [airbag system] was defective is common to all putative class members" and "predominates over the individual issues"); *Carriuolo v General Motors Co.*, 823 F.3d 977, 989 (11th Cir. 2016) (predominance satisfied where plaintiffs alleged "consistent" theories of liability and damages for all class members, including whether GM inaccurately communicated vehicle safety ratings "allow[ing] it to command a price premium"); *Gen. Motors Corp. v. Bryant*, 285 S.W.3d 634, 639 (Ark. 2008) (whether defect existed in class vehicles and "whether or not General Motors concealed that defect are predominating questions.").

[27] Another factor, "the likely difficulties in managing a class action," is not of consequence in the context of a proposed settlement class. *See Amchem*, 521 U.S. at 620 ("[c]onfronted with a request for settlement-only class certification, a [trial] court need not inquire whether the case, if tried, would present intractable management problems, for the proposal is that there be no trial"); *Frank v. Eastman Kodak Co.,*, 228 F.R.D. 174, 183 (W.D.N.Y. 2005) ("The court need not consider the [manageability] factor, however, when the class is being certified solely for the purpose of settlement."); *Denney v. Jenkens & Gilchrist*, 230 F.R.D. 317, 335

Resolving this litigation through the class mechanism is plainly superior to litigation by individual Class Members. Most Plaintiffs and Class Members have insufficient financial resources with which to prosecute individual actions, and the value of any individual claim is simply too low to incentivize most Class Members to pursue litigation. *Sykes v. Mel Harris & Assocs. LLC*, 285 F.R.D. 279, 294 (S.D.N.Y. 2012) ("the class members' interests in litigating separate actions is likely minimal given their potentially limited means with which to do so and the prospect of relatively small recovery in individual actions"). This is especially true here given the high cost of marshalling the evidence necessary to litigate the claims at issue and the disparity in resources between the typical Class Member and well-funded, litigation-savvy defendants like New GM and the GUC Trust: the pooling of resources offered by the class mechanism is required to drive participation. Plaintiffs' Class Counsel have already devoted significant resources to this litigation: engaged in multiple rounds of briefing on motions to dismiss, summary judgment, class certification, discovery issues, and Late Claims Motions in the Bankruptcy Court; taken depositions of hundreds of GM witnesses and experts and defended hundreds of depositions of Plaintiffs and experts; orchestrated a labor- intensive written-discovery and document-review effort; presented Plaintiffs' vehicles to GM for inspection; retained experts; and engaged in significant motion practice on other issues. No individual litigant pursuing a purely economic loss case could invest the same resources.

Employing the class device here will not only achieve economies of scale for putative Class Members, but will also conserve the resources of the judicial system and preserve public

---

(S.D.N.Y. 2005) ("Because this is a settlement-only class, the Court need not be concerned with the feasibility of managing the trial of a class action involving many different states' laws.") *aff'd in relevant part sub nom. Denney v. Deutsche Bank AG*, 443 F.3d 253 (2d Cir. 2006). Because the fourth "superiority" factor—"the likely difficulties in managing a class action," Fed. R. Civ. P. 23(b)(3)(D)—does not bear on a settlement-only class, any variations among state laws governing the claims at issue are irrelevant to certification.

confidence in the integrity of the system by avoiding the expense of repetitive proceedings and preventing inconsistent adjudications of similar issues and claims. *See Hanlon*, 150 F.3d at 1023; *Wolin*, 617 F.3d at 1176 ("Forcing individual vehicle owners to litigate their cases, particularly where common issues predominate for the proposed class, is an inferior method of adjudication."). Further, numerous class action lawsuits based on the same facts at issue here have been filed against New GM. Through the MDL process, those cases were transferred to this Court and are now part of this consolidated litigation (in addition to the personal injury cases). That the MDL Panel chose this Court to be the transferee court is one indication that having a single case—as opposed to multiple cases—is the sensible approach. Thus, a class action is the most suitable mechanism to fairly, adequately, and efficiently resolve the proposed Class Members' claims.

In sum, the Class, including the Subclasses, satisfy all elements of Rule 23(a) and (b)(3). The class action mechanism is not only the best and most efficient way to adjudicate the Class members' claims in this case, it is also the only viable method of doing so.

## III.    THE COURT SHOULD APPOINT MR. BERMAN AND MS. CABRASER AS COUNSEL FOR THE CLASS, AND SUBCLASS COUNSEL AS COUNSEL FOR THE SUBCLASSES.

"An order that certifies a class action . . . must appoint class counsel under Rule 23(g)." Fed. R. Civ. P. 23(c)(1)(B). In determining whether to appoint Hagens Berman and Lieff Cabraser as Class Counsel for purposes of the Settlement, the Court must examine:

> (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the type of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class.

Fed. R. Civ. P. 23(g)(1)(A). Each of those prerequisites is readily satisfied.

At the outset of the MDL, as part of a competitive application process, the Court chose Mr. Berman and Ms. Cabraser as Co-Lead Counsel due to their qualifications, experience, and commitment to the successful prosecution of this case. *See* ECF No. 8. It also selected, *inter alia*, Marc Seltzer of Susman Godfrey, Joe Rice of Motley Rice, Peter Prieto of Podhurst Orseck, P.A., David Boies of Boies Schiller Flexner LLP, and Adam Levitt of DiCello Levitt Gutzler to serve on the Executive Committee. *Id.*

1. The criteria that the Court considered in appointing Lead Counsel were substantially similar to the considerations set forth in Rule 23(g). *See, e.g.*, *Clemens v. Hair Club for Men, LLC*, No. 15-01431-WHA, 2016 WL 1461944, at *2 (N.D. Cal. April 14, 2016). Plaintiffs' Class Counsel, and their respective law firms, have undertaken an enormous amount of work, effort, and expense in this litigation and demonstrated their willingness to devote whatever resources were necessary to see it through to a successful outcome. *See* Cabraser Decl. ¶ 12 (Lieff Cabraser's "total net expenses to date" in connection with this Action are $3,523,897.78); Berman Decl. ¶ 19 (Hagens Berman has "already advanced more than $5,100,000 in out-of-pocket costs in the prosecution of the case"). Subclass Counsel have also diligently pursued their responsibilities for the duration of this litigation. Each Subclass would be represented by a member of the Executive Committee, a group of highly experienced attorneys who have assisted Plaintiffs' Class Counsel with, *inter alia*, consolidated pleadings; document management and review; electronic and general discovery issues; depositions; non-GM defendants; communication with class members; and other responsibilities. They are intimately familiar with the context and history of this litigation, and have provided substantial assistance to Plaintiffs' Class Counsel and the Court in moving this litigation toward resolution. Notably, the proposed Subclass representatives include Allocation Counsel, who zealously

represented each of the five Subclasses for the purpose of advocating allocation of the Net Common Fund to members of each Subclass.

This Court has already found, and Plaintiffs' Class Counsel and proposed Subclass Counsel have demonstrated in action, their ability to represent the interests of the Class and each Subclass. They should be appointed as Class Counsel and Subclass Counsel under Rule 23(g)(3), and confirmed under 23(g)(1) upon final approval.

## IV. THE PROPOSED FORMS AND MANNER OF NOTICE COMPLY WITH RULE 23 AND DUE PROCESS.

The polestar for assessing the adequacy of notice, whether through the lens of Rule 23 or constitutional due process, is "reasonableness." *Visa U.S.A., Inc.*, 396 F.3d at 114. Reasonableness is, in turn, "a function of anticipated results, costs, and amount involved." *In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1099 (5th Cir. 1977). Both the manner of dissemination and the forms of the notice proposed here aim to ensure "the best notice that is practicable under the circumstances." Fed. R. Civ. P. 23(c)(2)(B).

### A. The Proposed Combination of Individual Mailed Notice, an Extensive Multimedia Notice Program, and a Settlement Website Is Reasonably Directed to Apprising Class Members of Their Rights.

To ensure notice is sufficiently disseminated to Class Members, Plaintiffs propose a comprehensive, multi-pronged approach developed in connection with notice expert Jennifer Keough of JND. Class Notice will consist of (1) individual direct-mail notice "to all members who can be identified through reasonable effort," Fed. R. Civ. P. 23(c)(2)(B); (2) issuance of multiple nationwide press releases in English and Spanish; (3) media publication of the Summary Settlement Notice in *People* magazine, a leading nationwide consumer magazine; (4) a universally accessible Settlement website; and (5) a toll-free telephone number available to Class Members.

*First*, the Class Action Settlement Administrator, under the supervision of Plaintiffs' Class Counsel, will launch a nationwide, data-driven effort to identify all Class Members. Specifically, the Class Action Settlement Administrator will retain a service provider that will collect the names and last known address of each Class Member from the Department of Motor Vehicles ("DMVs") utilizing the vehicle identification numbers (VINs) provided to the Class Action Settlement Administrator by New GM for the Subject Vehicles. After Subject Vehicle owners and/or lessees are identified, under the direction of Plaintiffs' Counsel, the Class Action Settlement Administrator will update the addresses with advanced address research using skip trace databases or a comparable service and the United States Postal Service ("USPS") National Change of Address ("NCOA") database. The Class Action Settlement Administrator will then mail notice, substantially in the form attached as Exhibit 11 to the Settlement Agreement ("Short Form Notice"), individually to Class Members via first class mail. *See, e.g.*, *Edwards v. N. Am. Power & Gas, LLC*, No. 3:14-cv-01714 (VAB), 2018 WL 3715273, at *5 (D. Conn. Aug. 3, 2018) (approving notice by short-form postcard directing class members to website). To ensure that all Class Members receive notice, the Class Action Settlement Administrator will (a) promptly re-mail any Short Form Notices returned by the United States Postal Service with a forwarding address, and (b) by itself or using one or more address research firms, research any returned Short Form Notice that does not include a forwarding address to determine the recipient's current, best address, and promptly mail the Short Form notice to that address. The Short Form Notice will provide general information regarding the Settlement and Class Members' rights in connection with it, and direct recipients to the Settlement website for additional information, including a copy of the Long Form Notice and Settlement Agreement.

*Second*, the Class Action Settlement Administrator will issue nationwide press releases based on the Summary Settlement Notice. The press release will be available in both English and Spanish, and issued twice: first at the launch of the Class Notice program, and again, as a reminder of the approaching deadline, just prior the end of the Settlement Claim Period.

*Third*, to extend notice further, particularly among Class Members for whom direct notice data is inaccurate or incomplete, JND will arrange for publication of the Summary Settlement Notice in *People*, a highly read consumer magazine. *People* is a weekly entertainment magazine with a circulation of over 3.4 million and a total readership of over 34.9 million, making it one of the most read publications in the country.

*Fourth*, the Class Action Settlement Administrator will establish and maintain a settlement website to provide Class Members with detailed information about the case and access to key documents, including the Long Form Notice, the Settlement Claim Form, the Settlement Agreement, the Complaint, and the Preliminary Approval Order, as well as answers to frequently asked questions.

*Fifth*, the Class Action Settlement Administrator will establish and maintain a toll-free telephone number. Class Members can call the toll-free telephone number, which will be prominently displayed on notice documents, to obtain additional information about the Settlement, listen to answers to FAQs, request a Long Form Notice and/or Settlement Claim Form, or request a return telephone call.

These efforts are directed to maximize the reach of notice under the circumstances of this case, and demonstrate Plaintiffs' Class Counsel "acted reasonably in choosing the means likely to inform potential class members." *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 246 F.R.D. 156, 166 (S.D.N.Y. 2007) (citing *Weigner v. City of New York*, 852 F.2d 646, 649 (2d

Cir. 1988).  Indeed, courts have routinely approved comparable notice programs in automotive class action cases.  *See, e.g.*, *In re MyFord Touch Consumer Litig.*, No. 13-CV-03072-EMC, 2019 WL 1411510, at *11 (N.D. Cal. Mar. 28, 2019) (court approved notice program where "[n]otice will be sent via U.S. mail (the Short Form Class Notice), email (the Email Notice), and posted on the settlement website (the Long Form Class Notice)").  This Court can thus comfortably exercise its "considerable discretion" to approve the notice program.  *Dornberger*, 203 F.R.D. at 123; *see also In re "Agent Orange" Prod. Liab. Litig. MDL No. 381*, 818 F.2d 145, 169 (2d Cir. 1987) (district court's determination with respect to reasonableness of efforts to identify class members "must be accepted unless clearly erroneous").

**B.      The Proposed Notice Clearly and Concisely Informs Class Members About the Settlement's Terms and Their Rights.**

The content of the Notice has been drafted to "be understood by the average class member," *Visa U.S.A., Inc.*, 396 F.3d at 114, and informs Class Members of all pertinent aspects of the Settlement.  Specifically, it states—in plain, easily understood language—(1) the nature of the lawsuit; (2) the definition of the Class; (3) Class Members' claims; (4) the amount and terms of the Settlement, including information about Class Members' right to obtain a copy of the Settlement Agreement and the applicable waivers and releases; (5) the process to be excluded from the Class, including the timing and manner thereof; (6) the right of any Class Member to object to any aspect of the Settlement; (7) the binding effect of the Settlement on Class Members who do not elect to be excluded; (8) the legal representation of Class Members in court proceedings; (9) the maximum amount of attorneys' fees and expenses that will be sought; (10) the identity and contact information for the representatives of Plaintiffs' Class Counsel who are reasonably available to answer questions from Class Members concerning matters contained in the Notice; and (11) the date and time of the final Fairness Hearing.  *See* Fed. R. Civ. P.

23(c)(2)(B).[28]   The Notice also contains the Plan of Allocation and provides Class Members with information about how to submit a Claim Form in order to be eligible to receive a distribution from the Settlement Fund.

The Notice is thus "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).

### C.   The Parties Have Selected an Experienced Class Action Settlement Administrator After a Competitive Bidding Process.

1.   Plaintiffs propose that the notice and claims process be administered by Jennifer M. Keough of JND Legal Administration ("JND"), an independent settlement and claims administrator selected by Plaintiffs' Class Counsel, New GM, and the GUC Trust after a competitive bidding process.   JND has substantial experience carrying out complex class action notice and payment projects, and has handled the administration of numerous complex, data-driven settlements.   The principals of JND, including Ms. Keough, collectively have over 75 years of experience in class action legal and administrative fields.   Ms. Keough has personally overseen some of the largest legal claims administration matters in the country's history including, among others, the BP Deepwater Horizon Settlement and the Cobell Indian Trust Settlement (the largest U.S. government class action settlement ever).   In addition, JND has been recently appointed to handle notice and claims administration tasks for class action settlements in the following motor vehicle cases: *Amin v. Mercedes-Benz USA, LLC*, No. 17-cv-01701-AT (N.D. Ga.); *In re MyFord Touch Consumer Litig.*, No. 13-cv-3072 (EMC) (N.D.

---

[28] Plaintiffs have left blank the dates of the Fairness Hearing in the proposed Notice so the Court may provide a date and time convenient to it upon entering the Preliminary Approval Order.   Other dates in the Notice are tied to the date the Preliminary Approval Order is entered or to the mailing of the Notice, and are thus likewise left blank.

Cal.); *In re Navistar MaxxForce Engines Mktg., Sales Practices and Products*, No. 14-cv-10318 (N.D. Ill.); and *Udeen v. Subaru of Am., Inc.*, No. 18-cv-17334-RBK-JS (D.N.J.). JND is an approved vendor for the United States Securities and Exchange Commission (SEC) and the Federal Trade Commission (FTC), and has been recognized by the National Law Journal, the Legal Times, and the New York Law Journal, for excellence in class action administration. *See* Keough Decl. ¶¶ 3-10.

## V. PROPOSED SCHEDULE

In connection with preliminary approval of the Settlement, the Court must set a Fairness Hearing date, dates for mailing and publication of the Notice, and deadlines for objecting to the Settlement or opting out of the Class. The parties respectfully propose the following schedule for the Court's consideration, as agreed to by the parties and set forth in the proposed Preliminary Approval Order:

| Event | Proposed Date |
|-------|---------------|
| Joint Hearing on the Joint Motion for Preliminary Approval, Withdrawal of the Reference of Late Claims Motion, and Rule 9019 Motion | April 23, 2020 at 9:30 a.m. |
| Issuance of Class Notice (including opt-out and objection procedures) | 70-100 Days After Preliminary Approval Order |
| Deadline for Plaintiffs' Class Counsel to file Motion for Attorneys' Fees and Expenses | 154 Days After Preliminary Approval Order |
| Deadline to submit opt-outs from and objections to proposed Class Settlement Agreement. | 175 Days After Preliminary Approval Order |
| Completion of briefing in the MDL Court regarding final approval of proposed Class Settlement Agreement. | 195 Days After Preliminary Approval Order |
| Fairness Hearing conducted by the MDL Court | 215-230 Days After Preliminary Approval Order |

The proposed deadlines exceed the requirements of the Class Action Fairness Act, 28 U.S.C. § 1715(b), and afford ample time for Class Notice to be fully implemented and for Class Members to object to or request exclusion from the Class. While the dates and deadlines are lengthier than in some other cases, the duration of this litigation and number of Class Members necessitate sufficient lead time to implement the extensive Class Notice program.

## **CONCLUSION**

Plaintiffs request that the Court enter an order, substantially in the form of the proposed Preliminary Approval Order submitted as Exhibit 6 to Settlement Agreement, (1) preliminarily approving the proposed Settlement as set forth in the Settlement Agreement; (2) determining that the Court, at the final approval stage, will likely certify the Class as defined in the Settlement Agreement; (3) directing that notice be provided to proposed Class Members in the form and manner specified in the Settlement Agreement; (4) appointing Plaintiffs as representatives of the proposed Class for purposes of disseminating notice, and certain Plaintiffs as representatives of the proposed Subclasses; (5) appointing Steve W. Berman, of Hagens Berman Sobol Shapiro LLP ("Hagens Berman") and Elizabeth J. Cabraser of Lieff Cabraser Heimann & Bernstein, LLP ("Lieff Cabraser," and together with Hagens Berman, "Plaintiffs' Class Counsel") as Class Counsel for the proposed Class; (6) appointing the Allocation Counsel and certain counsel appointed by the MDL Court to the Executive Committee (ECF No. 249) as Subclass Counsel; (7) authorizing the retention of Jennifer M. Keough of JND Legal Administration as Class Action Settlement Administrator, and directing Ms. Keough to carry out the duties and responsibilities of the Class Action Settlement Administrator specified in the Settlement Agreement; (8) appointing Flora Bian of JND as Qualified Settlement Fund Administrator and Trustee to carry out all duties and responsibilities of the Qualified Settlement Fund Administrator and Trustee as specified in the Settlement Agreement and the Qualified Settlement

Fund Trust Agreement; (9) establishing certain dates and procedures in connection with final approval of the Settlement Agreement, including but not limited to deadlines and procedures for Settlement Objections, Opt-Outs, and Settlement Claims; and (10) scheduling a Fairness Hearing to determine whether the Settlement is fair, reasonable, and adequate under Rule 23(e)(2), and whether the Class should be certified.

Dated: March 27, 2020

Respectfully submitted,

**HAGENS BERMAN SOBOL SHAPIRO LLP**

**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**

By: /s/ Steve W. Berman

By: /s/ Elizabeth J. Cabraser

Steve W. Berman
Sean R. Matt
Andrew M. Volk
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
seam@hbsslaw.com
andrew@hbsslaw.com

Elizabeth J. Cabraser
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000
Facsimile: (415) 956-1008
ecabraser@lchb.com

Rachel J. Geman
250 Hudson Street, 8th Floor
New York, NY 10013
Telephone: (212) 355-9500
Facsimile: (212) 355-9592
rgeman@lchb.com

*Co-Lead Counsel for Plaintiffs and the Proposed Class*

*Co-Lead Counsel for Plaintiffs and the Proposed Class*

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party through the Court's electronic filing service on March 27, 2020, which will send notification of such filing to the e-mail addresses registered.

_/s/ Steve W. Berman_
Steve W. Berman