# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| IN RE:<br><br>GENERAL MOTORS LLC<br>IGNITION SWITCH LITIGATION<br><br>*This Document Relates To*<br>*All Economic Loss Actions* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 14-MD-2543 (JMF)<br>No. 14-MC-2543 (JMF)<br><br>Hon. Jesse M. Furman |

<br><br>

## DEFENDANT GENERAL MOTORS LLC'S MEMORANDUM IN SUPPORT OF JOINT MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT, CERTIFICATION OF CLASS FOR PURPOSES OF SETTLEMENT, APPROVAL OF NOTICE PROCEDURES, AND APPOINTMENT OF CLASS COUNSEL AND CLASS REPRESENTATIVES

Richard C. Godfrey, P.C.
Wendy L. Bloom
Andrew B. Bloomer, P.C.
Mark J. Nomellini
KIRKLAND & ELLIS LLP
300 N. LaSalle
Chicago, IL 60654-3406
Phone: 312-862-2000
Fax: 312-862-2200
richard.godfrey@kirkland.com
wendy.bloom@kirkland.com
andrew.bloomer@kirkland.com
mark.nomellini@kirkland.com

*Attorneys for Defendant General Motors LLC*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

FACTUAL AND PROCEDURAL BACKGROUND ...................................... 6

    A.    Old GM's Bankruptcy, The Sale Order, And Establishment Of The GUC Trust. ............................................................................................. 6

    B.    New GM's 2014 Recalls And Compensation Of Vehicle Owners. ........................ 8

        1.    Summary Of Class Recalls. ...................................................... 8

        2.    Personal Injury Settlements. .................................................. 11

        3.    Government Settlements. ....................................................... 12

    C.    Plaintiffs' Alleged Claims And Damages In MDL 2543 ...................... 12

    D.    Plaintiffs' Alleged Classes, Claims, And Damages In The Bankruptcy Court. ................................................................................ 13

    E.    New GM And Plaintiffs Have Engaged In Extensive Discovery. ........................ 15

    F.    New GM And Plaintiffs Have Engaged In Multiple Rounds Of Motion Practice, Resulting In Many Significant Rulings Informing Settlement Negotiations. ................................................................... 15

        1.    Motions To Enforce The Sale Order And Second Circuit Decision. ........ 15

        2.    New GM And Plaintiffs Stipulate That The Law Of Each Plaintiff's Home Jurisdiction Governs The Plaintiff's Claims. ............... 17

        3.    The Court Partially Grants New GM's Motion To Dismiss Plaintiffs' Third Amended Consolidated Complaint. .............................. 17

        4.    The Court Partially Grants New GM's Motion To Dismiss Plaintiffs' Fourth Amended Consolidated Complaint. ............................ 18

        5.    The Court Holds That Claims For Lost Time Damages Generally Require Proof Of Lost Income, And Rejects Most Remaining Unjust Enrichment Claims. ...................................................... 20

        6.    The Court Holds That Many States Would Not Allow The Delta Ignition Switch Plaintiffs' Successor Liability Claims. ...................... 20

        7.    The Court Grants Summary Judgment Against Plaintiffs' Benefit-Of-The-Bargain Damages. ................................................... 21

8. Additional Fully Briefed Motions Provide Further Information On The Value Of Plaintiffs' Claims. .................................................... 22

9. Additional Issues Raised In Connection With The Late Proofs of Claim In The Bankruptcy Court Provide Further Information On The Value Of Plaintiffs' Claims. .................................................... 24

G. Arm's-Length Settlement Negotiations Lasted For Several Years, Finally Resulting In The Settlement Agreement. .............................................. 26

H. Summary Of The Proposed Settlement's Key Terms. .......................... 28

**ARGUMENT** ............................................................................................................ 31

**I. THE STANDARDS FOR GRANTING PRELIMINARY APPROVAL OF A PROPOSED CLASS ACTION SETTLEMENT.** ..................................................... 31

**II. PRELIMINARY APPROVAL OF THE PROPOSED SETTLEMENT SHOULD BE GRANTED.** ........................................................................... 33

A. Co-Lead Counsel And Class Representatives Have Actively Represented The Class In Five-Plus Years Of Demanding Litigation. ..................... 33

B. The Proposed Settlement Was Negotiated At Arm's Length, Overseen, Supervised, And Aided By An Experienced Court-Appointed Mediator ............ 34

C. The Proposed Settlement Is More Than Adequate. ............................. 36

1. The Settlement Benefits Are Reasonable Given The Costs, Risks, And Delay Of Trial. ...................................................................... 36

a. The value of plaintiffs' claims has been reduced by rulings rejecting various claims as a matter of law. .................................. 37

b. Plaintiffs cannot prove damages against New GM or Old GM. ........................................................................................ 38

c. Plaintiffs have little chance of obtaining a different result on appeal. ............................................................................ 39

d. The remaining claims of plaintiffs are subject to dismissal on independent grounds. ...................................................... 40

e. Plaintiffs' claims against the GUC Trust are subject to this Court's summary judgment rulings, as well as additional defenses such as untimeliness. ........................................... 41

f. Given the dim prospects of any recovery, the Settlement is more than adequate. ...................................................... 43

        2.      The Proposed Claims Process Is An Effective Method Of
                Distributing Relief To The Class. ............................................................ 45

        3.      Attorneys' Fees And Expenses Are Consistent With The
                Complexity And Duration Of The Litigation And With Awards In
                Similar Cases. .......................................................................................... 47

    D.      Class Members Are Treated Equitably By The Allocation Decision. .................. 49

III.    **THE PROPOSED SETTLEMENT SATISFIES THE *GRINNELL*
        FACTORS.** ........................................................................................................... **54**

    A.      The Stage Of The Proceedings Supports Approval Of The Settlement................ 54

    B.      No Class Could Be Certified For Trial. ............................................................. 55

**CONCLUSION** ............................................................................................................ **56**

**Cases**

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997)..................................................................................................54, 55

*In re American Bank Note Holographics, Inc.*,
127 F. Supp. 2d 418 (S.D.N.Y. 2001)..................................................................................53

*In re AOL Time Warner, Inc. Sec. Litig.*,
2006 WL 903236 (S.D.N.Y. Apr. 6, 2006)..........................................................................35

*Berni v. Barilla G e R. Fratelli, S.p.A.*, 332 F.R.D. 14 (E.D.N.Y. 2019) .....................................44

*Cagan v. Anchor Sav. Bank FSB*,
1990 WL 73423 (E.D.N.Y. May 22, 1990) ...........................................................................44

*Camp Drug Store, Inc. v. Cochran Wholesale Pharm., Inc.*,
897 F.3d 825 (7th Cir. 2018) ...............................................................................................47

*In re Capital One Tel. Consumer Prot. Act Litig.*,
80 F. Supp. 3d 781 (N.D. Ill. 2015) .....................................................................................44

*Christine Asia Co., Ltd. v. Yun Ma*,
2019 WL 5257534 (S.D.N.Y. Oct. 16, 2019) .................................................................33, 37

*City of Detroit v. Grinnell Corp.*,
495 F.2d 448 (2d Cir. 1974)......................................................................................... *passim*

*County of Suffolk v. Long Island Lighting Co.*,
907 F.2d 1295 (2d Cir. 1990)...............................................................................................35

*In re Credit Default Swaps Antitrust Litig.*,
2016 WL 2731524 (S.D.N.Y. Apr. 26, 2016)........................................................................50

*D'Amato v. Deutsche Bank*,
236 F.3d 78 (2d Cir. 2001)....................................................................................................34

*Davis v. J.P. Morgan Chase & Co.*,
827 F. Supp. 2d 172 (W.D.N.Y. 2011) .................................................................................44

*Dover v. British Airways, PLC (UK)*,
2018 U.S. Dist. LEXIS 174513 (E.D.N.Y. Oct. 9, 2018)........................................................35

*Dupler v. Costco Wholesale Corp.*,
705 F. Supp. 2d 231 (E.D.N.Y. 2010) ..................................................................................44

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
2013 WL 12333442 (N.D. Cal. Jan. 8, 2013), *report and recommendation
adopted sub nom. In re Dynamic Random Access Memory Antitrust Litig.*,
2014 WL 12879520 (N.D. Cal. June 27, 2014) ....................................................51

*Elliott v. Gen. Motors LLC (In re Motors Liquidation Co.)*,
829 F.3d 135 (2d Cir. 2016).............................................................. *passim*

*In re EVCI Career Colls. Holding Corp. Sec. Litig.*,
2007 WL 2230177 (S.D.N.Y. July 27, 2007) .......................................37

*Flinn v. FMC Corp.*,
528 F.2d 1169 (4th Cir. 1975) ...........................................................36

*Flores v. One Hanover, LLC*,
2014 WL 2567912 (S.D.N.Y. June 9, 2014) .......................................43

*In re Gen. Motors LLC Ignition Switch Litig.*,
2016 WL 3920353 (July 15, 2016)............................................12, 18, 37

*In re Gen. Motors LLC Ignition Switch Litig.*,
2017 WL 3382071 (S.D.N.Y. Aug. 3, 2017)..........................................20, 37

*In re Gen. Motors LLC Ignition Switch Litig.*,
2017 WL 3443623 (S.D.N.Y. August 9, 2017) .......................................19

*In re Gen. Motors LLC Ignition Switch Litig.*,
2017 WL 6509256 (S.D.N.Y. Dec. 19, 2017) .......................................20, 37

*In re Gen. Motors LLC Ignition Switch Litig.*,
2018 WL 1638096 (S.D.N.Y. Apr. 3, 2018)..........................................39

*In re Gen. Motors LLC Ignition Switch Litig.*,
2018 WL 1989572 (S.D.N.Y. Apr. 25, 2018).......................................21, 37

*In re Gen. Motors LLC Ignition Switch Litig.*,
2018 WL 4351892 (S.D.N.Y. Sep. 12, 2018)........................................40

*In re Gen. Motors LLC Ignition Switch Litig.*,
2019 WL 6827277 (S.D.N.Y. Dec. 12, 2019) .......................................3, 22, 38

*In re Gen. Motors LLC Ignition Switch Litig.*,
257 F. Supp. 3d 372 (S.D.N.Y. 2017).............................................19, 37

*In re Gen. Motors LLC Ignition Switch Litig.*,
339 F. Supp. 3d 262 (S.D.N.Y. 2018).............................................20, 37

*In re Gen. Motors LLC Ignition Switch Litig.*,
   407 F. Supp. 3d 212 (S.D.N.Y. 2019) ............................................................ *passim*

*In re Giant Interactive Group, Inc. Sec. Litig.*,
   279 F.R.D. 151 (S.D.N.Y. 2011) ........................................................................35

*In re Glob. Crossing Sec. & ERISA Litig.*,
   225 F.R.D. 436 (S.D.N.Y. 2004) ...................................................33, 36, 44, 54

*Grunin v. Int'l House of Pancakes*,
   513 F.2d 114 (8th Cir. 1975) .............................................................................36

*In re GSE Bonds Antitrust Litig.*,
   2019 WL 6842332 (S.D.N.Y. Dec. 16, 2019) ...................................................33

*In re GSE Bonds Antitrust Litig.*,
   414 F. Supp. 3d 686 (S.D.N.Y. 2019) .........................................................34, 50

*Hart v. RCI Hosp. Holdings, Inc.*,
   2015 WL 5577713 (S.D.N.Y. Sept. 22, 2015) ...................................................50

*In re Indep. Energy Holdings PLC Sec. Litig.*,
   2003 U.S. Dist. LEXIS 17090 (S.D.N.Y. Sept. 29, 2003) .................................36

*In re Initial Pub. Offering Sec. Litig.*,
   671 F. Supp. 2d 467 (S.D.N.Y. 2009) ...............................................................48

*Keil v. Lopez*,
   862 F.3d 685 (8th Cir. 2017) .............................................................................43

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
   327 F.R.D. 483 (S.D.N.Y. 2018) .................................................................43, 50

*Linney v. Cellular Alaska P'ship.*,
   151 F.3d 1234 (9th Cir. 1998) .......................................................................6, 44

*In re Literary Works in Elec. Databases Copyright Litig.*,
   654 F.3d 242 (2d Cir. 2011).........................................................................50, 51

*Maley v. Del Global Technologies Corp.*,
   186 F. Supp. 2d 358 (S.D.N.Y. 2002).................................................................53

*McReynolds v. Richards-Cantave*,
   588 F.3d 790 (2d Cir. 2009)................................................................................34

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
   246 F.R.D. 156 (S.D.N.Y. 2007) ........................................................................52

*Morris v. Affinity Health Plan, Inc.*,
  859 F. Supp. 2d 611 (S.D.N.Y. 2012)....................................................................35

*In re Motors Liquidation Co.*,
  529 B.R. 510 (Bankr. S.D.N.Y. 2015), *aff'd in part, vacated in part, rev'd in
  part sub nom. Elliott v. Gen. Motors LLC (In re Motors Liquidation Co.)*, 829
  F.3d 135 (2d Cir. 2016)......................................................................13, 42, 43

*N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*,
  2019 U.S. Dist. LEXIS 39807 (S.D.N.Y. Mar. 8, 2019) ..........................................35

*In re Nasdaq Market-Makers Antitrust Litig.*,
  2000 WL 37992 (S.D.N.Y. Jan. 18, 2000) ...............................................................53

*In re Nat'l Football League Players Concussion Injury Litig.*,
  821 F.3d 410 (3d Cir. 2016), *as amended* (May 2, 2016)........................................51

*Newman v. Stein*,
  464 F.2d 689 (2d Cir. 1972)...................................................................................36

*Officers for Justice v. Civil Serv. Comm'n*,
  688 F.2d 615 (9th Cir. 1982) .................................................................................44

*In re Oracle Sec. Litig.*,
  1994 WL 502054 (N.D.Cal. Jun. 18, 1994)...............................................................53

*Ortiz v. Fibreboard Corp.*,
  527 U.S. 815 (1999)................................................................................................54

*In re PaineWebber Ltd. P'ships Litig.*,
  171 F.R.D. 104 (S.D.N.Y. 1997), *aff'd sub nom. In re PaineWebber Inc. Ltd.
  P'ships Litig.*, 117 F.3d 721 (2d Cir. 1997) ...................................................6, 36, 49

*Pantelyat v. Bank of Am., N.A.*,
  2019 WL 402854 (S.D.N.Y. Jan. 31, 2019) ..............................................................34

*Parker v. Anderson*,
  667 F.2d 1204 (5th Cir. 1982) .........................................................................36, 43

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
  827 F.3d 223 (2d Cir. 2016)....................................................................................54

*Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*,
  507 U.S. 380 (1993)......................................................................................14, 25, 42

*In re Rite Aid Corp. Sec. Litig.*,
  362 F. Supp. 2d 587 (E.D. Pa. 2005) .....................................................................48

*In re Sears, Roebuck and Co. Front-Loading Washer Prods. Liab. Litig.*,
   867 F.3d 791 (7th Cir. 2017) ........................................................49

*TBK Partners, Ltd. v. W. Union Corp.*,
   675 F.2d 456 (2d Cir. 1982)...........................................................43

*In re Telik, Inc. Sec. Litig.*,
   576 F. Supp. 2d 570 (S.D.N.Y. 2008)...........................................34

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, &*
   *Prod. Liab. Litig.*,
   2013 WL 3224585 (C.D. Cal. June 17, 2013) ..........................46

*In re Wachovia Equity Sec. Litig.*,
   2012 WL 2774969 (S.D.N.Y. June 12, 2012) ...........................50

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
   396 F.3d 96 (2d Cir. 2005)......................................................34, 48

*In re WorldCom, Inc. Sec. Litig.*,
   2004 WL 2591402 (S.D.N.Y. Nov. 12, 2004).............................46

*In re WorldCom, Inc. Sec. Litig.*,
   388 F. Supp. 2d 319 (S.D.N.Y. 2005)...........................................50

**Statutes**

11 U.S.C. § 363(f)..........................................................................7

**Rules**

Federal Rule of Civil Procedure 23 .............................................3, 26

Federal Rule of Civil Procedure 23(b)(3) .................................14, 55

Federal Rule of Civil Procedure 23(b)(3)(D)....................................55

Federal Rule of Civil Procedure 23(e) ........................6, 31, 32, 49

Federal Rule Civil Procedure 23(e)(1)(B)(i)............................31, 56

Federal Rule of Civil Procedure 23(e)(1)(B)(ii) .............................32

Federal Rule of Civil Procedure 23(e)(2) ....................31, 32, 33, 54

Federal Rule of Civil Procedure 23(e)(2)(A)....................................33

Federal Rule of Civil Procedure 23(e)(2)(C)(ii) ..............................45

Federal Rule of Civil Procedure 23(e)(2)(C)(iii) ...........................................................................47

Federal Rule of Civil Procedure 23(e)(2)(D)...........................................................................49, 53

Federal Rule of Civil Procedure 23(e)(3) ...................................................................................32

Federal Rule of Evidence 702...............................................................................................3, 24

**Other Authorities**

Fed. R. Civ. P. 23 Advisory Committee's Note to 2018 Amendment................................... *passim*

4 *Newberg on Class Actions* § 13:53 (5th ed.) ......................................................................45, 46

4 *Newberg on Class Actions* § 13:56 (5th ed.) ...........................................................................50

Theodore Eisenberg, Geoffrey Miller, and Roy German, *Attorneys' Fees in Class
    Actions: 2009-2013*, 92 N.Y.U. L. REV. 937, 947 (Oct. 2017) ............................................48

# INTRODUCTION

This Court was charged with managing thousands of lawsuits arising from various recalls of GM vehicles in 2014, involving many different vehicle models and model years, beginning with those having a recalled ignition switch assembly. This motion includes claims for alleged economic losses to purchasers and lessees of vehicles subject to seven 2014 recalls, which include vehicles manufactured or sold both before and after the 2009 bankruptcy-approved sale of certain "Old GM" assets to "New GM." Over years of litigation, this Court has rejected various of plaintiffs' claims and damages theories. Its recent August 6, 2019 summary judgment ruling rejecting plaintiffs' purported evidence of economic loss benefit-of-the-bargain damages (which the Court subsequently confirmed on December 12, 2019, by denying plaintiffs' motion for reconsideration) exposed a fundamental barrier to any recovery by plaintiffs: that while plaintiffs claimed scores of billions of dollars in economic loss damages for millions of individuals, they in fact and as a matter of law cannot prove they suffered any economic losses. To the contrary, New GM has repaired the recalled vehicles at no cost to plaintiffs and the objective evidence shows that the recalls had no effect on the market value of their vehicles.

The Court's ruling "change[d] the landscape in dramatic ways," and all but foreclosed plaintiffs' ability to prove benefit-of-the-bargain damages. *See In re Gen. Motors LLC Ignition Switch Litig.*, 407 F. Supp. 3d 212, 241 (S.D.N.Y. 2019) ("*Benefit of the Bargain S.J. Op.*"). In light of that ruling, and at the urging of both this Court and the Bankruptcy Court presiding over potential claims against Old GM, the Parties "revisit[ed] the issue of settlement." *See id.*; *see also* 8/12/2019 Bankr. Hr'g Tr. at 56:16 (Bankr. 14612) (court states to counsel for the GUC Trust, "I hope you'll go back to mediation."). With the aid of a skilled independent mediator appointed by this Court, the Honorable Layn R. Phillips, former United States District Court Judge and United States Attorney, the parties have negotiated, and now seek preliminary approval of, a class

Settlement. Named Plaintiffs, proposed plaintiffs' Class Counsel, New GM, and the GUC Trust

agreed to this Settlement to resolve on a nationwide basis the economic loss claims of a settlement

class (and various sub-classes) consisting of those who owned, purchased, and leased GM vehicles

subject to the seven 2014 recalls on or before the recall announcements, and assert, or seek to

assert, claims against New GM and the GUC Trust (which is responsible for distributing Old GM's

remaining assets).[1]

This Settlement is the latest in New GM's comprehensive efforts to address claims relating

to the seven recalls. Beginning in 2014, New GM repaired or offered to repair the vehicles at issue

at no cost to consumers. Through a voluntary claims process overseen by an independent Claims

Administrator, Kenneth Feinberg, New GM settled 360 claims for personal injury and wrongful

death pertaining to the ignition switch recall. Since that time, New GM also has worked diligently

and over the course of several years to resolve the personal injury and wrongful death claims filed

in MDL 2543, the Bankruptcy Court, and various state courts as well as unfiled claims, such that

very few remain pending. In addition, New GM has paid fines and settlement sums to federal and

state governments. The proposed Settlement will—if approved by this Court—provide a common

fund of $120 million to putative Class Members claiming economic losses—a generous amount

given the record establishing that the putative Class would likely recover nothing in continued

litigation. Further, in addition to its contribution to the common fund, New GM will pay any fees

---

[1] This Memorandum is filed by New GM in support of the *Joint Motion for Preliminary Approval of Class Settlement, Certification of Class for Purposes of Settlement, Approval of Notice Procedures, and Appointment of Class Counsel & Class Representatives*, filed by the Parties to the Settlement Agreement: (i) General Motors LLC ("New GM"); (ii) Motors Liquidation Company General Unsecured Creditors Trust (the "GUC Trust"); and (iii) named Plaintiffs seeking to represent the sub-classes of purchasers and lessees of the recalled vehicles. New GM's Memorandum addresses the Parties' joint request for "*Preliminary Approval of Class Settlement*." Class Counsel's memorandum addresses the other aspects of the motion.

and costs awarded to Plaintiffs' counsel (up to a maximum of $34.5 million), and those fees and costs will thus not come out of the common fund. This Court should grant preliminary approval to the proposed Settlement because it is in all parties' best interests and will help bring this massive, sprawling, and long-standing litigation to a close.

As this Court recently observed, after "five-plus years of litigation, hundreds of depositions, millions of documents exchanged in discovery, and untold trees felled and ink spilled by the parties and the Court, the parties should have enough data to agree on a settlement value for this litigation; the risks of delay and reversal are merely additional data to factor into the calculus." *In re Gen. Motors LLC Ignition Switch Litig.*, 2019 WL 6827277, at *14 (S.D.N.Y. Dec. 12, 2019) ("*Benefit-of-the-Bargain SJ Reconsider Op.*"). This ample data has enabled the parties to conduct a clear-eyed assessment of the risks and benefits of continued litigation, and demonstrated that the proposed Settlement is not only adequate and fair to the proposed settling classes—it is plaintiffs' only reasonable option.

*First*, numerous dispositive rulings have significantly limited plaintiffs' claims against New GM. On the question of damages alone, the Court's recent summary judgment ruling "foreclosed Plaintiffs' ability to prove diminution-in-value damages as a matter of law in the three Bellwether States." *Id.* at *12. The legal and undisputed factual defects that rendered plaintiffs' evidence insufficient in the Bellwether States also foreclose recovery for such damages in the remaining states. In all jurisdictions, plaintiffs rely on the same expert, Stephen Boedeker, whose opinion is unsound as a matter of economics and law. Boedeker's opinion is also contrary to Rule 23, which does not relieve plaintiffs of their burden of proving individual damages, and inadmissible under Federal Rule of Evidence 702. Moreover, plaintiffs' only purported evidence proffered in the Bankruptcy Court of the alleged value of their economic loss late claims against

the GUC Trust was the very same conjoint-survey method of Boedeker rejected by this Court. 3/8/2019 Berman Decl. ¶¶ 7-8 (Bankr. Docket No. 14466), Exhibit B (5/9/17 Boedeker Report) (Bankr. Docket No. 14466-2 (filed under seal)).

*Second*, the possibility of a different result on appeal is remote and not worth the additional cost and delay. This Court's comprehensive opinion denying plaintiffs' motion for reconsideration explains in detail why they will not prevail on appeal. Even if the Second Circuit granted plaintiffs' pending petition for interlocutory appeal and reversed this Court's rejection of Boedeker's benefit-of-the-bargain evidence, plaintiffs cannot avoid this Court's holding that they are entitled only to the lesser of (i) the difference in market value between the vehicles as warranted and as sold, or (ii) repair costs—and they have not asserted or offered evidence that Boedeker's purported damages estimates are lower than the recall repair costs. Additionally, this Court's holding that plaintiffs had a duty to mitigate damages means that plaintiffs' only potential benefit-of-the-bargain damages claims are for the cost of repairs, but these are zero because New GM already has offered to repair the vehicles under the recalls at no cost to vehicle owners. And an appeal after final judgment years from now would be costly and highly uncertain for plaintiffs; to prevail, they would have to succeed in overturning this Court's rulings, and overcome New GM's additional defenses, which provide multiple independent grounds defeating their claims.

*Third*, plaintiffs' remaining damages claim against New GM for "lost time" damages is limited by law and equally unsupported by admissible evidence. Plaintiffs rely on their expert's evidence (which is subject to New GM's pending *Daubert* motion) based on "averages"; such evidence is inadmissible and insufficient to prove any plaintiff's (or class-wide) damages as a matter of law where, as here, the facts are plaintiff-specific and vary widely. Moreover, under this Court's holdings, to recover for "lost time" damages plaintiffs in nearly all states must prove that

they lost income from time spent having their vehicles repaired under the recalls, which very few plaintiffs allege.

*Fourth*, the Bankruptcy Court has announced that it intends to follow this Court's rulings, 8/12/19 Bankr. Tr. at 9, and hence plaintiffs seeking to recover from Old GM/the GUC Trust in the Bankruptcy Court face the same barriers to recovery as in the MDL.  In addition, before the Bankruptcy Court would even consider their damages theories, plaintiffs must first prove that they are entitled to file a late class claim (or any claims at all) in the Bankruptcy Court.  And even if plaintiffs succeeded in filing late claims (and could overcome all of the defenses on the merits of such claims), their ability to actually recover from the GUC Trust would be precluded by the doctrine of equitable mootness.  Accordingly, plaintiffs' efforts to pursue the GUC Trust are without merit.

*Fifth*, in addition to the insurmountable barriers to proving damages, New GM's pending summary judgment motion provides independent grounds for rejecting plaintiffs' claims, including that they will not be able to prove causation; they cannot prove reliance (in states that require it); the law in many states bars plaintiffs' unjust enrichment claims; and New GM lacks any duty to purchasers of Old GM vehicles for alleged economic losses.  Furthermore, New GM's opposition to plaintiffs' class certification motion shows that no litigation class could properly be certified.  Given the numerous individual issues and varying laws of over 50 jurisdictions, as well as the lack of any class-wide evidence of damages, any trial(s) involving millions of putative claims would be unmanageable.

*Sixth*, where, as here, the parties undisputedly have ample data, experienced counsel's assessment of the value of the Settlement is entitled to great weight.  That it is less than the vastly exaggerated amounts claimed by plaintiffs' discredited expert evidence is irrelevant.  To the

contrary, given counsel's assessment of the likelihood that plaintiffs could recover nothing, and the number of plaintiffs included in the Class, it is not surprising that a fair settlement will not yield large recoveries on a per-plaintiff basis. *See*, *e.g., City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 455 & n.3 (2d Cir. 1974) ("The fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved."); *see also Linney v. Cellular Alaska P'ship.*, 151 F.3d 1234, 1242 (9th Cir. 1998) (same); *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 131 (S.D.N.Y. 1997) ("[T]he dollar amount of the settlement by itself is not decisive in the fairness determination, and the fact that the settlement fund may equal only a fraction of the potential recovery at trial does not render the settlement inadequate."), *aff'd sub nom. In re PaineWebber Inc. Ltd. P'ships Litig.*, 117 F.3d 721 (2d Cir. 1997).

In short, after years of hard-fought litigation, plaintiffs claiming economic losses have reasonably concluded that settlement is their best chance to recover anything for the putative class. The proposed Settlement is fair, reasonable, and adequate, and the result of extensive arm's-length negotiations between experienced adversaries after enormous discovery, supervised and aided by an independent, experienced mediator. This Court is deeply versed in the strengths and weaknesses of the Parties' positions, and has the requisite foundation to conclude that it will likely be able to grant final approval. Hence, preliminary approval is warranted under Rule 23(e).

## FACTUAL AND PROCEDURAL BACKGROUND

### A. Old GM's Bankruptcy, The Sale Order, And Establishment Of The GUC Trust.

Through the second half of 2007 and the entirety of 2008, General Motors Corporation ("Old GM") hemorrhaged over $70 billion in net losses. *Elliott v. Gen. Motors LLC (In re Motors Liquidation Co.)*, 829 F.3d 135, 144 (2d Cir. 2016). Despite emergency loans from the government

and attempts to develop a new business plan, continuing losses in 2009 forced Old GM on June 1, 2009 to file a voluntary petition for Chapter 11 bankruptcy protection in the Bankruptcy Court. *Id.* at 144-45.

On the same day it filed for Chapter 11, Old GM also filed a motion to sell certain of its assets and transfer certain liabilities to the entity that would become General Motors LLC ("New GM"). *Id.* at 145. New GM was a new entity created by the Canadian and U.S. governments, and owned predominantly by the U.S. Department of the Treasury. *Id.* The proposed sale of assets from Old GM to New GM was pursuant to an agreement and proposed Sale Order negotiated by Old GM, the Treasury Department, and other parties. *Id.* at 143.

The proposed Sale Order provided, pursuant to 11 U.S.C. § 363(f), that New GM acquired the purchased assets of Old GM "free and clear of all liens, claims, and encumbrances, and other interests of any kind or nature whatsoever, including rights or claims based on any successor or transferee liabilities." *Id.* at 146. Under this provision, and subject to limited exceptions, New GM would not be responsible for any claims based on vehicles manufactured by Old GM before the sale closed, including successor liability claims. The only liabilities New GM assumed for Old GM vehicles were specifically defined in the Sale Agreement and consisted of (1) post-sale accidents/incidents involving personal injury, loss of life, or property damage, but New GM did not assume punitive damages; (2) repairs or the replacement of parts (but not monetary damages) for a limited duration provided under the "glove box warranty"; and (3) Lemon Law claims (as defined in the Sale Agreement). *Id.* at 147. After considering various objections to the proposed Sale Order—including from consumer organizations, state attorneys general, and accident victims who opposed the "free and clear" provision—the Bankruptcy Court approved and entered the Sale Order, and the sale officially closed on July 10, 2009. *Id.* at 146-47.

As part of the sale, New GM paid Old GM various forms of compensation.  *Id.* at 146.  A contingent element of the purchase price under the Sale Agreement is referred to as the "Adjustment Shares," additional shares of New GM common stock that would be issued and paid to Old GM if and only if the estimated allowed aggregate general unsecured claims against Old GM exceeded $35 billion, with the amount of shares varying based on by how much the allowed aggregate unsecured claims exceeded the $35 billion threshold.  Sale Agreement § 3.2(c)(i) (Bankr. Docket No. 2968).

After the sale, Old GM proposed a liquidating plan that would distribute the sale proceeds it received from New GM to various claimants, including general unsecured creditors with allowed claims.  *See Elliott*, 829 F.3d at 147.  This liquidating plan created the GUC Trust to hold sale proceeds such as New GM stock and stock warrants and certain Old GM assets.  *Id.* at 147-48.  The GUC Trust has used these assets to pay unsecured claimants a percentage of their allowed claims *pro rata*.  *Id.*  If New GM were required to issue any Adjustment Shares, those would also become assets of the GUC Trust.  *Id.*

**B.**      **New GM's 2014 Recalls And Compensation Of Vehicle Owners.**

**1.**      **Summary Of Class Recalls.**

During 2014, New GM conducted recalls of Old GM and/or New GM vehicles.  Seven of those recalls form the focus of the Fifth Amended Consolidated Complaint ("5ACC"); six of those seven recalls form the focus of the proposed late claims in the Bankruptcy Court.  New GM announced a recall starting in February 2014 under NHTSA Recall No. 14v047 to remedy the "Delta Ignition Switch" defect.  These vehicles were recalled because under certain conditions the ignition switch could unintentionally move from the "run" position to "accessory" or "off" with a corresponding loss of power.  The Delta Ignition Switch recall covered the following vehicles:

(1) 2005-2007[2] Chevrolet Cobalt; 2006-2007 Chevrolet HHR; 2007 Pontiac G5; 2007 Saturn Sky; 2003 Saturn Ion; and 2006-2007 Pontiac Solstice; and (2) 2008-2010 Chevrolet Cobalt; 2008-2011 Chevrolet HHR; 2008-2010 Pontiac G5; 2008-2010 Saturn Sky; and 2008-2010 Pontiac Solstice. Vehicles in the first category were manufactured with a faulty ignition switch (the "Production Part Vehicles"), while those in the second category (the "Service Parts Vehicles") were added to the recall in March 2014 because they may have been repaired using a faulty ignition switch that had been sold to dealers or aftermarket wholesalers.

In addition to the Delta Ignition Switch recall, New GM conducted recalls for four other groups of vehicles where the ignition switch might unintentionally rotate under certain conditions, with those conditions and the causes varying for each recall. In June 2014, New GM recalled vehicles under NHTSA Recall No. 14v355, encompassing the 2005-2009 Buick Lacrosse; 2006-2014 Chevrolet Impala; 2000-2005 Cadillac Deville; 2006-2011 Cadillac DTS; 2006-2011 Buick Lucerne; and 2006-2007 Chevrolet Monte Carlo. In July 2014, New GM recalled vehicles under NHTSA Recall No. 14v394, encompassing certain 2003-2014 Cadillac CTS (as identified by VIN); and certain 2004-2006 Cadillac SRX (as identified by VIN). In July 2014, New GM recalled vehicles under NHTSA Recall No. 14v400, encompassing 2000-2005 Chevrolet Impala; 1997-2003 Chevrolet Malibu; 2000-2005 Chevrolet Monte Carlo; 1999-2004 Oldsmobile Alero; 1998-2002 Oldsmobile Intrigue; 1999-2005 Pontiac Grand Am; and 2004-2008 Pontiac Grand Prix. In June 2014, New GM recalled vehicles under NHTSA Recall No. 14v346, encompassing 2010-2014 Chevrolet Camaros.[3]

---

[2]    The years referenced in these descriptions refer to vehicle Model Years.

[3]    The 2010-2014 Chevrolet Camaro recall is not at issue in the Late Claims Motion.

Regarding the remaining two recalls, in March 2014, New GM recalled vehicles under NHTSA Recall No. 14v118, encompassing some 2008-2009 (as identified by VIN) and all 2010-2013 Buick Enclave; some 2009 (as identified by VIN) and all 2010-2013 Chevrolet Traverse; some 2008-2009 (as identified by VIN) and all 2010-2013 GMC Acadia; and 2008-2010 Saturn Outlook ("Side Airbag"). Corrosion and/or loose crimps in the seat mounted side impact airbag wiring harness connectors could cause an increase in resistance in the connectors, resulting in the airbag light illuminating and, given enough time, potentially the side impact airbags, front center side airbag, and pretensioners not deploying in a crash.

In March 2014, New GM recalled vehicles equipped with power steering under NHTSA Recall 14v153, encompassing: some 2005-2010 Chevrolet Cobalt, some 2009-2010 Chevrolet HHR, some 2007-2010 Pontiac G5, 2004-2007 Saturn Ion, 2004-2005 Chevrolet Malibu; 2004-2005 Chevrolet Malibu Maxx and some 2006 Chevrolet Malibu Maxx (as identified by VIN); some 2005-2006 and 2008-2009 Pontiac G6 (as identified by VIN); and some 2008-2009 Saturn Aura (as identified by VIN) ("Power Steering"). These vehicles were recalled because they could experience a loss of electric power steering assist, with the causes of such a loss varying among the models.

For each of the seven recalls, New GM remedied the issues through various repairs at no cost to customers, such as replacing the ignition switch and ignition lock cylinder, and providing two keys and a key ring for the Delta Ignition Switch vehicles; and replacing keys and key rings with a changed design and/or providing key inserts or key covers for the other vehicles recalled for unintentional key rotation. Docket No. 5860 (New GM Statement of Undisputed Facts in Supp. of S.J. Mot.) ¶¶ 1-135. New GM also provided remedies for vehicles under the Side Airbag and Power Steering recalls, which plaintiffs admitted were effective in repairing the alleged

defects.  Docket No. 6059 (Pls. Opp. to New GM Bellwether Economic Loss S.J. Mot.) at 4 n. 1; 24 n. 21.

### 2.  Personal Injury Settlements.

In addition to conducting the recalls, New GM also provided compensation to those who, tragically, might have been physically injured or died as a result of a recall condition.  This compensation occurred through two avenues.  *First*, New GM established an independently run voluntary claims facility administered by Kenneth Feinberg to compensate those who alleged injuries from motor vehicle accidents that might have been connected to the Delta Ignition Switch. The facility was an efficient and rapid means to resolve claims, without rigorous analysis of the causes of accidents and without consideration of New GM's legal or factual defenses.  This facility was uncapped and New GM ultimately paid out settlements to 360 eligible claimants.

*Second*, New GM has settled personal injury and wrongful death claims filed in the MDL 2543 Court, the Bankruptcy Court, various state courts, as well as unfiled claims outside of the Feinberg facility.  These settlements were facilitated by the thirteen personal injury bellwether trials scheduled in this Court.  Docket No. 422, Order No 25. ¶ 2.  Of the three bellwethers that proceeded to trial in this Court, the first (*Scheuer*) resulted in the plaintiff's voluntary dismissal of his claims with prejudice during trial, while the other two (*Barthelemy/Spain* and *Ward*) both resulted in complete defense verdicts for New GM.  Relying on these trial results, another trial win for New GM in a Texas State Court, and litigation of these and other bellwether personal injury cases, New GM has now settled more than 4,000 such claims.  Fewer than 120 personal injury/wrongful death claims remain unsettled against New GM, with an additional 61 remaining against Old GM.

### 3. Government Settlements.

New GM also has entered into settlements with various government entities related to the ignition switch recalls. With respect to the federal government, in September 2015, New GM entered into a Deferred Prosecution Agreement with the Office of the U.S. Attorney for the Southern District of New York ("DPA"). Pursuant to the DPA, in addition to a financial forfeiture, New GM agreed to retain an independent monitor to review and assess various aspects of New GM's operations, including motor vehicle safety and recall processes. Separately, New GM also reached a consent order with NHTSA regarding the timing of the Delta Ignition Switch recalls, paying an additional penalty to the U.S. government.

For state governments, New GM reached an agreement with 49 state attorneys general under which the company paid a financial settlement; this settlement also provided for New GM to maintain or establish certain programs related to safety and recalls. New GM separately settled with (i) the Arizona Attorney General (with most of the settlement amount being distributed to Arizona owners of recalled vehicles), and (ii) with the Orange County California District Attorney.

### C. Plaintiffs' Alleged Claims And Damages In MDL 2543.

Plaintiffs allege economic losses in the 5ACC based on a "benefit-of-the-bargain defect theory," which "compensates a plaintiff for the fact that he or she overpaid, at the time of sale, for a defective vehicle." *In re Gen. Motors LLC Ignition Switch Litig.* ("*TACC MTD Op.*"), 2016 WL 3920353, at *7, 10 (July 15, 2016); *see also*, *e.g.*, 5ACC ¶¶ 17, 861, 1596, 1623, 1643, 1658. Plaintiffs also claim they "incurred damages in at least the form of lost time required to repair their vehicles." *See e.g.*, 5ACC ¶¶ 1602, 4300, 6545. Plaintiffs additionally seek injunctive relief for this Court to oversee New GM's implementation of the recalls at issue, establish and administer a fund to pay claims for vehicle owners' out-of-pocket expenses, and, more generally, to monitor New GM's "efforts to improve its safety processes." *Id.* ¶¶ 1077, 1094, 1688.

To support these remedies, plaintiffs bring various claims including violation of consumer protection statutes, fraudulent concealment, unjust enrichment, breach of the implied warranty of merchantability and violation of the Magnuson-Moss Warranty Act in some states, and negligence in a few states. In addition, plaintiffs who purchased a Delta Ignition Switch vehicle on or before July 9, 2009 allege successor liability versions of these claims, seeking to hold New GM liable for Old GM's conduct. Plaintiffs who owned a Delta Ignition Switch vehicle between July 10, 2009 and November 30, 2009 bring claims alleging that New GM fraudulently concealed their right to file a claim against Old GM in its bankruptcy. Finally, the 5ACC continues to allege a RICO claim against New GM, which this Court dismissed.

**D.    Plaintiffs' Alleged Classes, Claims, And Damages In The Bankruptcy Court.**

After the sale of assets by Old GM to New GM, the Bankruptcy Court entered an order establishing November 30, 2009 as the deadline for general unsecured creditors to file proofs of claims against Old GM. However, the recalls at issue here were not announced until 2014. After the recalls were announced, and in response to claims filed against New GM, the Bankruptcy Court ruled that the Sale Order precluded pre-sale economic loss claims against New GM. *In re Motors Liquidation Co.*, 529 B.R. 510, 598 (Bankr. S.D.N.Y. 2015), *aff'd in part, vacated in part, rev'd in part sub nom. Elliott*, 829 F.3d 135. The Second Circuit decision in *Elliot*, 829 F.3d 135, discussed in greater detail in Section F.1, did not decide whether there was a due process violation for any plaintiffs relating to the claims bar date notice. To address this issue, plaintiffs seeking relief in the Bankruptcy Court were required by that Court to seek leave, by December 22, 2016, to file late claims motions related to recalls.[4]

---

[4]    "If other plaintiffs wish to join in a Late Claim Motion, they . . . [were required to] file a joinder (not to exceed two pages) with the [Bankruptcy] Court by January 6, 2017." Bankr. Docket No. 13802 at 5.

On December 22, 2016, two plaintiffs who are named plaintiffs in the 5ACC filed a Late Claims motion, seeking to assert proposed nationwide class claims against the GUC Trust under Rule 23(b)(3), and asserting the same damages theory that had been asserted in the 5ACC. Bankr. Docket No. 13806. One such claimant, Patricia Barker, sought leave to file a class claim against the GUC Trust on behalf of an "Ignition Switch Class," defined as "all persons in the United States who, as of November 30, 2009, either owned or leased a defective Old GM vehicle included in Recall No. 14V-047." *Id.* at 12. A second claimant, Yvonne James-Bivins, sought leave to file a class claim against the GUC Trust on behalf of a "Non-Ignition Switch Class," defined as "all persons in the United States who, as of November 30, 2009, either owned or leased a defective Old GM vehicle included in Recall Nos. 14V-355, 14V-394, 14V-400, 14V-118 and 14V-153." *Id.* Barker and James-Bivins seek to file late claims against the GUC Trust based upon many of the same theories set forth in the 5ACC.

Certain other parties filed joinders to the late class claims motion, as permitted by the Bankruptcy Court's December 13, 2016 Order To Show Cause. Bankr. Docket No. 13802; *see also* Bankr. Docket No. 13811; Bankr. Docket No. 13818. The economic loss plaintiffs that filed these joinders are members of the proposed Settlement Class.

On April 24, 2018, other economic loss plaintiffs filed a Notice of Amended Exhibits that purported to add 58 additional economic loss claimants. Bankr. Docket No.v14280. Each of these additional 58 claimants are also named plaintiffs in the 5ACC filed in the MDL.

Certain issues raised by the Late Claims Motions have been briefed, but not yet decided in the Bankruptcy Court.[5] Bankr. Docket Nos. 13871, 13872, 13873, 13882, 13883, 13884. Prior to

---

[5]   In its March 2, 2017 Order, the Bankruptcy Court directed the parties to address the "Initial Late Claim Motions Issues,"—*i.e.,* "(i) the issue ('Applicability of *Pioneer* Issue') of whether the proponents of the Late Claim Motions must satisfy the standard set forth in *Pioneer Inv.*

reaching the Settlement, the Parties intended to submit further briefing on the ability of the plaintiffs to pursue late claims against the GUC Trust. Bankr. Docket Nos. 14625, 14654, 14661.

### E. New GM And Plaintiffs Have Engaged In Extensive Discovery.

New GM and the plaintiffs have vigorously litigated the economic loss cases since MDL 2543 was established five-and-a-half years ago. New GM has produced over 23.4 million pages of documents. The parties have conducted 777 depositions, including 102 depositions of current or former employees of New GM or Old GM, and 92 named plaintiff depositions. The parties have exchanged 62 expert reports, including 36 New GM expert reports and 26 plaintiff expert reports, and taken a total of 37 expert depositions of 19 New GM experts and 18 plaintiff experts. Docket No. 7619. This voluminous discovery informed the Parties' valuation of the claims against New GM in MDL 2543.

### F. New GM And Plaintiffs Have Engaged In Multiple Rounds Of Motion Practice, Resulting In Many Significant Rulings Informing Settlement Negotiations.

#### 1. Motions To Enforce The Sale Order And Second Circuit Decision.

Beginning almost immediately after the first recalls, thousands of cases were filed in various federal district courts against New GM, which were consolidated in this MDL. In response, New GM filed motions in the Bankruptcy Court to enforce the "free and clear" provisions of the Sale Order. *Elliott*, 829 F.3d at 150-51. Among other relief, New GM sought to enjoin all economic loss suits against it arising from the Delta Ignition Switch and other alleged defects in vehicles made by Old GM. *Id.* at 151. The Bankruptcy Court (Judge Gerber presiding)

---

*Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380 (1993), in order to obtain authority to file late proofs of claim, and (ii) the issue ('Tolling Issue') as to whether and as of when some or all of the proponents of the Late Claim Motions are the beneficiaries of a tolling agreement with respect to the time for filing the Late Claim Motions." Bankr. Docket No. 13869 at 2 (emphasis in original).

"held that New GM could not be sued—in bankruptcy court or elsewhere—for ignition switch [or other alleged defect] claims that otherwise could have been brought against Old GM, unless those claims arose from New GM's own wrongful conduct." *Id.*

The Bankruptcy Court's judgment was directly appealed to the Second Circuit. Reversing the Bankruptcy Court, the Second Circuit held that because Old GM knew or reasonably should have known of the Delta Ignition Switch defect, Old GM was required to provide direct mail notice of the bankruptcy sale to owners of Delta Ignition Switch vehicles. *Id.* at 159. Because Old GM provided only publication notice of the sale, the Second Circuit held that enforcing the Sale Order injunction against Delta Ignition Switch vehicle owners would violate due process. *Id.* at 166. For the non-ignition-switch defects, the Second Circuit held there were insufficient findings that would allow it to decide whether there was any due process violation, and vacated the Bankruptcy Court's decision to enjoin those claims. It remanded the case for further proceedings. *Id.* The Second Circuit expressly did not address whether any due process violation excused compliance with the deadline for filing claims in the Bankruptcy Court, and held that the Bankruptcy Court's decision on that issue was an advisory opinion. *Id.* at 168-69.

Following the Second Circuit's decision, Delta Ignition Switch plaintiffs with claims for economic losses relating to Old GM vehicles brought successor liability claims against New GM in this MDL. Plaintiffs have not alleged a due process violation for any non-Delta Ignition Switch defects, and have not brought successor liability claims against New GM based on those other defects. Having made a "strategic decision" to seek recovery from New GM, *see* 2/17/2015 Hr'g Tr. at 112 (Bankr. Docket No. 13602), plaintiffs did not seek leave to file claims against Old GM's bankruptcy estate until December 2016, when plaintiffs who owned Old GM vehicles and allege the defects described in Background Section B.1—including the Delta Ignition Switch defect—

filed motions in the Bankruptcy Court seeking leave to file late claims against the GUC Trust. *See also Elliott*, 829 F.3d at 168 (noting, as of the date of oral argument in the Second Circuit, "plaintiffs have not filed any proofs of claim with the GUC Trust, nor have they even asked the bankruptcy court for permission to file late proofs of claim or to lift the bar date, as would be required before relief could be granted").

### 2. New GM And Plaintiffs Stipulate That The Law Of Each Plaintiff's Home Jurisdiction Governs The Plaintiff's Claims.

Litigating the myriad issues involved in the economic loss class actions pending in MDL 2543 first required determining which state's law would apply, especially as the initial complaints alleged that Michigan law should apply nationwide. Accordingly, in late 2014 the Court ordered simultaneous choice-of-law briefing to proceed in early 2015 for a subset of plaintiffs. Docket No. 478, Order No. 30 at 2. Both plaintiffs' and New GM's initial choice-of-law briefs established that Michigan law could not apply nationwide, and that instead the law of each plaintiff's home state would apply to that plaintiff's claims. Docket Nos. 597, 598. Accordingly, in March 2015 the parties stipulated and the Court ordered that for the plaintiffs at issue, "the substantive laws of each Plaintiff's home jurisdiction will govern all of that Plaintiff's claims asserted in the Complaint." Docket No. 697, Order No. 40 at 2. Although the various amended complaints have removed and added plaintiffs since then, the parties have applied each plaintiff's home state law to govern his or her claims.

### 3. The Court Partially Grants New GM's Motion To Dismiss Plaintiffs' Third Amended Consolidated Complaint.

The substantive briefing in this Court began with New GM's motion to dismiss the claims of plaintiffs from eight states in the plaintiffs' Third Amended Consolidated Complaint ("TACC MTD"). The TACC MTD included arguments that plaintiffs could not recover for "brand devaluation," could not recover without a manifest defect, that plaintiffs did not have a viable

RICO claim, that their unjust enrichment claims were barred by their express warranties and having adequate remedies at law, and that state law doctrines barred certain fraudulent concealment claims.  Docket Nos. 2356, 2357.

The Court granted significant portions of the TACC MTD, weakening plaintiffs' claims. In particular, the Court rejected plaintiffs' argument that they could recover because the 2014 recalls damaged the GM brand, regardless of whether a plaintiff's vehicle was defective.  *TACC MTD Op.*, at *7-10.  Without this "brand devaluation" theory, each plaintiff would be required to present evidence and prove that his or her vehicle contained a defect.  The Court also dismissed plaintiffs' RICO claims for failure to allege an enterprise or an injury cognizable under RICO.  *Id.* at *11-18.  Dismissing the RICO claim removed the threat of treble damages.  The TACC MTD Opinion also contains several other favorable rulings for New GM, including that (i) a manifest defect is required for Oklahoma consumer protection and breach of warranty and Missouri breach of warranty claims, (ii) the Florida economic loss doctrine bars plaintiffs' fraudulent concealment claims, (iii) the claims of Louisiana purchasers of New GM vehicles were barred by the Louisiana Products Liability Act, and (iv) most unjust enrichment claims should be dismissed because of a written warranty or adequate legal remedy.  *Id.* at *2, 27-29, 35-37.

### 4. The Court Partially Grants New GM's Motion To Dismiss Plaintiffs' Fourth Amended Consolidated Complaint.

After the Court's TACC MTD Opinion, plaintiffs filed a Fourth Amended Consolidated Complaint ("FACC") and New GM brought another motion to dismiss for plaintiffs in eight different states ("FACC MTD").  As with the prior motion, the FACC MTD made numerous arguments including that only plaintiffs whose vehicles had a manifest defect could recover, various plaintiffs lacked causation for their alleged damages, and plaintiffs' claims were barred for various state-law-specific reasons.  Docket Nos. 3577, 3578.

The Court granted significant portions of the FACC MTD, again rejecting plaintiffs' theories and limiting the value of their claims. *See In re Gen. Motors LLC Ignition Switch Litig.* ("*FACC MTD Op.*"), 257 F. Supp. 3d 372 (S.D.N.Y. 2017). In particular, this Court held that plaintiffs incurred alleged economic loss (if any) at the time the vehicle was sold, and thus New GM could not have caused the economic loss of plaintiffs who purchased their vehicles before July 10, 2009 (when New GM purchased certain Old GM assets). *Id.* at 400-03. Furthermore, the Court held that plaintiffs who sold, traded-in, or otherwise disposed of their vehicles before the recalls could not have realized any economic loss damages "as the then-unknown defect could not have affected the resale price."[6] *Id.* at 403. The FACC MTD Opinion also held that New York and Texas plaintiffs could bring claims only if they alleged a manifest defect and that Pennsylvania law requires a manifest defect for common-law fraud and breach of implied warranty. *Id.* at 429-31, 436-39, 450-52. It also dismissed Texas and Michigan fraudulent concealment claims for lack of a duty to disclose, held that Wisconsin fraudulent concealment claims were barred under the economic loss rule, and rejected many unjust enrichment claims because of a written warranty or adequate legal remedy or lack of a direct benefit. *Id.* at 424-25, 452-54, 460, 462. Thus, as with the TACC MTD, the FACC MTD further reduced the possible recoveries for plaintiffs' claims.

---

[6] After plaintiffs filed a motion to reconsider this ruling, the Court affirmed that plaintiffs who disposed of their vehicles before the recalls had no damages. *In re Gen. Motors LLC Ignition Switch Litig.*, 2017 WL 3443623, at *2 (S.D.N.Y. August 9, 2017) ("Most importantly, even now, Plaintiffs do not articulate a coherent theory of how a plaintiff who bought a vehicle with a concealed defect and sold the same vehicle before the defect was revealed can logically, if not legally, prove that he or she suffered damages."). The Court did leave open that "for purposes of at least *some* claims in *some* states, the law does not appear to require a plaintiff to allege damages in order to survive a motion to dismiss," *id.* at *2, but plaintiffs have not identified any state claims for which a plaintiff can recover without any damages.

5.      **The Court Holds That Claims For Lost Time Damages Generally Require Proof Of Lost Income, And Rejects Most Remaining Unjust Enrichment Claims.**

After the TACC and FACC MTDs, New GM and plaintiffs agreed to brief the manifest defect rule and unjust enrichment claims for the remaining jurisdictions, and also whether plaintiffs could recover "lost time" spent obtaining the recall repairs. *In re Gen. Motors LLC Ignition Switch Litig.* ("*Other Jurisdictions Op.*"), 339 F. Supp. 3d 262, 274-75 (S.D.N.Y. 2018). This Court found that "as a matter of law, the overwhelming majority of states adhere to the view that lost-time damages are the equivalent of lost earnings or income." *Id.* at 307. Accordingly, in these states, to recover under plaintiffs' "lost time" theory, each plaintiff or putative class member individually would have to prove lost earnings or income from obtaining the recall repairs, which very few plaintiffs alleged. In addition, the Court ruled—or the plaintiffs conceded—that their remaining unjust enrichment claims largely were barred by the written warranties or an adequate remedy at law. *Id.* at 333. Finally, as a part of this briefing, plaintiffs also agreed that the laws of Arkansas, New Hampshire, North Carolina, North Dakota, South Carolina, and Utah require a manifest defect to recover for any claims at issue. Docket No. 5098, Ex. 3.

6.      **The Court Holds That Many States Would Not Allow The Delta Ignition Switch Plaintiffs' Successor Liability Claims.**

The Court also repeatedly rejected the successor liability claims that Delta Ignition Switch plaintiffs brought seeking to hold New GM liable for Old GM's conduct. The Court held that the jurisdictions of California, the District of Columbia, Florida, Louisiana, Massachusetts, New York, and Wisconsin each would apply Delaware successor liability law, which bars successor liability claims under the facts here. *In re Gen. Motors LLC Ignition Switch Litig.* ("*Aug. 2017 Succ. Liab. Op.*"), 2017 WL 3382071, at *1, *17-19 (S.D.N.Y. Aug. 3, 2017). Subsequent decisions granted summary judgment against Maryland plaintiffs' successor liability claims, *In re Gen. Motors LLC*

*Ignition Switch Litig.* ("*Dec. 2017 Succ. Liab. Op.*"), 2017 WL 6509256, at *3-4 (S.D.N.Y. Dec. 19, 2017), and such claims under Texas and Virginia law, *In re Gen. Motors LLC Ignition Switch Litig.* ("*Apr. 2018 Succ. Liab. Op.*"), 2018 WL 1989572 (S.D.N.Y. Apr. 25, 2018) (holding that New York successor liability law, which would be selected by Texas and Virginia choice-of-law rules, bars plaintiffs' successor liability claims).

### 7. The Court Grants Summary Judgment Against Plaintiffs' Benefit-Of-The-Bargain Damages.

With the Court having ruled on multiple motions to dismiss and other dispositive motions, the parties next briefed summary judgment and class certification for three Bellwether States—California, Texas, and Missouri. Docket Nos. 5858, 5859, 6059, 6194. Among other contentions, New GM argued that plaintiffs have no evidence of benefit-of-the-bargain damages, and that such damages were barred by New GM's recall repairs. Docket No. 5859 at 12-24. The Court granted New GM's summary judgment motion against plaintiffs' benefit-of-the-bargain damages, issuing three key rulings:

> First, the Court holds that, in all three Bellwether States, Plaintiffs' benefit-of-the-bargain damages are properly measured as the lesser of (1) the cost of repair or (2) the difference in fair market value between the Plaintiffs' cars as warranted and those same cars as sold. Second, that means that evidence of New GM's post-sale repairs is relevant to the calculation of Plaintiffs' damages and, indeed, could theoretically eliminate those damages altogether. And third, whether or not Plaintiffs' claims for "cost-of-repair" damages could survive New GM's motion, the Court is compelled to conclude that their claims for "difference-in-value" damages cannot because Plaintiffs have failed to introduce any evidence of the fair market value of the allegedly defective vehicles they actually purchased and, therefore, have failed to create a triable issue of fact on an essential element of any such claim.

*Benefit of the Bargain S.J. Op.*, 407 F. Supp. 3d 212, 217 (S.D.N.Y. 2019). With respect to the third ruling, the Court held that plaintiffs' putative economic damages expert had not calculated the difference in fair market value between vehicles with and without a defect because the expert had failed to measure New GM's willingness to sell at plaintiffs' expert's alleged actual and but-

for prices.  *Id.* at 235.  Accordingly, plaintiffs had no evidence to prove that any of them suffered benefit-of-the-bargain damages, and the Court granted summary judgment against those damages and related claims.  *Id.* at 241.  Thus, the Court's summary judgment motion eliminated plaintiffs' core damages theory.

Plaintiffs moved for reconsideration of the Court's decision, which the Court denied after considering plaintiffs' arguments at length.  *Benefit-of-the-Bargain SJ Reconsider Op.*, 2019 WL 6827277.  The Court did certify its decision for interlocutory appeal, *id.* at *12-14, which remains pending and to date has not been allowed.

### 8.    Additional Fully Briefed Motions Provide Further Information On The Value Of Plaintiffs' Claims.

New GM and plaintiffs have fully briefed other dispositive or critical motions that have not yet resulted in a Court ruling.  Independent of the Court's ruling against plaintiffs' benefit-of-the-bargain damages claims, New GM's summary judgment briefing presented other arguments as to why some or all of the California, Texas, and Missouri plaintiffs lacked viable claims.  Docket No. 5859.  Regarding damages, New GM explained that plaintiffs cannot recover lost time damages because many of them did not have the recall repairs performed, they lacked evidence of lost earnings, and plaintiffs' purported expert evidence could not establish any plaintiff's claim for lost-time damages because their expert admitted he did not examine how much time any named plaintiff spent obtaining repairs.  *Id.* at 27-30.  New GM also argued that certain plaintiffs' claims are barred by the manifest defect rule and because they disposed of their vehicles before the recalls. *Id.* at 24-26.  With respect to injunctive relief, New GM argued that plaintiffs were not entitled to any such relief because they have no irreparable harm, because having this Court attempt to manage New GM's recalls and business conduct would be contrary to the public interest, and because plaintiffs' requested injunction was plainly overbroad.  *Id.* at 70-75.  New GM also

presented numerous defenses to liability, including that (i) certain plaintiffs could not demonstrate causation and reliance as required for their claims; (ii) plaintiffs' implied warranty claims were barred by their vehicles' written warranties, limitations periods, and their substantial use of the vehicles; and (iii) the claims of those who purchased Old GM vehicles were barred because New GM had no duty to disclose or warn (among other state-specific arguments). *Id.* at 32-70. After the Court granted summary judgment against plaintiffs' benefit-of-the-bargain damages, New GM re-filed its summary judgment motion with the remaining arguments; that motion is still pending. Docket Nos. 7095-96.

The parties also fully briefed class certification for the three Bellwether States. Docket Nos. 5845, 5846, 6132, 6181. New GM presented market evidence establishing there was no systematic class-wide decline in recalled vehicle prices, and thus plaintiffs and class members could not show a difference between the prices paid and market prices with disclosed defects. Docket No. 6132 at 12-14, 17-19. Indeed, plaintiffs' expert's own survey data established that between 26.6% and 39.1% of consumers would have been willing to pay the same (or more) for vehicles with disclosed defects, and thus had no benefit-of-the-bargain injury or damages. *Id.* at 24-26. Moreover, New GM argued that plaintiffs' attempt to use averages to establish class-wide economic loss violates Article III, Rule 23, the Rules Enabling Act, and Supreme Court precedent. *Id.* at 27-32. As to plaintiffs' liability claims, survey and other expert evidence demonstrates that vehicle purchasers varied widely in how much emphasis they placed on safety and many would have purchased vehicles at the price they paid regardless of the defects at issue. *Id.* at 67-75. Other liability barriers include that many putative class members lack a manifest defect in states where it is a precondition to any recovery (such as Texas) and that what evidence putative class members

could use to attempt to prove New GM's knowledge of the defects varies depending on when they purchased their vehicles. *Id.* at 48-51, 76-84.

Finally, New GM and plaintiffs also filed a total of eleven Rule 702 motions to exclude the other side's experts, including motions New GM filed against all the experts plaintiffs relied on to prove damages and injury.[7] These motions provide yet more information allowing the parties to evaluate what experts would be allowed to testify at any trial and previewed the cross-examination each expert would experience even if permitted to testify. Indeed, the Court recognized that the opinion of plaintiffs' putative economic damages expert "would be excludable under Rule 702" because it fails to provide evidence of the vehicles' market value. *Benefit-of-the-Bargain SJ Op.*, 407 F. Supp. 3d at 236 n.12.

9. **Additional Issues Raised In Connection With The Late Proofs of Claim In The Bankruptcy Court Provide Further Information On The Value Of Plaintiffs' Claims.**

Because the proposed late proofs of claim filed with the Late Claims Motions are substantially similar to the claims in the 5ACC, most of the District Court's rulings and pending New GM motions discussed in the previous subsections also apply to the merits of the proposed late proofs of claim, assuming the proposed claims were first allowed to be filed, which, to date, they have not been. In fact, before any Court could reach the merits of the proposed late proofs of

---

[7]  Docket Nos. 5854, 5855 (New GM Motion to Exclude Stevick and Loudon); Docket Nos. 6062, 6064 (New GM Motion to Exclude Manuel); Dockets Nos. 6065, 6066 (New GM Motion to Exclude Goldberg); Docket Nos. 6067, 6130 (New GM Motion to Exclude Gans); Dockets Nos. 6069, 6131 (New GM Motion to Exclude Boedeker); Docket Nos. 6108, 6109 (Plaintiffs' Motion to Exclude List); Docket Nos. 6110, 6111(Plaintiffs' Motion to Exclude Cornell); Docket Nos. 6112, 6113 (Plaintiffs' Motion to Exclude Jason); Docket Nos. 6114, 6115 (Plaintiffs' Motion to Exclude Hanssens); Docket Nos. 6116, 6117 (Plaintiffs' Motion to Exclude Keller); Docket Nos. 6118, 6119 (Plaintiffs' Motion to Exclude Willig).

claim, other complex, contentious issues will need to be addressed regarding the Late Claims Motions, some of which have been briefed but have not yet resulted in Bankruptcy Court rulings.

Specifically, there is a dispute over the standard for obtaining leave to file late claims. Plaintiffs have argued that they may assert late claims based solely on a showing that they suffered a due process violation related to the 2009 bar date. Yet, no due process violation has been established by any of the plaintiffs with respect to the 2009 bar date. New GM and the GUC Trust have also argued that plaintiffs are precluded from asserting late claims because of their strategic delay in pursuing claims against the GUC Trust after the recalls. Bankr. Docket No. 13879. Accordingly, plaintiffs cannot satisfy the *Pioneer* factors. *See Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993). Of the four *Pioneer* factors, the one given the most weight is the reason for the delay in filing late claims, including whether the delay was in the reasonable control of the movant. New GM and the GUC Trust have argued that the delay here— measured from the date of the applicable recall announcement—is attributable to plaintiffs' voluntary strategic decision, made after the recalls, to pursue New GM and not the GUC Trust. While certain plaintiffs entered into a tolling agreement with the GUC Trust that covers a portion of the period in question, Scheduling Order, May 16, 2014, Bankr. Docket No. 12697, at 3, a substantial majority of the proposed class—the non-Delta Ignition Switch plaintiffs—never entered into such an agreement. *Id.*; January 12, 2017 Status Conference Bankr. Hr'g Tr. at 37-41.

Another complex issue is whether the doctrine of equitable mootness bars plaintiffs' claims. The Bankruptcy Court's April 2015 decision applied the five *Chateaugay* factors and determined that if the plaintiffs' late claims were allowed, GUC Trust assets could not be accessed to pay them under the doctrine of equitable mootness. The Bankruptcy Court found, among other

things, that any relief would "knock the props out" from the transactions in which GUC Trust unitholders acquired their units. Allowing billions of dollars in additional claims against the GUC Trust, in the Bankruptcy Court's view, would be "extraordinarily unjust" given the unitholders' expectation that the universe of claims against the GUC Trust would decrease, and not increase, over time following the 2009 bar date. The Bankruptcy Court's determination was also based, in part, on its acknowledgment that purchasers of GUC Trust units could not foresee that future distributions would be delayed while additional claims were filed and litigated. Although the Second Circuit vacated the Bankruptcy Court's equitable mootness ruling as advisory, it did not reverse the Bankruptcy Court's decision on the merits of those issues, and thus the same arguments made in 2015 would be advanced today.

Additional complex issues would arise from continued litigation of plaintiffs' claims if their Late Claims Motion was granted. For example: (i) whether class certification for the plaintiffs' proposed late class claims would be appropriate,[8] (ii) whether plaintiffs can introduce new expert testimony to support their claims consistent with this Court's August 2019 Opinion, and (iii) the merits of plaintiffs' claims in 51 different jurisdictions. On these issues, the same arguments already raised in the MDL would apply to claims against the GUC Trust.

### G. Arm's-Length Settlement Negotiations Lasted For Several Years, Finally Resulting In The Settlement Agreement.

Settlement negotiations between New GM and plaintiffs began in March and April of 2016, when plaintiffs' Class Counsel communicated a global settlement demand to New GM. After

---

[8]    The Bankruptcy Court held that, in order to resolve claims against the GUC Trust on behalf of a purported class, certification under Rule 23 was necessary. Plaintiffs and the GUC Trust then sought approval of a settlement class in connection with a new settlement agreement. The Bankruptcy Court observed that, in light of this Court's ruling rejecting plaintiffs' damages evidence, the proposed class settlement agreement—which relied on the same evidence rejected by this Court—likely would not succeed. *See* 8/12/19 Bankr. Tr. at 41.

Class Counsel sent another such demand in March 2017, on August 21, 2017 this Court ordered New GM and plaintiffs to propose a procedure for appointing a mediator for the economic loss claims. Docket No. 4443, Order No. 130 ¶ 5. One month later, the Court selected an experienced class action and MDL mediator, the Honorable Layn R. Phillips, from lists of mediators proposed by New GM and Class Counsel. Docket No. 4525, Order No. 132. Since September 2017—more than two years before the Parties reached this agreement—settlement discussions have been guided and overseen by Judge Phillips. New GM and Class Counsel engaged in numerous communications with Judge Phillips regarding settlement offers, and held in-person mediations in December 2017 and October 2018. *See* March 26, 2020 Declaration Of Court-Appointed Economic Loss Mediator, Layn R. Phillips, In Support Of Preliminary Approval Of Class Settlement. ("Phillips Decl."), Docket No. 7820, ¶¶ 8-14.[9] In addition, the GUC Trust and plaintiffs engaged in bilateral settlement discussions beginning in May 2017 and, in fact, entered into previous settlement agreements. Bankr. Docket No. 14061-1; Bankr. Docket No. 14293-1; Bankr. Docket No. 14409-1. However, none of these prior bilateral settlement agreements were approved by the Bankruptcy Court, Bankr. Docket No. 14212; Bankr. Docket No. 14373, and the GUC ultimately terminated the most recent one, Bankr. Docket No. 14622, and instead joined the mediation being facilitated by Judge Phillips.

Settlement discussions intensified after the Court granted summary judgment against plaintiffs' benefit-of-the-bargain damages claims on August 6, 2019. Docket No. 7019; Phillips Decl. ¶¶ 15-19. Class Counsel, New GM, and the GUC Trust all participated in various in-person mediations in September 2019, December 2019, and January 2020, and exchanged settlement

---

[9]  March 26, 2020 Declaration Of Court-Appointed Economic Loss Mediator, Layn R. Phillips, In Support Of Preliminary Approval Of Class Settlement.

proposals during this period. Phillips Decl. ¶¶ 20-29. In January 2020—more than 3 years after Class Counsel's first proposal, and more than 5 months after the Court's summary judgment opinion fundamentally changed the value of plaintiffs' alleged claims—the Parties made substantial progress on key terms, which after further intense negotiations resulted in the Settlement Agreement being reached on March 27, 2020. *Id.* ¶¶ 29-37.

H. **Summary Of The Proposed Settlement's Key Terms.**[10]

The settling Class is divided into five sub-classes: (1) the Delta Ignition Switch Subclass comprises those Class Members who own(ed), purchase(d), and/or lease(d) a Subject Vehicle subject to NHTSA Recall No. 14v047, (2) the Key Rotation Subclass comprises those Class Members who own(ed), purchase(d), and/or lease(d) a Subject Vehicle subject to NHTSA Recall Nos. 14v355, 14v394 and 14v400, (3) the Camaro Knee-Key Subclass comprises those Class Members who own(ed), purchase(d), and/or lease(d) a Subject Vehicle subject to NHTSA Recall No. 14v346, (4) the Power Steering Subclass comprises those Class Members who own(ed), purchase(d), and/or lease(d) a Subject Vehicle subject to NHTSA Recall No. 14v153, and (5) the Side Airbag Subclass comprises those Class Members who own(ed), purchase(d), and/or lease(d) a Subject Vehicle subject to NHTSA Recall No. 14v118. Settlement Agreement ¶ 12. The Class will be compensated through a Common Fund into which New GM will pay $70 million and the GUC Trust will pay $50 million. *Id.* ¶¶ 17, 78, 81. Upon entry of the GUC Trust Approval Order (described below) and Preliminary Approval Order, as an advance of their Common Fund payment obligations, New GM shall contribute $8.8 million and the GUC Trust shall contribute $2 million to pay for notice costs and costs of Settlement administration prior to the Fairness Hearing. *Id.*

---

[10] The Settlement's actual terms are set forth in the Settlement Agreement, which controls over any description of the Settlement in this brief or the Motion it supports.

¶ 80.a.[11]  Within 30 days of the Final Effective Date,[12] New GM and the GUC Trust will make additional payments of $61.2 million and $48 million respectively, and no amount in this Common Fund will revert to either New GM or the GUC Trust.  *Id.* ¶ 81.  In addition to the Common Fund payments by New GM and the GUC Trust, New GM will pay up to a maximum of $34.5 million in Attorneys' Fees and Expenses, if the Court so approves.  *Id.* ¶¶ 90.d, 149.

The Settlement provides for a comprehensive notice plan to provide information to the Class, including direct mail notice, publication in media outlets, an internet website, and toll-free telephone number.  *Id.* § III.  In typical fashion, Class Members will become eligible for payment by submitting a Settlement Claim Form, which will be reviewed by the Class Action Settlement Administrator.  *Id.* ¶¶ 91, 100.

Allocation Counsel, who are partners of the lawyers this Court appointed to Plaintiffs' Executive Committee, each represented one of the five Subclasses in a mediation overseen by Judge Phillips.  *Id.* ¶ 7.  They ultimately agreed to be bound to the Allocation Decision determined and proposed by Judge Phillips (Settlement Agreement, Exhibit 2), which sets forth the methodology by which the Common Fund will be allocated among Class Members.  *Id.* ¶ 81.c.  The Class Action Settlement Administrator will evaluate each Settlement Claim Form submitted to confirm the Person submitting it is a Class Member and to determine the settlement payment

---

[11]  The notice and settlement administration costs to be paid by the GUC Trust and New GM prior to the Final Effective Date are an advance on their obligations under the Settlement to pay into the Common Fund, and under no circumstances shall the total payments by New GM exceed $70 million or the total payments by the GUC Trust exceed $50 million.  To the extent notice Costs and costs of Settlement administration prior to the Final Effective Date exceed this amount, Class Counsel shall pay those costs and will be reimbursed from the Common Fund after the Final Effective Date.

[12]  The Final Effective Date means the latest date on which the Final Order and Final Judgment approving this Agreement becomes final.  Settlement Agreement ¶ 24.

applying the Allocation Decision and Settlement Claim Review Protocol (Settlement Agreement Exhibit 10). *Id.* ¶ 100. Decisions of the Class Action Settlement Administrator are final and non-appealable. *Id.* ¶ 84.

The Common Fund will be established and created as a Qualified Settlement Fund Trust approved and overseen by this Court. *Id.* ¶¶ 57, 78-79. The Class Action Settlement Administrator will work with the Qualified Settlement Fund Administrator and Qualified Settlement Fund Trustee to disburse payments from the Common Fund to Class Members. *Id.* ¶ 81.c.

In exchange for this Settlement benefit, the Class and its Class Members will provide a standard release of and covenant not to sue New GM, the GUC Trust, and other Released Parties from all claims relating to the subject matter of the Actions, the Recalls, or that are, or could have been, alleged in the 5ACC, the Late Claims Motions, or in the Proposed Proofs of Claims,[13] including, but not limited to, those relating to the design, manufacturing, advertising, testing, marketing, functionality, servicing, sale, lease or resale of the Subject Vehicles.[14] *Id.* ¶ 113.

---

[13]   In order for this Court to have jurisdiction over the all parties and claims subject to the Settlement Agreement, the Settling Parties agreed to seek withdrawal of the reference with respect to the Late Claims Motions (along with their accompanying Proposed Proofs of Claim) against the GUC Trust. *Id.* ¶ 140.

[14]   The Settlement preserves the right of the Class, or any named Plaintiff or Class Member, to pursue claims against the Motors Liquidation Company Avoidance Action Trust ("AAT"). *Id.* ¶ 142. In addition, if the AAT becomes a party to the Settlement Agreement before the Final Effective Date, it will deposit into the Common Fund a sum agreed upon among the AAT, Plaintiffs' Class Counsel, and New GM's Counsel. *Id.* ¶ 81.a. New GM's obligation to the Common Fund shall then be reduced, on a dollar for dollar basis, in an amount equal to fifty percent (50%) of the sum paid by AAT. *Id.* If the AAT settlement occurs after the Final Effective Date, 50% of that amount will be deposited into the Common Fund and the other 50% will be paid to New GM. *Id.* The Settling Parties are not seeking to withdraw the reference with respect to the Late Claims Motions (and Proposed Proofs of Claims) against the AAT. *Id.* ¶ 142.

The Settlement also will resolve claims between New GM and the GUC Trust and a pending contested motion in the Bankruptcy Court regarding an excess distribution of GUC Trust Assets. To that end, the GUC Trust has filed a motion ("GUC Trust Motion") in the Bankruptcy Court seeking approval of (i) the GUC Trust's entry into and performance of the terms and conditions of the Settlement; (ii) the GUC Trust's distribution of $300 million in GUC Trust Assets to its unitholders (which may then occur at any time after the Bankruptcy Court approves the GUC Trust Motion); and (iii) New GM's release of the GUC Trust and the GUC Trust's release of New GM, including the GUC Trust's release of any claims seeking Adjustment Shares, which become effective upon the Excess Distribution Date (as defined in the Settlement Agreement). The Parties do not seek withdrawal of the reference as to the GUC Trust Motion and have noticed a joint hearing of this Court and the Bankruptcy Court at which time the GUC Trust Motion will be presented to the Bankruptcy Court. Entry of an order approving the GUC Trust Motion (defined in the Settlement Agreement as the GUC Trust Approval Order) substantially in the form proposed by the Parties is a condition precedent to the entry of a Preliminary Approval Order. *Id.* ¶ 141.

## ARGUMENT

## I. THE STANDARDS FOR GRANTING PRELIMINARY APPROVAL OF A PROPOSED CLASS ACTION SETTLEMENT.

Claims of "a class proposed to be certified for purposes of settlement – may be settled . . . only with the court's approval." Fed. R. Civ. P. 23(e). Under the framework established in the 2018 amendment to Rule 23(e), before the Court may approve dissemination of notice to the putative class, it must first decide whether it "will likely be able to" grant final settlement approval pursuant to Rule 23(e)(2), which identifies the relevant considerations. *See* Fed. R. Civ. P. 23(e)(1)(B)(i). Thus, this Court may grant preliminary approval of the proposed Settlement if it

concludes that it will likely be able to find (at final approval) that the Settlement is "fair, reasonable, and adequate," considering whether:

(A)     the class representatives and class counsel have adequately represented the class;

(B)     the proposal was negotiated at arm's length;

(C)     the relief provided for the class is adequate, taking into account:

(i)     the costs, risks, and delay of trial and appeal;
(ii)    the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
(iii)   the terms of any proposed award of attorney's fees, including timing of payment; and
(iv)    any agreement required to be identified under Rule 23(e)(3); and

(D)     the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2). The first two factors (subsections A and B) address the fairness of the process, the last two (subsections C and D) address substantive fairness. *See* Fed. R. Civ. P. 23(e)(2) advisory committee's note to 2018 amendment. At the same time, the Court must also find that it will likely be able to "certify the class for purposes of judgment on the proposal." Fed. R. Civ. P. 23(e)(1)(B)(ii).

The considerations identified in the 2018 amendment to Rule 23(e) were not intended to "displace" any factor courts had previously considered in evaluating settlements, but to "focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal." See Fed. R. Civ. P. 23(e)(2) advisory committee's note to 2018 amendment. Thus, courts in the Second Circuit continue to consider nine so-called *Grinnell* factors that may be relevant in deciding whether to approve a particular class settlement:

(1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and]

(9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*See City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974). These factors largely overlap with the Rule 23(e)(2) considerations; both focus on whether the process is fair (*i.e.*, the result of arm's-length negotiations among counsel having adequate information), and whether the benefits to the class are "fair, reasonable, and adequate" given the risks of continued litigation and prospects for succeeding on their claims. *In re GSE Bonds Antitrust Litig*., 2019 WL 6842332, at *1 (S.D.N.Y. Dec. 16, 2019). "[N]ot every factor must weigh in favor of [the] settlement, rather the court should consider the totality of these factors in light of the particular circumstances." *Christine Asia Co., Ltd. v. Yun Ma*, 2019 WL 5257534, at *9 (S.D.N.Y. Oct. 16, 2019) (citing *In re Glob. Crossing Sec. & ERISA Litig*., 225 F.R.D. 436, 456 (S.D.N.Y. 2004)).

## II.   PRELIMINARY APPROVAL OF THE PROPOSED SETTLEMENT SHOULD BE GRANTED.

### A.   Co-Lead Counsel And Class Representatives Have Actively Represented The Class In Five-Plus Years Of Demanding Litigation.

This Court knows, from more than five years of experience, that named plaintiffs and their counsel have vigorously represented the putative Class (and five Subclasses) as required by Rule 23(e)(2)(A). The same holds true for the named claimants in the Late Claims Motions, who are also named plaintiffs in the 5ACC and are represented by the same counsel. For example, according to plaintiffs, "Co-Lead Counsel for the Economic Loss Plaintiffs have already devoted significant resources to this class litigation, engaged in multiple rounds of briefing on motions to dismiss, summary judgment and discovery issues; taken depositions of hundreds of GM witnesses and experts and defended . . . depositions of Plaintiffs and experts; orchestrated a labor-intensive written-discovery and document-review effort; presented Plaintiffs' vehicles to GM for inspection; retained experts; and engaged in significant motion practice on other issues." Docket No. 5846 at

34-35.  In the Bankruptcy Court, co-lead counsel, on behalf of the Late Claims Motions' class

representatives, have engaged in years of briefing and arguing issues relating to the late claims.

This factor weighs in favor of finding that the Settlement is procedurally fair.  *See In re*

*GSE Bonds Antitrust Litig.*, 414 F. Supp. 3d 686, 692 (S.D.N.Y. 2019) (granting preliminary

approval where "Co-Lead Counsel have demonstrated that they are qualified, experienced, and

able to conduct the litigation, as evidenced in their interactions with the Court as well as with a

mediator.").[15]

### B.      The Proposed Settlement Was Negotiated At Arm's Length, Overseen, Supervised, And Aided By An Experienced Court-Appointed Mediator.

"[A] strong presumption of fairness attaches to a class action settlement reached in arm's-

length negotiations among able counsel."  *In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 576

(S.D.N.Y. 2008) (citing *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d Cir. 2005),

and Manual for Complex Litigation, Third, § 30.42 (1995)); *see also Pantelyat v. Bank of Am.,*

*N.A.,* 2019 WL 402854, at *3 (S.D.N.Y. Jan. 31, 2019) ("A proposed settlement is presumed

procedurally fair, reasonable, and adequate if it culminates from 'arm's-length negotiations

between experienced, capable counsel after meaningful discovery.'") (quoting *McReynolds v.*

*Richards-Cantave,* 588 F.3d 790, 803 (2d Cir. 2009)).

The Parties' Settlement Agreement was facilitated by an experienced court-appointed class

action mediator, Judge Layn R. Phillips (Ret.), providing compelling evidence that the proposed

Settlement is not the product of collusion between the Parties.  *See D'Amato v. Deutsche Bank*,

236 F.3d 78, 85 (2d Cir. 2001) ("a court-appointed mediator's involvement in pre-certification

settlement negotiations helps to ensure that the proceedings were free of collusion and undue

---

[15]    *See* Part II.D., *infra*, regarding representation of subclasses.

pressure.") (citing *County of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295, 1323 (2d Cir. 1990)); *In re Giant Interactive Group, Inc. Sec. Litig.*, 279 F.R.D. 151, 160 (S.D.N.Y. 2011) (finding there was "significant evidence demonstrating that this settlement was the product of prolonged, arms-length negotiation, including as facilitated by a respected mediator" (Hon. Layn Phillips (Ret.)); *see also N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, 2019 U.S. Dist. LEXIS 39807, at *6, *13–*14 (S.D.N.Y. Mar. 8, 2019) (the parties' participation in mediation is evidence of arm's-length negotiations); *Dover v. British Airways, PLC (UK)*, 2018 U.S. Dist. LEXIS 174513, at *10–*11 (E.D.N.Y. Oct. 9, 2018) (same); *Morris v. Affinity Health Plan, Inc.*, 859 F. Supp. 2d 611, 618–19 (S.D.N.Y. 2012) (participation of experienced mediator "is also a strong indicator of procedural fairness") (citing *In re Giant Interactive Grp., Inc. Sec. Litig.*, 279 F.R.D. 151, 159–60 (S.D.N.Y 2011) (parties were entitled to a presumption of fairness where mediator facilitated arm's-length negotiations); *In re AOL Time Warner, Inc. Sec. Litig.*, 2006 WL 903236, at *7 (S.D.N.Y. Apr. 6, 2006) (noting that involvement of mediator in pre-certification settlement negotiations helped "ensure that the proceedings were free of collusion and undue pressure")).

> As summarized by Judge Phillips:

> The two-and-a-half-years-mediation process was an extremely hard-fought and lengthy negotiation from beginning to end. Although I cannot disclose specifics regarding the Parties' positions, there were many complex issues that required significant thought and practical solutions. Throughout the mediation process, the negotiations between the Parties were vigorous and conducted at arm's length and in good faith. I was in a position to evaluate the substance of the proposals made by counsel, and there was no indication of collusion at any point. At each step of the way, over the course of several years, counsel for the Parties advocated zealously on behalf of their clients working to maximize the settlement outcome to the benefit of their respective clients in a highly adversarial set of mediations.

Phillips Decl. ¶ 37.

### C. The Proposed Settlement Is More Than Adequate.

"'The most important factor [in judging the adequacy of the settlement] is the strength of the case for plaintiffs on the merits, balanced against the amount offered in settlement.'" *Grinnell Corp.*, 495 F.2d at 455; *see also Parker v. Anderson*, 667 F.2d 1204, 1209 (5th Cir. 1982); *Flinn v. FMC Corp.*, 528 F.2d 1169 (4th Cir. 1975); *Grunin v. Int'l House of Pancakes*, 513 F.2d 114 (8th Cir. 1975); Fed. R. Civ. P. 23(e)(2) advisory committee's note to 2018 amendment ("The relief that the settlement is expected to provide to class members is a central concern. . . . Another central concern will relate to the cost and risk involved in pursuing a litigated outcome."). The Court must determine whether the proposed Settlement falls within a "range of reasonableness"— a range which "recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion." *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972); *see also Global Crossing*, 225 F.R.D. at 461 (noting that "the certainty of [a] settlement amount has to be judged in [the] context of the legal and practical obstacles to obtaining a large recovery"); *In re Indep. Energy Holdings PLC Sec. Litig.*, 2003 U.S. Dist. LEXIS 17090, at *12–*13 (S.D.N.Y. Sept. 29, 2003) (noting few trials result in full amount of damages claimed).

#### 1. The Settlement Benefits Are Reasonable Given The Costs, Risks, And Delay Of Trial.

Where, as here, the process is fair, the Parties' assessment of the value of the Settlement is entitled to great weight and the Court should not substitute its judgment for those of counsel "who are most closely acquainted with the facts of the underlying litigation." *In re PaineWebber Ltd. Partnerships Litig.*, 171 F.R.D. 104, 125 (S.D.N.Y. 1997) ("So long as the integrity of the arm's length negotiation process is preserved, . . . a strong initial presumption of fairness attaches to the proposed settlement' and 'great weight' is accorded to the recommendations of counsel."), *aff'd*

117 F.3d 721 (2d Cir. 1997); *Christine Asia Co., Ltd.* 2019 WL 5257534, at *8 ("Absent fraud or collusion, [courts] should be hesitant to substitute [their] judgment for that of the parties who negotiated the settlement.") (quoting *In re EVCI Career Colls. Holding Corp. Sec. Litig.*, 2007 WL 2230177, at *4 (S.D.N.Y. July 27, 2007)).

### a. The value of plaintiffs' claims has been reduced by rulings rejecting various claims as a matter of law.

The litigation the Parties seek to settle is far more modest than what plaintiffs have asserted over the past five years. A series of rulings on motions to dismiss and summary judgment have rejected several of plaintiffs' theories and reduced the value of claims that are even potentially viable. For example, this Court's rulings:

- rejected plaintiffs' argument that they could recover because the recalls damaged the GM brand regardless of whether a plaintiff's vehicle was defective. *TACC MTD Op.* at *7;

- dismissed plaintiffs' RICO claims—the only claims that would not require consideration of individual state law—thus removing any possibility of treble damages (*id.* at 11–18);

- barred claims against New GM by plaintiffs who purchased their vehicles before the date that New GM purchased certain Old GM assets. *FACC MTD Op.* at 400-03;

- barred claims of plaintiffs who sold, traded-in, or otherwise disposed of their vehicles before the recalls (*id.* at 403);

- held that plaintiffs' unjust enrichment claims largely were barred by the written warranties or an adequate remedy at law. *Other Jurisdictions Op.* at 274-75;

- rejected successor liability claims for ten of 16 jurisdictions considered (California, the District of Columbia, Florida, Louisiana, Maryland, Massachusetts, New York, Texas, Virginia and Wisconsin). In these ten jurisdictions, the only potential claims against New GM in connection with Old GM vehicles are for fraudulent-concealment-of-right-to-file-bankruptcy claims, which are limited to what plaintiffs could have recovered as part of Old GM's bankruptcy—a fraction of their claimed values. *See* 8/21/2018 Status Conf. Tr. at 20-21; *Aug. 2017 Succ. Liab. Op.*, at *1, 17-19; *Dec. 2017 Succ. Liab. Op.* at *3-4; *Apr. 2018 Succ. Liab. Op.*[16]

---

[16] These decisions also resulted in the dismissal of numerous claims and/or individual plaintiffs under the laws of particular jurisdictions.

In addition, early motion practice established that the law of Michigan could not be applied to all plaintiffs' claims—and claims would instead be governed by the law of plaintiffs' home states, greatly increasing the manageability problems in any proposed litigation class. Docket No. 697, Order No. 40 at 2.

### b. Plaintiffs cannot prove damages against New GM or Old GM.

Now, after the most recent summary judgment ruling, plaintiffs have little chance of proving even modest damages, which they would have to do on a plaintiff-by-plaintiff basis. (*See* Part III.B, *infra.*) Having already rejected plaintiffs' brand-devaluation theory, this Court in August 2019 rejected plaintiffs' purported evidence of benefit-of-the-bargain damages in three Bellwether states. *Benefit-of-the-Bargain SJ Op.*, 407 F. Supp. at 241. This ruling "change[d] the landscape in dramatic ways," reducing plaintiffs' potential benefit-of-the-bargain damages to repair costs alone, which this Court held was subject to the duty to mitigate. *Id.* at 222. Accordingly, plaintiffs in the Bellwether States could—if they somehow could first establish liability—recover only costs of repairs not covered by recall repairs, and would face a costly, uphill battle in proving New GM's recall repairs were inadequate. *See, e.g.,* Pl.'s Reply ISO Pet. for Interlocutory Appeal, Case No. 19-4314, Docket No. 23-2 at 5 (2d Cir. Jan. 8, 2020) ("[T]he district court's ruling means that, as a practical matter, California Plaintiffs may be unable to prove economic damages at all.").

That ruling, which "foreclosed Plaintiffs' ability to prove diminution-in-value damages as a matter of law in the three Bellwether States," *Benefit-of-the-Bargain SJ Reconsider Op*. at *12, likely forecloses these damages claims in the remaining states, against both New GM and Old GM/the GUC Trust:

> Not only are the 1.4 million putative class members in the bellwether states impacted by the district court's ruling (*see* Docket No. 5846 at 9), but millions of other putative class members from the other 47 states may be as well. ***The ruling***

38

*also impacts related proceedings in the bankruptcy court, where pre-bankruptcy buyers of "Old GM" cars are pursuing claims against the remaining estate assets.*

Pls.' Pet. for Interlocutory Appeal, Case No. 19-4314, Docket No. 1 (2d Cir. Dec. 23, 2019) , at 18-19 (emphasis added). In fact, one primary purpose of bellwether procedure is to evaluate claims for the purpose of considering settlement. As Class Counsel told this Court, "[a] bellwether procedure focusing on these two states [California and Missouri] will provide valuable benchmarks for use in evaluating the claims of Plaintiffs and putative classes in other states." 8/25/17 Berman/Cabraser Ltr. to Judge Furman, Docket No.4459. This Court concurred with plaintiffs that the purpose of the Bellwethers is to "help inform the settlement discussions" because "it's likely that we would be able to apply those [Bellwether] decisions in some streamlined fashion to the other states down the road." 8/11/17 Status Conf. Tr. at 25:2-8; *see also In re Gen. Motors LLC Ignition Switch Litig.*, 2018 WL 1638096 (S.D.N.Y. Apr. 3, 2018), at *2 (concluding that post-sale mitigation would affect the availability of damages in "many, if not most (or even all)" of the sixteen jurisdictions then under consideration).

Without proof of damages, plaintiffs' remaining claims have little, if any, value.

### c.   Plaintiffs have little chance of obtaining a different result on appeal.

The Court's thorough decisions provide counsel more than enough information to evaluate the likely outcome of any appeal. Plaintiffs' pending petition for an interlocutory appeal of this Court's summary judgment ruling has little chance of success. Among other reasons, this Court's rejection of plaintiffs' expert's purported benefit-of-the-bargain damages estimates was compelled by Bellwether State law, specifically, that (i) a change in market price/value must be proved, and (ii) market price requires evidence of willingness to sell at that price, which plaintiffs lacked. *See*, *e.g.*, 8/6/2019 SJ Order at 28–30 (citing cases), Docket No. 7019; 12/12/2019 Order at 22 n.4, Docket No. 7616. Also, plaintiffs did not challenge this Court's ruling that they are limited to the

lesser of cost of repair or the difference in market value. That holding limits plaintiffs' benefit-of-the-bargain damages to the cost of repairs, yet plaintiffs lack evidence of the cost of such repairs (which New GM provided for free). Because plaintiffs' damages are limited to costs of repair, any decision by the Second Circuit reversing this Court's rejection of Boedeker's benefit-of-the-bargain evidence would be moot.

Additionally, to succeed on any appeal after final judgment, plaintiffs would have to obtain reversal not only of this Court's damages rulings, but also of the numerous other orders that have reduced the value of plaintiffs' claims. They would also have to prevail (and defend the victory on appeal) on the pending summary judgment and *Daubert* motions, as well as the motion for class certification, without which (according to plaintiffs) their claims cannot succeed. *See* Part III.B., *infra.* In valuing the settlement, counsel must weigh the remote chances of overcoming all these hurdles against the significant delay and expense involved in any such appeal.

> ### d. The remaining claims of plaintiffs are subject to dismissal on independent grounds.

Independent of the Court's rulings rejecting plaintiffs' damages evidence, Class claims against New GM fail for the additional reasons explained in the pending Bellwether summary judgment motion and prior opposition to class certification. For example, most vehicle owners, purchasers and lessees have no individual evidence of causation; most cannot show reliance in states that require it; the law in many states bars plaintiffs' unjust enrichment claims; and New GM had no duty to purchasers of Old GM vehicles. *See* Background, Part F.8, *supra.* Plaintiffs' claims for lost-time damages, which require proof of lost income, *see In re Gen. Motors LLC Ignition Switch Litig.*, 2018 WL 4351892, at *54 (S.D.N.Y. Sep. 12, 2018), fare no better. Plaintiffs rely on damages estimates provided by Ernest Manuel, which are the subject of New GM's pending summary judgment and *Daubert* motions demonstrating (among other reasons) that

Manuel's "averages" evidence is inadmissible as a matter of law to prove lost income or any purported "lost time" damages where, as here, the circumstances vary greatly from individual to individual. *See* Docket No. 7096, Mem. ISO Mot. for Summ. J., at 15; Docket No. 7101, Mem. ISO Mot. to Exclude Manuel.

> e. **Plaintiffs' claims against the GUC Trust are subject to this Court's summary judgment rulings, as well as additional defenses such as untimeliness.**

None of this Court's prior rulings can be relitigated in Bankruptcy Court. Judge Glenn repeatedly has stated that he would follow this Court's rulings. 8/12/19 Bankr. Tr. at 9 ("when Judge Furman decides issues relevant to both the proceedings in this court and in the MDL, I have no intention of ruling on those same issues"). As a result, the recent summary judgment ruling rejecting Boedeker's damages evidence precludes plaintiffs from establishing that their claims are worth the amount necessary to require payment of the Adjustment Shares—using the same expert and methods this Court rejected. *See Id*. at 50–51. Indeed, shortly after this Court's rejection of Boedeker's analysis, Judge Glenn explained that the ruling had "change[d] the landscape greatly" both in the MDL and the Bankruptcy Court. *Id.* at 17.

Plaintiffs alleging claims against the GUC Trust must first show they are entitled to pursue those claims despite their failure to file such claims before the 2009 bar date established by the Bankruptcy Court, or to timely seek leave to file late clams. In its decision regarding the "free and clear" provision of the 2009 asset sale, the Second Circuit expressly did not decide whether there was a due process violation excusing any plaintiff's failure to meet the 2009 Bankruptcy Court bar date. *See Elliott*, 829 F.3d 135. Despite having notice, at the latest, at the time of the 2014 recalls, plaintiffs did not sue the GUC Trust nor did they seek leave to file late proofs of claims in the

Bankruptcy Court until December 2016.[17]  Nor did they object or seek a stay when the GUC Trust

informed certain plaintiffs' counsel that it would proceed with a November 2014 distribution to

unitholders *without* reserving funds to pay potential claims against it related to the recalls.  *See In*

*re Motors Liquidation Co*., 529 B.R. 510, 538 (Bankr. S.D.N.Y. 2015).  Plaintiffs' counsel called

that decision to not challenge the distribution "strategic."  February 17, 2015 Hr'g. Tr., at 113:10–

14*; see also In re Motors Liquidation Co*., 529 B.R. 510, 591 (Bankr. S.D.N.Y. 2015).  Moreover,

plaintiffs' proposed late claims may also be barred on equitable mootness grounds.  *See*

Background Part F.8, *supra*.

Thus, even if they had evidence of economic losses, in order to recover any portion of those

purported losses against the GUC Trust and New GM, plaintiffs would have to establish that their

delay in filing claims in the Bankruptcy Court was the result of "excusable neglect."  *See Pioneer*

*Inv. Servs. Co. v. Brunswick Assoc. Ltd. P'shp.*, 507 U.S. 380, 388 (1993) (holding that "courts

would be permitted, where appropriate, to accept late filings caused by inadvertence, mistake, or

carelessness, as well as by intervening circumstances beyond the party's control").  But the record

establishes that plaintiffs' delay in filing their claims in Bankruptcy Court was not due to

"neglect"—nor was it "excusable."  Instead, it was an intentional, "tactical decision" to pursue

successor liability claims against New GM.  This decision was an attempt to circumvent the

priority scheme of the Bankruptcy Court.  As Judge Gerber observed:

> [Proponents want] to assert a successor liability claim.  [They] want[] to go after an
> entity with the potential to go after 100-cent dollars instead of baby bankruptcy
> dollars.  That has the effect, for that subclass of the creditor community who can

---

[17]  The Delta Ignition Switch plaintiffs obtained a tolling agreement from the GUC Trust three
months after the recalls were announced; counsel did not, however, obtain such an agreement
for the Non-Delta Ignition Switch plaintiffs (who make up the vast majority of the putative
classes).

sue for 100-cent dollars, of giving that creditor group a leg up over the poor suckers
in the creditor community who can only get baby bankruptcy dollars.

February 17, 2015 Hr'g. Tr., at 42:15-23; *see also In re Motors Liquidation Co.*, 529 B.R. 510,

591 (Bankr. S.D.N.Y. 2015) ("the failure to block the November [2014] distribution did not result

from a lack of diligence. It resulted, as the Plaintiffs candidly admitted, from tactical choice.").

### f. Given the dim prospects of any recovery, the Settlement is more than adequate.

Where, as here, plaintiffs face material if not insurmountable barriers to any recovery at

all, "there is no reason, at least in theory, why a satisfactory settlement could not amount to a

hundredth or even a thousandth part of a single percent of the potential recovery." *Grinnell*, 495

F.2d at 455 n.2; *see also TBK Partners, Ltd. v. W. Union Corp.*, 675 F.2d 456, 464 (2d Cir. 1982)

(same); *Keil v. Lopez*, 862 F.3d 685, 696 (8th Cir. 2017) (same); *Parker*, 667 F.2d at 1210 n.6

(same).[18] By this measure, the range of possible satisfactory settlement amounts would include a

penny (or less) per plaintiff—*i.e.*, a "thousandth part of a single percent" of Boedeker's wildly

inflated (and discredited) damages estimates—which could be a "satisfactory settlement" given

the fundamental weaknesses of plaintiffs' claims. But this Court has already rejected Boedeker's

evidence and, given the weakness of plaintiffs' claims, it does not remotely represent "potential

recovery." In fact, under plaintiffs' best-case scenario—in which they survive the pending

Bellwether summary judgment and *Daubert* motions (and have similar success on motions

regarding claims in other states), and then could somehow prove liability—their claims are limited

to possible "lost time" damages (which many states do not recognize) and whatever repair costs

(if any that they personally incurred) that exceeded the recall repairs, neither of which can be

---

[18] *Accord In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 327 F.R.D. 483, 495 (S.D.N.Y. 2018); Stinson v. City of New York, 256 F. Supp. 3d 283, 294 (S.D.N.Y. 2017); *Flores v. One Hanover, LLC*, 2014 WL 2567912, at *5 (S.D.N.Y. June 9, 2014).

proved on a class-wide basis. When this "best case scenario" is discounted by counsel's assessment of the *probable* chances of success, the amount of the settlement—a non-reversionary $120 million Common Fund for the Class—is more than generous. *See Dupler v. Costco Wholesale Corp.*, 705 F. Supp. 2d 231, 246 (E.D.N.Y. 2010) ("[t]he fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved") (quoting *Grinnell*, 495 F.2d at 455)); *see Berni v. Barilla G. e R. Fratelli, S.p.A.*, 332 F.R.D. 14, 31-32 (E.D.N.Y. 2019) (given the "significant adverse decisions," and plaintiffs' weak potential for recovery of damages, a settlement that included no damages but only injunctive relief was "fair and reasonable."); *Davis v. J.P. Morgan Chase & Co.*, 827 F. Supp. 2d 172 (W.D.N.Y. 2011) (court "should not impose some arbitrary cutoff, and refuse to approve a settlement amount that falls below a certain percentage of [a] purely theoretical recovery" even though Second Circuit had reversed summary judgment in defendant's favor); *In re Glob. Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 460-61 (S.D.N.Y. 2004) (approving settlement materially less than claimed damages); *Cagan v. Anchor Sav. Bank FSB*, 1990 WL 73423, at *12–13 (E.D.N.Y. May 22, 1990) (approving settlement that was less than 2% of the "best possible recovery").[19]

---

[19] *Accord Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th Cir. 1998) ("the proposed settlement is not to be judged against a hypothetical or speculative measure of what might have been achieved by the negotiators . . . Thus, 'the very essence of a settlement is compromise, a yielding of absolutes and an abandoning of highest hopes.'") (quoting *Officers for Justice v. Civil Serv. Comm'n,* 688 F.2d 615, 624-25 (9th Cir. 1982)); *In re Capital One Tel. Consumer Prot. Act Litig.*, 80 F. Supp. 3d 781, 789–90 (N.D. Ill. 2015) (approving settlement where recovery per claimant was $34.60 and noting that "Plaintiffs would indeed face myriad hurdles by proceeding to trial.").

## 2. The Proposed Claims Process Is An Effective Method Of Distributing Relief To The Class.

The Court must also evaluate "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims." Fed. R. Civ. P. 23(e)(2)(C)(ii). This factor requires the Court to consider whether the claims-processing method "facilitates filing legitimate claims." Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment. Here, the proposed method distributes funds to class members "in as simple and expedient a manner as possible." 4 *Newberg on Class Actions* § 13:53 (5th ed.).

The Settlement provides for the creation of a Common Fund, against which Class Members will be able to file Settlement Claims in order to receive a share of the recovery pursuant to an Allocation Decision applied by the Class Action Settlement Administrator. The various forms of notice to the Class provided for by the Settlement will contain the relevant instructions. Class Members simply download the Settlement Claim Form from the website administered by the Class Action Settlement Administrator (or request the form by phone via a toll-free number) and provide the facts required for the Class Action Settlement Administrator to verify class membership. Settlement Agreement ¶¶ 91-93. If additional information is required, the purported Class Member will be contacted by the Class Action Settlement Administrator. *Id.* ¶ 100. After all deadlines for receipt of Settlement Claims and evaluation of all Settlement Claim Forms, the Class Action Settlement Administrator will apply the Allocation Decision and Settlement Claim Review Protocol, and following the Final Effective Date, checks will be mailed to Class Members.[20] "The

---

[20] The mailing address data for class members is dated and incomplete, so simply mailing checks to purported class members (without a claim form) would not result in a fair distribution. Equally important, a claim form is necessary in order for claimants to establish their eligibility. The Class Action Settlement Administrator will, however, make reasonable efforts to deliver notices that are returned without a forwarding address and otherwise attempt to update addresses. Settlement Ex. 14 (Decl. of the Class Action Settlement Administrator) ¶ 20.

requirement that class members download a claim form or request in writing a claim form, complete the form, and mail it back to the settlement administrator is not onerous." *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prod. Liab. Litig.*, 2013 WL 3224585, at *18 (C.D. Cal. June 17, 2013); *see also* 4 *Newberg on Class Actions* § 13:53 (5th ed.) ("In general, merely requiring potential claimants to fill out a form in order to collect from the settlement fund is not considered cumbersome."); *In re WorldCom, Inc. Sec. Litig.*, 2004 WL 2591402, at *12 (S.D.N.Y. Nov. 12, 2004) ("The information that claimants are required to submit is necessary in order for a fair distribution of the settlement proceeds.").

Importantly, no portion of the Net Common Fund[21] will revert to New GM or the GUC Trust. Settlement Agreement ¶¶ 80.a, 81; *see, e.g.*, 4 Newberg on Class Actions § 13:53 (5th ed.) ("where a sum certain is disgorged from the defendant," the settlement "is more likely to be found fair, reasonable, and adequate"). Instead, the entire Net Common Fund will be distributed to eligible Settlement Claimants according to the terms of the Allocation Decision and Settlement Claim Review Protocol. *See* Settlement Agreement, Ex. 10 n. 1.

The Settlement Agreement also provides that current owners and lessees of Subject Vehicles may not receive a payment unless and until they have the applicable recall repair performed on their vehicle (to the extent not previously performed). Settlement Agreement ¶ 82. This requirement ensures that as many vehicles as possible receive the recall repair offered by New GM, consistent with New GM's commitment to customer safety as well as this Court's holding that these repairs mitigate the claimed economic loss damages.

---

[21] The Net Common Fund is defined in the Settlement Agreement as the "the funds remaining in the Common Fund after subtracting payments for all Settlement Implementation Expenses (as defined in Paragraph 80 below), as well as, if there is a Final Effective Date, after subtracting payments for any Plaintiff Incentive Awards (as defined in Paragraph 81 below)." Settlement Agreement ¶ 41.

### 3. Attorneys' Fees And Expenses Are Consistent With The Complexity And Duration Of The Litigation And With Awards In Similar Cases.

Rule 23(e)(2)(C)(iii) directs the Court to consider the terms of any proposed award of attorneys' fees. The Parties have agreed that Plaintiffs' Class Counsel will request approval of up to but no more than $34.5 million in Attorneys' Fees and Expenses to be paid by New GM after the Settlement's Final Effective Date or the expiration of any appeal period pertaining to the Court's award of Attorneys' Fees and Expenses, and New GM will not oppose an application for Attorneys' Fees and Expenses in that maximum amount. Settlement Agreement ¶¶ 90.d., 149. The foregoing fees are in addition to the $70 million New GM is paying into the common fund. But under no circumstances will New GM pay or be required to pay any amount greater than $34.5 million in Attorneys' Fees and Expenses, nor shall the GUC Trust be required to pay any amount for Attorneys' Fees and Expenses. *Id.* ¶ 149. These Attorneys' Fees and Expenses will be allocated by Plaintiffs' Class Counsel among all plaintiffs' counsel in the Actions and/or for work incurred that inured to the benefit to the Class, subject to approval by the Court. *Id.* ¶ 152. Given the duration and complexity of the litigation, the extensive briefing, and the number of expert witnesses as balanced against the litigation victories secured by New GM over the course of the litigation, these Attorneys' Fees and Expenses are reasonable. Finally, the attorneys' fees were negotiated at arm's length under the supervision of, and through, the Court-appointed mediator (Judge Phillips), separately from and only after an agreement in principal was reached on settlement payment to the Class.

For the sake of comparison, the proposed Attorneys' Fees and Expenses in this case are equivalent to 22% of the amount recovered by the Class.[22] This is well within the range approved

---

[22] Where, as here, the amount of the fee is in addition to the class recovery, "'[t]he ratio that is relevant to assessing the reasonableness of the attorney's fee that the parties agreed to is the ratio of (1) the fee to (2) the fee plus what the class members received.'" *See Camp Drug*

in recent years in various cases involving a similar size class recovery (*i.e.*, 20%–33% in settlements of roughly $100-130 million (inclusive of fees)). [23] It is also within the range approved in many consumer/products liability cases. *See, e.g.*, *In re: Takata Airbag Products Liab. Litig. – Ford Motor Co.*, No. 1:15-md-02599 (S.D. Fla. 2018) (awarding attorney's fees of 25.0%), Docket No. 3182.

Furthermore, the ratio of fees to the amount of recovery is just one of the "*Goldberg*" factors that courts in the Second Circuit consider in evaluating a fee:  "(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation ...; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations." *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 480 (S.D.N.Y. 2009) (quoting *Wal-Mart Stores, Inc. v. Visa USA Inc.*, 396 F.3d 96, 121-22 (2d.

---

*Store, Inc. v. Cochran Wholesale Pharm., Inc.*, 897 F.3d 825, 833 n.25 (7th Cir. 2018).

[23]   *See Pirnik v. Fiat Chrysler Automobiles, N.V.*, No. 1:15-cv-07199-JMF (S.D.N.Y. 2019) (awarding attorney's fees of 26.3% in a $110 million settlement), Docket No. 369; *In re Novartis Wage and Hour Litig.*, No. 1:06-md-01794-PAC (S.D.N.Y. 2012) (awarding attorney's fees of 28.0% in a $99 million settlement), Docket No. 214; *Cabot East Broward 2 LLC v. Cabot*, No. 0:16-cv-61218-WPD (S.D. Fla. 2018) (awarding attorney's fees of 33.3% in a $100 million settlement), Docket No. 301; *In re Starz Stockholder Litig.*, No. 12584-VCG (C.A. Del. 2018) (awarding attorney's fees of 30.0% in a $92.5 million settlement); *In re: Automotive Parts Antitrust Litig. – Automobile Dealership Actions*, No. 2:13-cv-01702-MOB (E.D. Mich. 2018) (awarding attorney's fees of 29.0% in a $115 million settlement), Docket No. 224; *Knurr v. Orbital ATK Inc.,* No. 1:16-cv-01031-TSE-MSN (E.D. Va. 2019) (awarding attorney's fees of 27.8% in a $108 million settlement), Docket No. 462; *In re Rite Aid Corp. Sec. Litig.*, 362 F. Supp. 2d 587 (E.D. Pa. 2005) (awarding attorney's fees of 24.9% in a $130 million settlement); *In re: Lithium Ion Batteries Antitrust Litig. – Indirect Purchaser Plaintiffs*, No. 4-13-md-02420-YGR (MDL) (N.D. Cal. 2020) (awarding attorney's fees of 25.7% in a $113 million settlement), Docket No. 2571; *In re Ins. Brokerage Antitrust Litig.*, No. 2:04-cv-5184 (GEB), (D.N.J. June 5, 2007), Docket No. 1185, and *In re Ins. Brokerage Antitrust Litig.*, No. 2:04-cv-5184 (FSH) (D.N.J. Feb. 16, 2007) (awarding attorney's fees of 24.9% in a $130 million settlement), Docket No. 1005. *See also* Theodore Eisenberg, Geoffrey Miller, and Roy German, *Attorneys' Fees in Class Actions: 2009-2013*, 92 N.Y.U. L. REV. 937, 947 (Oct. 2017).

Cir. 2005)).  By itself, the ratio is not necessarily an accurate indicator of procedural fairness, particularly in lengthy, complex, expensive litigation, where, as here, the amount ultimately recovered by the class accurately reflects a remote chance of recovery and does not suggest collusion.  Indeed, according to the Seventh Circuit, even fees that *exceed* the class recovery are not necessarily unreasonable:

> [W]e've said that a district court should compare attorney fees to what is actually recovered by the class and presume that fees that exceed the recovery to the class are unreasonable. . .  The presumption is not irrebuttable, however, and in this case the extensive time and effort that class counsel had devoted to a difficult case against a powerful corporation entitled them to a fee in excess of the benefits to the class.

*In re Sears, Roebuck and Co. Front-Loading Washer Prods. Liab. Litig.*, 867 F.3d 791, 793 (7th Cir. 2017) (remanding with directions to award $2.7 million where likely class recovery was $900,000).

The amount of attorneys' fees in this case is reasonable and supports the conclusion that the Settlement is more than adequate, fair and reasonable.

### D.     Class Members Are Treated Equitably By The Allocation Decision.

Amended Rule 23(e) instructs the Court to consider whether "the proposal treats class members equitably relative to each other."  Fed. R. Civ. P. 23(e)(2)(D).  "Matters of concern could include whether the apportionment of relief among class members takes appropriate account of differences among their claims, and whether the scope of the release may affect class members in different ways that bear on the apportionment of relief."  Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment.

"[I]n the case of a large class action the apportionment of a settlement can never be tailored to the rights of each plaintiff with mathematical precision."  *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 133 (S.D.N.Y. 1997), *aff'd*, 117 F.3d 721 (2d Cir. 1997) (*per curiam*).  Thus,

"while the plan of allocation must be fair and adequate, it need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel." *In re GSE Bonds Antitrust Litig.*, 414 F. Supp. 3d at 694 (internal quotations omitted); *see also In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 327 F.R.D. 483, 496 (S.D.N.Y. 2018) (same). Here, this factor is met because "similarly situated class members are treated similarly and [ ] dissimilarly situated class members are not arbitrarily treated as if they were similarly situated." 4 Newberg on Class Actions § 13:56 (5th ed.).[24]

"Ultimately, '[t]he goal of any distribution method is to get as much of the available damages remedy to class members as possible and in as simple and expedient a manner as possible.'" *In re LIBOR*, 327 F.R.D. at 496 (citing 4 Newberg on Class Actions § 12:15 (5th ed.) and *In re Credit Default Swaps Antitrust Litig.,* 2016 WL 2731524, at *9 (S.D.N.Y. Apr. 26, 2016) ("A principal goal of a plan of distribution must be the equitable and timely distribution of a settlement fund without burdening the process in a way that will unduly waste the fund.")); *see also In re GSE Bonds Antitrust Litig.*, 414 F. Supp. 3d at 695 (similar). The Allocation Decision achieves this goal and strikes "a reasonable balance between precision and efficiency." *In re LIBOR*, 327 F.R.D. at 496.

Class Counsel initially negotiated with New GM and the GUC Trust the maximum recovery that they could achieve for the entire class. "[A]ll class members share[d] an interest in maximizing the collective recovery." *In re Literary Works in Elec. Databases Copyright Litig.*,

---

[24] *Accord Hart v. RCI Hosp. Holdings, Inc.*, 2015 WL 5577713, at *12 (S.D.N.Y. Sept. 22, 2015) (stating that "a plan of allocation need not be perfect"); *In re Wachovia Equity Sec. Litig.*, 2012 WL 2774969, at *5 (S.D.N.Y. June 12, 2012) (stating that "'[a]n allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel") (quoting *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 344 (S.D.N.Y. 2005).

654 F.3d 242, 254 (2d Cir. 2011). At that point, Class Counsel recognized that the different recalls represented claims of varying strength—with, for example, the Delta Ignition Switch class members having the strongest claims—such that it was possible that class members' "interests diverge[d] as to the distribution of [the] recovery because each category of claim is of different strength and therefore commands a different settlement value." *Id.*

Accordingly, because the class members holding different strength claims based on their respective recalls would best be protected "by the formation of [ ] subclass[es] and the advocacy of independent counsel," *id.*, Class Counsel selected independent Allocation Counsel to represent the five subclasses comprising the types of recalls at issue. Phillips Decl. ¶ 33; Allocation Decision ¶¶ 5-6. Allocation Counsel are partners of members of Plaintiffs' Executive Committee already approved by this Court in Order No. 8. Docket No. 249; *see also* Phillips Decl. ¶ 33. A similar procedure for the appointment of Allocation Counsel was approved by the Third Circuit in *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 429–30 (3d Cir. 2016), *as amended* (May 2, 2016).

Allocation Counsel for each Subclass advocated on behalf of their respective Subclasses in arm's-length negotiations in a separate mediation before Judge Phillips, Phillips Decl. ¶ 34, with each "independent counsel pressing its most compelling case." *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d at 253. After receiving written and oral presentations from each Allocation Counsel, Judge Phillips developed the proposed Allocation Decision. Allocation Decision ¶ 7. Neutral parties such as "Special Masters are frequently used to assist settling parties and the courts in arriving at fair, adequate and reasonable plans of allocation and distribution." *Cf. In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 2013 WL 12333442, at *77 (N.D. Cal. Jan. 8, 2013), *report and recommendation adopted sub nom. In re Dynamic Random Access*

*Memory Antitrust Litig.*, 2014 WL 12879520 (N.D. Cal. June 27, 2014) (collecting cases).  Indeed,

in *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 246 F.R.D. 156, 170 (S.D.N.Y.

2007), the Court approved as fair and reasonable a plan of allocation that included a proposed

allocation of the settlement fund among twenty different class actions that Judge Phillips

recommended following briefing and argument by counsel.  *Id.* at 163 ("The allocation of the Net

Settlement Fund among the Actions was based on the recommendations of Judge Layn Phillips, a

retired United States District Judge, whom Lead Counsel retained to assist in formulating the Plan

of Allocation."); *see also In re Merrill Lynch Research Reports Sec. Litig.*, 2007 WL 7647452

(S.D.N.Y. June 28, 2007) (Lead Plaintiffs' Memorandum of Law in Support of Final Approval of

Proposed Class Action Settlement, Allocation Among Cases, and Plan of Allocation) (describing

how Judge Phillips, after reviewing competing submissions, issued a recommendation for

allocation of the settlement fund between the twenty actions subject to the Court's approval).

The Allocation Decision is based on Judge Phillips's evaluation of "the relative strengths

of the liability claims of each of the Subclasses."  Allocation Decision ¶¶ 5, 14; *see also* Fed. R.

Civ. P. 23 advisory committee's note to 2018 amendment (court should evaluate whether "the

apportionment of relief among class members takes appropriate account of differences among their

claims").  For example, Judge Phillips found that Subclass 1 (the Delta Ignition Switch Subclass)

"has a materially better case on liability than any of the other Subclasses and is therefore entitled

to a 2X multiplier."  Allocation Decision ¶¶ 19-21 (finding that higher awards for Subclass 1 were

supported by New GM's admissions in the Statement of Facts attached to the DPA).  Judge Phillips

likewise found that Subclass 2 (the Key Rotation Subclass) had made a "credible case that using

the evidence developed with respect to Subclass 1, it can piece together a liability case" based on

alleged "similarity between the ignition switches in the Subclass 1 and Subclass 2 vehicles" and

Old GM's and New GM's alleged "cross-platform knowledge." *Id.* ¶¶ 22-23. He accordingly found that Subclass 2 should receive a 1.5 multiplier. Finally, Judge Phillips found that Subclasses 3, 4, and 5 "have weaker liability cases than Subclasses 1 and 2" and therefore should not receive any multiplier. *Id.* ¶¶ 19, 24-29 (discussing why those subclasses had weaker liability cases than Subclasses 1 and 2); *see also* Settlement Claim Review Protocol n.1 (describing allocation formula).[25]

Because Rule 23(e)(2)(D) requires that a class action settlement "treat[] class members equitably relative to each other," it is appropriate for a plan of allocation to reflect the strengths and weaknesses of the various claims and "to allocate more of the settlement to class members with stronger claims on the merits." *See In re Oracle Sec. Litig.*, 1994 WL 502054, at *1, at *3 (N.D.Cal. Jun. 18, 1994)); *see also Maley v. Del Global Technologies Corp.*, 186 F. Supp. 2d 358, 367 (S.D.N.Y. 2002) (plan of allocation that was "devised by experienced plaintiffs' counsel who are familiar with the relative strengths and weaknesses of the potential claims of Class members" satisfied the same standards of fairness, reasonableness, and adequacy that applied to the overall settlement); *In re Nasdaq Market-Makers Antitrust Litig.*, 2000 WL 37992, at *2 (S.D.N.Y. Jan. 18, 2000) (allocation formulas, such as the use of weighting factors, are "an appropriate means to reflect the comparative strength and value of different categories of claim"); *In re American Bank Note Holographics, Inc.*, 127 F. Supp. 2d 418, 430 (S.D.N.Y. 2001) (finding that plan of allocation was reasonable where it "result[ed] from detailed assessments of the strengths and weaknesses of the claims asserted, the applicable damages, and the likelihood of recovery").

---

[25] Judge Phillips declined to attempt to differentiate among the subclasses on the basis of relative alleged damages, given the Court's rejection of Boedeker's damages opinion. Allocation Decision ¶ 18.

Finally, this is not a case like *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 627 (1997) or *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 856-57 (1999), where the "release applies to future claims and claimants, and disadvantaged class members are bound to it." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d 223, 240 (2d Cir. 2016). Instead, here, all Class Members are seeking compensation for alleged past economic losses due to the recalls and are thus identically situated with respect to the Release.

## III.   THE PROPOSED SETTLEMENT SATISFIES THE *GRINNELL* FACTORS.

Most of the factors identified in *Grinnell* overlap with the considerations identified in Rule 23(e)(2) discussed above. Two additional factors weigh in favor of settlement approval and warrant further discussion here:

### A.   The Stage Of The Proceedings Supports Approval Of The Settlement.

This factor—which addresses "whether the parties had adequate information about their claims" in order to value the settlement, *see In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 458 (S.D.N.Y. 2004)—undoubtedly favors preliminary approval. This Court has already found that after "five-plus years of litigation . . . the parties should have enough data to agree on a settlement value for this litigation." 12/12/2019 Order at 33 (Docket No. 7616). Counsel's assessment of the value of the Settlement is also informed by this Court's detailed analysis of their claims in numerous opinions. *See* Background Part F, *supra.* It is also informed by rulings of the Bankruptcy Court, which in the last few years has rejected earlier, bilateral attempts to settle potential claims against the GUC Trust and has made clear its belief that the Parties should consider global settlement. *See* 8/12/2019 Bankr. Tr. at 56:16 (stating to counsel for the GUC Trust, "I hope you'll go back to mediation.").

## B.    No Class Could Be Certified For Trial.

The claims of the Rule 23(b)(3) classes proposed by plaintiffs in the MDL and Bankruptcy Court could not be certified for trial.  As plaintiffs told the Second Circuit, this Court's Order "[s]triking conjoint damages also greatly alters the landscape for the pending motion for class certification in the bellwether states because the district court held that Plaintiffs have no evidence of class-wide overpayment."  *See* Pls.' Pet. for Interlocutory Appeal, at 11.  The need to prove any alleged damages on an individual basis is just one factor that would make a class trial unmanageable.  For example, in their motion for class certification, plaintiffs proposed a single trial of 23 separate classes and subclasses applying the differing laws of 3 states, involving 7 distinct recalls involving 160 different vehicle models, under 7 counts, each with their own varying elements, and with diverse bases for claims against New GM, such as direct liability, successor liability, and novel Bankruptcy-Claim-Fraud counts.  Pls. Mot. for Class Certification, Docket No. 5845 at 1-12; Pls.' Mem. ISO Mot., Docket No. 5846 at 36.  Any jury would be hopelessly confused by attempting to apply so many different legal standards to the different facts of each recall, which would be compounded by determining the individual facts for each named plaintiff.  These manageability problems, however, are irrelevant to the settlement classes proposed by the Parties.  *See Amchem Prods.*, 521 U.S. at 620 ("Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, *see* Fed. R. Civ. Proc. 23(b)(3)(D), for the proposal is that there be no trial.").

According to plaintiffs, without class certification, it would be impossible for plaintiffs to recover:  "the courthouse doors will be closed to almost all of these consumers unless a Class is certified."  Docket No. 5846 at 2.  Thus, because no class could be certified for trial, without the

proposed Settlement, the named individual plaintiffs know they would likely recover nothing, and the absent putative class members would recover nothing.

The Bankruptcy Court claimants face the same barriers to certification of a litigation class. Without certification, the named claimants could not file a class proof of claim against the GUC Trust and could not possibly meet the $35 billion threshold necessary in order for New GM to be required to pay any Adjustment Shares to the GUC Trust. Thus, absent the proposed Settlement, each individual plaintiff would be required to litigate its right to file a later claim against the GUC Trust (which it is unlikely to be able to prove). The proposed Settlement is the only way these plaintiffs can recover anything from New GM and Old GM.

In short, the Court's August 2019 summary judgment ruling, reaffirmed last December, not only foreclosed plaintiffs' principal claim of damages, it doomed any hope of a class recovery in both this Court and the Bankruptcy Court. Given these fundamental barriers to recovery, this Court should find that the proposed Settlement is fair, reasonable, and adequate, and grant the Parties' motion for preliminary approval.

## CONCLUSION

This Court and the Bankruptcy Court have recognized that it is in the Parties' best interests to settle the economic loss claims. This Court is intimately familiar with the facts and claims in this case and has ample basis to find that it "will likely be able to" approve the proposed Settlement Agreement as fair, reasonable and adequate. *See* Fed. R. Civ. P. 23(e)(1)(B)(i). Accordingly, New GM respectfully requests that the Court grant the parties' motion for preliminary approval of the proposed Settlement Agreement.

Respectfully submitted,

Dated March 27, 2020:                    /s/ Richard C. Godfrey, P.C.

Richard C. Godfrey, P.C.
Wendy L. Bloom
Andrew Bloomer, P.C.
Mark J. Nomellini
KIRKLAND & ELLIS LLP
300 N. LaSalle
Chicago, IL  60654-3406
Phone:  312-862-2000
Fax:  312-862-2200
richard.godfrey@kirkland.com
wendy.bloom@kirkland.com
andrew.bloomer@kirkland.com
mark.nomellini@kirkland.com

*Attorneys for Defendant General Motors LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on March 27, 2020, I electronically filed the foregoing using the CM/ECF system which will serve notification of such filing to the email of all counsel of record in this action.

By: /s/ *Richard C. Godfrey, P.C.*

Richard C. Godfrey, P.C.